UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK

JGK 08/18/2017
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

```
----------------------------X
                            :
PLAINTIFFS 1-21,            :
                            :    15-CV-2431 (ADS)(GRB)
            Plaintiff,      :
                            :    June 30, 2017
                            :
        V.                  :    Central Islip, NY
                            :
COUNTY OF SUFFOLK, et al.,  :
                            :
            Defendant.      :
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT AND RULING
BEFORE THE HONORABLE GARY R. BROWN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          MALLORY BRENNAN, ESQ.


For the Defendant:          ADRIANA LOPEZ, ESQ.
                            SCOTT GREENE, PRO SE



Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1                 THE CLERK:  Calling case 15-CV-2431,
 2     Plaintiffs 1-21 v. County of Suffolk, et al.
 3                 Counsel, please state your appearance for
 4     the record.
 5                 MS. BRENNAN:  Good morning.  This is Mallory
 6     Brennan from Shearman & Sterling, on behalf of
 7     plaintiffs 1 through 21.
 8                 THE COURT:  Would you like to introduce
 9     anyone else who's here on your behalf?
10                 MS. BRENNAN:  I would be delighted to.
11                 THE COURT:  Go ahead.
12                 MS. BRENNAN:  This is my colleague, James
13     Alicia (ph), also from Shearman & Sterling.
14                 THE COURT:  Welcome back.  Go ahead.
15                 MS. BRENNAN:  And Joanna Cuevas Ingram, who
16     joins us from Latino Justice, also on behalf of the
17     plaintiffs.
18                 THE COURT:  Excellent.  Thank you for
19     coming.
20                 Counsel?
21                 MS. LOPEZ:  Good morning, your Honor.  My
22     name is Adriana Lopez.  I'm here on behalf of Suffolk
23     County and i8 represent the Suffolk County defendants,
24     not Mr. Greene.
25                 THE COURT:  Ms. Lopez, good to see you
```

1  again.

2            MS. LOPEZ:  Thank you, Judge.

3            THE COURT:  Mr. Greene, are you on the phone

4  with us this morning?

5            MR. GREENE:  Yes, sir, I am.

6            THE COURT:  Very good.  I will note your

7  presence.

8            Ms. Lopez, thank you for arranging that.

9            MS. LOPEZ:  No problem, your Honor.

10           THE COURT:  This is on for a status

11  conference.  The main issue I would like to deal with

12  today would be the application by plaintiffs concerning

13  the protective order on the immigration issue.

14           Would you like to be heard on that?

15           MS. BRENNAN:  I would, thank you.  I'm

16  prepared to go ahead if the Court is.

17           THE COURT:  Please.

18           MS. BRENNAN:  May it please the Court.

19  Again, Mallory Brennan from Shearman & Sterling on

20  behalf of plaintiffs.

21           The relief that plaintiffs seek in the

22  motion for a protective order is narrow but it is

23  extremely important.  The purpose of the motion is to

24  prevent plaintiffs from being questioned during

25  depositions about matters that go directly to

1  immigration status.  There are three reasons that the

2  Court should grant the motion today.  First, as I

3  mentioned, the scope of the relief that's requested is

4  in fact quite narrow.  There are only four specific

5  categories of inquiry that we believe should be

6  precluded from discovery.

7            THE COURT:  Okay, go ahead.

8            MS. BRENNAN:  Second, these inquiries are

9  irrelevant to any material claim or defense in this

10  case.  Plaintiffs are pursuing claims for violation of

11  their constitutional and civil rights based on racial

12  and ethnic discrimination, not based on their

13  immigration status.  Finally, the substantial chilling

14  effect that is widely recognized, caused by inquiries

15  into immigration status, far outweighs whatever value

16  questions about plaintiffs' status might yield.

17            With respect to the specific categories, I

18  think it's important that we be clear about what

19  plaintiffs are requesting and what we are not

20  requesting.  There are four specific categories as to

21  which we believe discovery should be precluded.

22            First, questions that go directly to

23  immigration status.  So questions such as, are you

24  concerned about your immigration status, or, do you

25  have a green card, should not be permitted.

1          Second, questions that are directed to

2     separate immigration proceedings such as an application

3     for an adjustment of status.

4          Third, questions that are directed to a

5     plaintiff's or witness' entry into the United States,

6     so when did you come, how long have you been here, how

7     did you enter the country, how many times have you been

8     in the United States.

9          Then finally, questions concerning Social

10    Security numbers, tax i.d. numbers or employment

11    authorization.

12         All four of those categories go directly to

13    immigration status.  That are the types of inquiries

14    that courts in this district and elsewhere routinely

15    prohibit.  I just want to be quite clear that in

16    defendants' opposition, there was the suggestion that

17    plaintiffs are seeking to prohibit discovery from any

18    matter that might touch on immigration in any way, and

19    that that would be a limiting factor to defendants in

20    pursuing their claims, and that is not the scope of

21    relief that plaintiffs are seeking here.

22         THE COURT:  I can't say I would blame

23    counsel if the precise contours were not that clear

24    because the iterative process by which this developed

25    does leave some questions.  Before I let you walk away

1    from that point --

2              MS. BRENNAN:  Certainly.

3              THE COURT:  Your fourth category, Social

4    Security numbers, employment authorizations, do you

5    consider motor vehicle licenses in the same category?

6              MS. BRENNAN:  No, we don't.  We consider

7    that to be distinct.  So, too, for example with vehicle

8    registration.  I believe that the defendants had

9    suggested that plaintiffs were seeking to preclude

10   testimony about names that plaintiffs may have used.

11   It's common in the Latino community for individuals to

12   have multiple names as opposed to just the two or three

13   that might be common outside of that community, and

14   plaintiffs aren't seeking to prohibit any of that

15   discovery.  In fact, though I appreciate that the Court

16   does not have the full record from the depositions that

17   have taken place to date in this case.

18              Defendants' counsel, however, was present

19   and the only questions where plaintiffs were instructed

20   not to answer are questions that fall into the

21   categories that I've articulated here.  So this is not

22   -- we're not trying to make it impossible for

23   defendants to prove their case.  We're just trying to

24   get an appropriate degree of protection so that

25   plaintiffs are comfortable pursuing their

1 constitutional rights.

2     If there are no further questions with

3 respect to the categories, I'll turn to my second

4 point, which concerns the irrelevance of immigration

5 status to the claims and defenses in the case.  As I

6 explained and as is apparent on the face of the

7 complaint, plaintiffs are pursuing claims for

8 discriminatory police practices based on their ethnic

9 heritage, based on their race, not based on immigration

10 status.

11     Simply put, there's just no way that you can

12 look at a person, whether they're of Latino heritage or

13 any other ethnic background, and evaluate whether they

14 are American citizens, whether they're in this country

15 illegally.  You can't know that on site.  So

16 plaintiffs' allegations here are directed to -- if you

17 look in the complaint, for example, nearly fifty times,

18 we allege that Suffolk County Latinos have been targets

19 of discriminatory police practice, and I quote, "solely

20 because they are Latino."

21     Indeed, the only allegations in the

22 complaint that anywhere mention undocumented status or

23 immigration status concern the defendants' own

24 perceptions and racial profiling based on assumptions

25 which we contend derive from plaintiffs' Latino

1 heritage.  So to the extent that there is any discovery

2 that is even worthwhile touching on immigration status,

3 it should be with respect to defendants' own

4 perspectives and beliefs, not with respect to whether

5 or not plaintiffs are undocumented.

6          I'd like to touch briefly on the defenses

7 that defendants contend they will be limited from

8 pursuing if the Court grants plaintiffs' motion.

9 First, the Suffolk County defendants contend that they

10 will seek to establish that defendant Greene was a

11 rogue actor and that he was targeting plaintiffs

12 because he believed that Latino motorists were more

13 likely to be undocumented, unlicensed, and therefore

14 unlikely to file complaints with the Suffolk County

15 Police Department about his conduct.  Again, that goes

16 to defendant Greene's own beliefs and perceptions, not

17 whether plaintiffs are or are not undocumented.

18          With respect to defendants' contention that

19 they shouldn't be -- that the Suffolk County defendants

20 couldn't possibly be expected to investigate crimes or

21 concerns that weren't reported to them, that simply

22 misconstrues the complaint in this case.  We're not

23 alleging that they should have been clairvoyant, we're

24 alleging that they should have had better systems in

25 place to monitor and that they failed to investigate

1    claims that were actually reported.

2              In any event, that issue is something of a

3    side show because plaintiffs, when questioned about

4    whether they were afraid to report their experiences

5    with defendant Greene or other of the John doe

6    defendants, have answered that question.  So we're not

7    seeking to preclude the county from inquiring about

8    whether defendants were afraid, only from going so far

9    as to inquire as to immigration status.

10              Finally, defendants make the point in their

11   opposition a couple of times that they should be able

12   to inquire into immigration status because it goes to

13   plaintiffs' credibility.  That is simply not sufficient

14   justification for discovery into immigration status.

15              THE COURT:  You had me at hello on that

16   particular argument.

17              MS. BRENNAN:  All right.  I will move on

18   then.  I'll move on to my final point, which is that

19   the substantial effect of inquiries into immigration

20   status far and away outweighs whatever probative value

21   defendants think that they might gain from making

22   inquiries into that subject matter.

23              Magistrate Judge Pollack in the Eastern

24   District put it this way in Wejaja v. King UUSA (ph).

25   She recognized that as a starting point, discovery into

immigration status is not normally available.  This is

because the fear and intimidation that's created by

having to answer questions about immigration status is

a real issue.  It's a real concern.  The Ninth Circuit

put it this way in <u>Rivera v. Nibco</u> (ph).  If discovery

into immigration status was permitted in every civil

rights case that asserts claims based on race

discrimination or ethnic heritage, there would be broad

swaths of viable actions that would never be brought

because of the intimidation effect, and that's the

balance that plaintiffs ask this Court to find falls in

favor of them.

           To conclude, your Honor, given that the

scope of the protection that the plaintiffs seek is

limited and the significant impact and intimidation

that these kinds of inquiries into immigration status

has on the plaintiffs, we request that the Court grant

the motion.  I'd be happy to answer any questions that

you might have.

           THE COURT:  I have a few.

           MS. BRENNAN:  Please.

           THE COURT:  It should be noted that I think

the world of Judge Pollack, so I always pay attention

when someone cites her to me.  What kind of case was

that, do you know?

```
 1              MS. BRENNAN:  The Wejaja case I believe was
 2   a Fair Labor Standards Act case.
 3              THE COURT:  Okay.
 4              MS. BRENNAN:  I would note that with respect
 5   to that -- I believe that defendants suggested that
 6   that's a different kind of case and that for some
 7   reason, the standards wouldn't apply, but that's simply
 8   not the case.  The Southern District of New York
 9   addressed that very question in the case Tapa v. Deer
10   (ph).  There, the court explained that the key question
11   is one of relevance.  It's not whether it's a Fair
12   Labor Standards Act case or it's an Alien Tort Claims
13   Act case, it's a matter of relevance.
14              THE COURT:  So the one argument that the
15   County made that I didn't hear you address was the
16   notion that there could be sub-classes, given that you
17   have a class action here, that the impact of the
18   complained-of conduct could affect citizens,
19   naturalized citizens, lawful permanent residents, those
20   with work authorizations and those without differently.
21   What about that?
22              In other words, doesn't the County have the
23   right to know sort of what they're facing in the trial
24   here?  In other words, don't they have the right to
25   know if there are different groups for whom different
```

1    relief might be called for, or for some groups that

2    might not be classes, in other words that may not

3    qualify as a class because they're not numerous?  Don't

4    they have that right and how do we address that if we

5    don't do it this way?

6          MS. BRENNAN:  I think the answer to that

7    question is pretty straightforward.  The plaintiffs in

8    this case are suing on behalf of Latino residents in

9    Suffolk County.  As I mentioned before, there's no way

10   you can look at a person who you might perceive to be

11   of Latino heritage and evaluate whether that person is

12   documented, undocumented, a naturalized citizen, in the

13   process of becoming naturalized.

14          Those are really distinctions without a

15   difference for purposes of these claims, because the

16   source of the discrimination doesn't have anything to

17   do with immigration status.  So without getting too far

18   into details about whether all plaintiffs and witnesses

19   in this case are documented or undocumented, it doesn't

20   really make a difference.  That's not a basis to

21   distinguish among the class.  I think to the extent

22   that -- I would note that defendants don't really

23   explain why it would make a difference.  There's

24   nothing in the complaint --

25          THE COURT:  I will agree with you that I

```
 1  don't think it was articulated but I think I can
 2  explain why.  In your complaint, and I cite to page 61
 3  of the complaint, you seek U visa authorization or U
 4  visa certifications for what must be by definition some
 5  plaintiffs.  In other words, you're looking for
 6  specific immigration relief.  Doesn't that fact
 7  distinguish this case from any of the cases you've
 8  cited to me?  I couldn't find another case where
 9  immigration relief was sought as part of the complaint
10  and yet plaintiffs' counsel said, immigration status is
11  irrelevant and prejudicial and you can't inquire into
12  it.  How can I reconcile those two concepts, counsel?
13         MS. BRENNAN:  I think the answer to that
14  question is that to the extent there are plaintiffs for
15  whom U visa applications have not already been
16  completed, that that is the kind of relief that can be
17  addressed separately and wouldn't necessarily be sought
18  on behalf of the entire class because to your point --
19         THE COURT:  Right.
20         MS. BRENNAN:  -- it's not the kind of thing
21  that lends itself to class-wide relief.  I think it's
22  the same with respect to remuneration for monies that
23  were taken from certain of the plaintiffs by defendant
24  Greene.  That, too, is not necessarily the kind of
25  relief that would be on a class-wide basis because, for
```

1   example, those who have experienced discrimination

2   through targeted checkpoints that were designed to

3   target Latino communities or by the failure to

4   investigate complaints lodged by Latinos, they're not

5   going to be participating in the efforts to recover

6   funds.

7          THE COURT:  I would still point out to you

8   that if the U visa relief remains, at some point, the

9   question must be asked regarding anonymous plaintiffs 1

10   through 21, please raise your hand if you'd like a U

11   visa.  That's the same as asking them if they're

12   documented or not, is it not?

13          MS. BRENNAN:  Not in the context of a

14   deposition, your Honor.

15          THE COURT:  No, but at some point --

16          MS. BRENNAN:  Yes.  At some point, to the

17   extent there are named plaintiffs who have not yet had

18   the opportunity to apply for a U visa application,

19   which in fairness concerned the separate criminal

20   proceeding that was brought against defendant Greene.

21   And to the extent that at the conclusion of the case,

22   there are additional plaintiffs who have not yet made

23   that application, then there would need to be a process

24   through which they could do so, but we think that that

25   can be addressed separately.

```
1              THE COURT:  So really your argument then is

2    not that substantively, this question can never be

3    asked.  You're just arguing when and where and how it

4    should be asked.  Is that fair?

5              MS. BRENNAN:  Yeah, I think that's a fair

6    distinction.

7              THE COURT:  Okay.

8              MS. BRENNAN:  If we get to the point where

9    liability is found and it becomes appropriate for a U

10   visa application to be submitted, I think that we can

11   take it up then.

12             THE COURT:  Okay, but then we have to take

13   one more step.  And when you represent to me here --

14   you're arguing -- you're doing a fine job, counsel, and

15   I'm not criticizing you.  And it's a big case and

16   there's a lot of paper and you've got to go through a

17   lot of things.  But when you say to me, Judge, we're

18   just about people who, I think the argument is looked

19   or appeared to be Latino and how they were treated,

20   which actually raises an interesting question about

21   somebody who is actually not Latino but appears to be,

22   but that's a question for another day and far above my

23   pay grade, so I'm glad to say we're not going to talk

24   about that today.

25             But when you say that the allegations don't
```

1  have anything to do with status, it makes me look at

2  the complaint, and I will give you one example, and

3  there are many.  Paragraph 141:  You say, upon

4  information and belief, the 2007 directive -- I know

5  you all know what that means -- the directive to arrest

6  all unlicensed drivers has led to the racial profiling

7  of undocumented Latino immigrants driving on Suffolk

8  County roads.  It's part of your story.  It's part of

9  the allegations you made that the licensing val non of

10  individuals led to a discriminatory practice as against

11  undocumented Latinos.  With that in mind, how can I

12  deny the County to make some kind of inquiry in that

13  area?

14          MS. BRENNAN:  I think paragraph 141 is a

15  good example of where it is the defendants' intent,

16  it's the County's intent and their perception and their

17  understanding and their apparent belief that Latino

18  motorists are more likely to be undocumented immigrants

19  than a perceived non-Latino motorist.  That's what's

20  relevant in paragraph 141.

21          I think the other thing to bear in mind is

22  that even there is some marginal degree of relevance as

23  to documented versus undocumented status, that is not

24  material to plaintiffs' claims or defendants' defenses

25  in this case.  It's a collateral issue at best and the

1    case is clear -- notably, defendants cite nothing to

2    the contrary -- that even if there is some degree of

3    relevance of immigration status to collateral issues in

4    the case, that does not outweigh the chilling effect

5    that those kinds of inquiries have on plaintiffs who

6    are trying to defend their constitutional rights.

7              THE COURT:  Okay, good, thank you.

8              MS. BRENNAN:  Thank you.

9              THE COURT:  Ms. Lopez, the ball is in your

10   court.

11             MS. LOPEZ:  Thank you, your Honor.  I

12   respectfully disagree with plaintiffs' counsel.  I

13   think immigration is material in this case.  As the

14   Court indicated, there are various paragraphs in the

15   complaint that specifically indicate that -- they talk

16   about undocumented immigrants living in Suffolk County.

17             In our letter, we cited to paragraph 78 of

18   the complaint, which pretty much says, in my own words,

19   that former Sergeant Greene and others from the Suffolk

20   County Police Department had a policy and practice in

21   place where they would target undocumented immigrants,

22   Latinos specifically, because they were under the

23   belief that they would be vulnerable, they will not go

24   to law enforcement, they wouldn't report the crime,

25   they were an easy target and, therefore, it was an easy

1  way to steal money from them.  They didn't say that it

2  was only Greene.  They mentioned the police department

3  in general, your Honor.

4          Based on that, I do again state that

5  immigration is material in this case.  It's not just a

6  collateral matter and the County shouldn't be precluded

7  from asking those questions because I think they go to

8  our defense, which is, the County doesn't have a policy

9  that discriminated against Latinos and to rob and steal

10 from them, it was Mr. Greene, the one who had this

11 scheme going on.  He knew who he was targeting, he knew

12 where he was going, he knew who he could go get and he

13 knew who was not going to say anything to the police

14 department because he was their own.  Who were they

15 going to believe, the victim, who is here undocumented,

16 against a fellow police officer who was doing this?

17 No, he knew what he was doing.

18          So yes, we should be entitled to ask those

19 questions based on that.  However, Judge, the one thing

20 that I find interesting in this case is that counsel

21 has said that we shouldn't be asking about, do you have

22 a green card, when did you enter the United States, how

23 did you enter the United States, do you have a Social

24 Security number?  Those questions really haven't been

25 asked during the depositions, your Honor.  The way that

1   we have been asking questions is more about background.

2   We asked about, how long have you been in the United

3   States?  Why?  Because we want to set a time frame as

4   to when they have been residing in Suffolk County.

5          Perhaps we should have started by, how long

6   have you been a Suffolk County resident, and then, have

7   you lived in any other counties, have you lived in any

8   other states?  And we have done that.  Then we go to

9   the question as to, how long have you been in the U.S.?

10  Why?  Because we want to establish a time frame.

11  You've been here for fifteen years?  Great.  Did you

12  come to New York State from the start or were you

13  living in other places?

14         The reason why we were asking those

15  questions is because in some of these cases when they

16  have been pulled over, the vehicles have been

17  registered in Texas, they have been registered in

18  Virginia.  There's connections to other states.

19  Therefore, we want to know, one, have you ever been in

20  Texas or Arizona, whatever other state you have ever

21  been to, and how long?  And if you have, have you ever

22  had any encounters with law enforcement?  Why?  Because

23  we want to know if they have been pulled over, if they

24  have been issued traffic violations and things of that

25  sort, which again relates to the complaint.  They're

1    saying that every time they have been pulled over in

2    Suffolk County is because they are Latino, they have

3    been targeted and there was no basis for the stop.

4    Those have been our questions, your Honor.

5              I do admit that we did ask about the status

6    of their U visa application.  The reason why we asked

7    those questions is because during discovery, they gave

8    us not the U visa application that was submitted.  They

9    only gave us the certification that was signed by the

10   law enforcement, by Suffolk County or the ADA who

11   prosecuted the case.  Based on the fact that they

12   produced that, they gave it to us, we asked, what's the

13   status?

14             Now the Court might ask, why do you ask

15   about the status of the U visa application?  Because it

16   lends to -- when you get a U visa approved, you get a

17   Social Security number and you get employment

18   authorization, which connects to what the Court asked,

19   what about the driver's license issue?  Because if you

20   have a Social Security number, you will be able to get

21   a driver's license.  If you have a driver's license,

22   then you shouldn't be getting tickets for operating a

23   vehicle without a license.  So there is a connection to

24   the questions that we have asked, Judge.

25             We have not been intimidating, we have not

1    been harassing, we have not at any point in time asked,

2    have you ever been deported, have you ever been placed

3    in immigration proceedings?  Have you ever been

4    arrested by ICE, did you cross the border, was it

5    through a visa, did you fly in, did you cross the

6    river, have you ever been -- did you pay a sponsor to

7    come in?  Those questions haven't been asked.  Perhaps

8    we could be able to ask those questions but we haven't

9    because we don't need that at this point.  For them to

10   say that we cannot ask about -- preclude us completely

11   from asking any background information is just not

12   correct.  We should be entitled to present our defense.

13           I wanted to address also about the fact -- I

14   wanted to make another point, Judge.  I think in

15   probably two of the depositions, we haven't even asked

16   the plaintiffs, where were you born, which I think we

17   shouldn't be precluded from asking that question,

18   either.  I mean at the end of the day, they are

19   claiming that they're Latinos.  And yes, you can be

20   Latino and born in the United States or like me.  I was

21   born in Colombia and I'm a U.S. citizen, but yet we

22   should be entitled to ask those basic questions because

23   they do have to prove that they're Latinos and they

24   haven't.  So again, our depositions haven't been

25   aggressive.  We have not been intimidating the

1   plaintiffs.  We just have been asking the questions

2   that I think needed to be asked in order to set forth

3   our defense.

4            As far as the sub-classes that the Court

5   touched upon, and it was one of the points that we're

6   bringing is that they want to certify a class of all

7   Suffolk County residents that are Latinos who somehow

8   may or perhaps in the future may be discriminated

9   against by the police department.  Our argument is that

10  that definition as is is over-broad because this case

11  at this point has only established that the people that

12  Greene was targeting were those people who were

13  vulnerable and didn't have documents in the United

14  States.

15           If that is the case, I'm part of the class,

16  Judge.  I'm a Suffolk County resident, always have

17  been, and I'm Latina, and I have never had an

18  interaction with the police department.  So we should

19  be entitled to ask those questions.

20           THE COURT:  That touches on an interesting

21  topic.  I'm going to throw one more question your way

22  and then I want to hear from Mr. Greene if he has

23  anything to add.  I mentioned earlier that there could

24  be people in the world that may be notified here who

25  appear to be Latino but are not, in other words born in

1  the Ukraine, the family has been in the Ukraine for a

2  thousand years but happens to appear to be Latino.  I

3  mentioned the question before about whether that person

4  could be a class member and I don't know the answer.

5  But assuming the answer is no, isn't that another basis

6  for inquiring as to the sort of bona fides of whether a

7  particular plaintiff is in fact Latino or identifies as

8  Latino, and aren't all these questions relevant to

9  that?

10          MS. BRENNAN:  I think the answer to your

11  first question is yes and to your second question is --

12          THE COURT:  Meaning that if I'm born in the

13  Ukraine, I still can qualify as a the plaintiff?

14          MS. BRENNAN:  No, I had forgotten about that

15  question.

16          THE COURT:  Sorry.

17          MS. BRENNAN:  The class is limited to those

18  of Latino heritage who are resident in Suffolk County.

19          THE COURT:  How do we know then?

20          MS. BRENNAN:  I think -- none of the

21  questions that we're seeking to preclude go to self-

22  identification of race, go to the origin, ethnicity,

23  country of origin.  That's not on the list of questions

24  that we're seeking to preclude.  We have given no

25  instructions in depositions.  To the extent that

1    defendants have asked questions about country of

2    origin, we haven't told our clients not to answer those

3    questions.  So there's something of a red herring

4    there.  That's nothing that we're trying to preclude

5    from discovery here.

6              THE COURT:  So to be clear, if Ms. Lopez

7    asked the question, where were you born, you were fine

8    with that?

9              MS. BRENNAN:  We recognize under the

10   circumstances of the nature of the class on whose

11   behalf we are suing that that is a relevant inquiry.  I

12   will say that there are distinctions that are drawn

13   between race/national origin.

14             THE COURT:  Sure.

15             MS. BRENNAN:  But without getting into the

16   finer points of those issues, that question is not on

17   the list of questions that we're seeking to preclude.

18             The other thing that I would add is that Ms.

19   Lopez's colloquy about driver's license and states of

20   registration and different plates and all of that

21   information, again, those questions are not on the list

22   of topics that we're seeking to preclude here, so

23   there's simply no basis for defendants' position that

24   plaintiff's motion would somehow impact their ability

25   to discover that information.  If they'd like to ask

1  how long a witness has been resident in Suffolk County,

2  they're welcome to do so.  We're not instructing our

3  clients not to answer those questions.  The scope of

4  relief that we're seeking here is very limited.

5          The last point that I would just add on that

6  note is that defendants have asked at least one witness

7  -- let me get the direct quote -- "you currently do not

8  have a green card, is that correct?"  That is an

9  example of questions that should be precluded in this

10  case.

11          THE COURT:  All right, thank you.

12          Mr. Greene, do you have anything you want to

13  add on this issue?

14          MR. GREENE:  No, sir.  As I've said before,

15  I feel as though I'm at a disadvantage.  So to try to

16  preclude or ask anything -- I don't want to overstep my

17  bounds.  So at this time, I'll just take in the

18  information but right now, I have no questions here.

19          THE COURT:  Okay, thank you, sir.  I

20  appreciate that.

21          MR. GREENE:  Thank you.

22          THE COURT:  I'm going to take one minute to

23  just check something.  I'll be right back and then I

24  think I'm going to be in a position to rule on this, so

25  stand by.

1           (Tape off, tape on.)

2           THE COURT:  I've read all the papers, I've

3    listened to counsel's arguments, all of which were very

4    well done, and I'm prepared to issue a ruling on this

5    question.

6           Before the undersigned is an application by

7    plaintiffs for a protective order "prohibiting the

8    County of Suffolk and other defendants from questioning

9    plaintiffs or other protected individuals on matters

10   related to immigration status."  That's DE-91 on page

11   1.

12           This issue apparently crystalized during the

13   deposition of one of the plaintiffs on January 12,

14   2017.  After a handful of questions, counsel for the

15   County asked the witness, "How long have you lived in

16   the United States?"  That's DE-83-1 at page 10.

17           Counsel for plaintiffs interposed an

18   objection and instructed the witness not to answer.

19   The situation quickly devolved -- a word I do not use

20   in a pejorative sense, just an observational sense, but

21   it devolved into a debate among counsel about the

22   propriety of inquiring into the immigration status of

23   the witness or asking any question that could

24   potentially bear on that issue.  If anyone wants to

25   read that, it's at pages 10 to 24 of the deposition.

1          Rather than seek a telephonic ruling,

2   counsel opted to suspend the deposition and perhaps

3   further depositions in the case and file motion papers

4   with the Court, which was I believe a wise decision

5   given the complexity of these issues.  Plaintiffs filed

6   the instant motion on May 3rd and the County filed its

7   response on May 8th.  Argument was held today and

8   counsel again did a fine job presenting this.  The

9   background of this matter is set forth in detail in

10  Judge Spatt's order dated October 14th, 2015,

11  familiarity with which is assumed and which is

12  incorporated by reference herein.  If anyone wants to

13  look that up, that's at DE-36.

14          To discuss this a little bit more,

15  plaintiffs' primary argument in support of its motion

16  centers on the notion that immigration status is

17  irrelevant to the claims and defense in this action,

18  rendering such inquiry "inappropriate."  That also can

19  be found in DE-82.

20          Counsel for plaintiffs argued more

21  specifically that, "County defendants' counsel

22  fundamentally misunderstands plaintiffs' complaint,

23  which makes clear that plaintiffs were victims of

24  unconstitutional discrimination and discriminatory

25  police action based on defendants' perceptions, however

 1   flawed, regarding plaintiffs' Latino heritage, not

 2   their immigration status.  Members of the class were

 3   discriminated against because they are Latino, not

 4   because of their immigration status.  Whether the

 5   plaintiffs are U.S. citizens, lawful permanent

 6   residents or presently seeking a change in their

 7   immigration status is irrelevant to whether they were

 8   the target of discriminatory police action because of

 9   their Latino heritage or any discriminatory assumptions

10   and perceptions made by police about their Latino

11   heritage."  That's DE-82 on page 1.

12            Indeed, if the allegations of the complaint

13   were so limited, plaintiffs' point would be well-taken.

14   In other words, had the complaint focused on the

15   targeting of plaintiffs and others as potential robbery

16   victims based solely upon the belief that they were

17   undocumented workers -- I apologize, that's incorrect

18   -- based on a belief that they were Latino and solely

19   on that belief, then the question of their actual

20   immigration status would likely be irrelevant.  See

21   complaint by way of example at paragraph 78.

22            "Defendant Greene and various John Doe

23   defendants, SCPD officers, had a practice and pattern

24   of targeting Latino drivers for unlawful stops and

25   searches, during which cash was stolen.  Suffolk County

1   Latinos were specifically targeted based on the belief

2   that these drivers were likely to be undocumented and

3   therefore prone both to carry cash and not to report

4   any theft."  Again, that's from the complaint.

5           However, as plaintiffs' counsel observed

6   during the suspended deposition that catalyzed this

7   dispute, this complaint extends past Officer Greene.

8   It extends well beyond Greene, and that's DE-83-1 at

9   14.  Indeed, a review of the complaint and First

10  Amendment complaint tends to undercut the

11  characterization of the allegations proffered by

12  plaintiffs' counsel on this motion.

13          I would note that in an effort to buttress

14  their characterization, counsel cites Judge Spatt's

15  discussion of the allegations in an opinion authorizing

16  plaintiffs to proceed anonymously, which is found at

17  DE-82 at 1.  However, in that decision, Judge Spatt

18  provided only a "brief overview of the serious

19  allegations contained in the plaintiffs' 62-page

20  complaint."  That's DE-36 at 3, which summary obviously

21  focused on those allegations which heightened the

22  perceived risks of retaliation that warranted granting

23  permission to proceed anonymously.

24          The complaint alleges that in 2007, the

25  County adopted a "policy to arrest all unlicensed

1   drivers," which it alleged "led to the aggressive

2   pursuit and stopping without cause of undocumented

3   Latino immigrants driving on Suffolk County roads."

4   That's DE-21 paragraph 139.

5          More specifically, it alleged that, "In

6   April, 2007, then Suffolk Assistant Chief of Patrol

7   Robert Ponzo sent an email to the SCPD commanders

8   stating that, "Starting immediately, any person

9   operating a motor vehicle who is not licensed will be

10  summarily arrested if he or she had no other form of

11  identification."  That's from paragraph 138.

12          According to the complaint, in 2009, a PBA

13  official, "publicly stated that he believed this 2007

14  directive to arrest all unlicensed drivers led to the

15  aggressive pursuit and stopping without cause of

16  undocumented Latino immigrants driving on Suffolk

17  County roads."  That's paragraph 141 which I cited

18  earlier during the argument.

19          The complaint claims that the 2007 "policy,

20  which was enacted as a means to target and harass

21  undocumented Latinos in Suffolk County, is still in

22  effect today."  Again, paragraph 142.

23          In describing the constitutional violations

24  complained of, the amended complaint charges -- and

25  this is a quote from the complaint:  "Defendants'

1   constitutional violations were and are directly and

2   proximately caused by policies, practices and/or

3   customs enforced, encouraged and sanctioned by the SCPD

4   and Suffolk County, including A) SCPD Commissioner

5   Richard Dormer's 2007 order to officers to arrest any

6   person operating a motor vehicle who is not licensed if

7   they are unable to offer another form of

8   identification, and Commissioner

9   Weber's refusal to rescind such a policy currently in

10  use today."  That's from paragraph 169 and you can also

11  see paragraph 192, which says the same thing.

12         Because the complaint specifically alleges

13  that the 2007 policy affected plaintiffs and potential

14  class members lacking documentation, these allegations

15  are difficult to reconcile with the arguments posited

16  by plaintiffs' counsel on this motion.  For avoidance

17  of doubt, the issue of whether these claims are

18  actionable is not before the undersigned and nothing in

19  this ruling should be so construed.

20         While plaintiffs' counsel has not

21  articulated this position, it could be argued that,

22  notwithstanding their heft, the allegations constitute

23  contextual surplusage.  However, the first amended

24  complaint also contains the following demand on page 61

25  in its prayer for relief, which seeks "the appointment

1    and authorization of a special master or monitor to

2    assess the eligibility of class members for U visas

3    certifications based upon whether they have been

4    helpful, are being helpful or are likely to be helpful

5    in the investigation or prosecution of qualifying

6    criminal activity and endorse United States Citizenship

7    and immigration Services form 1-918 supplement B U non-

8    immigrant status certification regarding the same."

9          This demand appears relevant only to those

10   plaintiffs and potential class members who require a

11   change to their immigration status.  As such, the

12   demand for U visas appears to dovetail with the

13   argument made by the County to suggest that inquiry

14   into immigration status are relevant to its defense

15   given the facts of this case.

16         Specifically, the County argues, among other

17   things, that it "seeks to establish through discovery

18   that there are different, if not many, subclasses of

19   Latinos in Suffolk County:  1) citizens, 2) naturalized

20   citizens, 3) lawful permanent residents, 4) work

21   authorization or other lawful status, and/or 5)

22   undocumented immigrants.  The County will show that

23   plaintiffs' proposed class is over-broad, that all

24   Suffolk County Latinos are not similarly situated and

25   that not all Latinos residing in Suffolk County are at

1  risk of discriminatory practices."  That's DE-95 at 4.

2        Thus, it would seem that the County requires

3  the information sought to formulate an argument as to

4  the breadth and scope of the proposed class and

5  ascertain whether the named plaintiffs are suitable

6  representatives of said class or, if they exist, other

7  subclasses.  Clearly, in light of the allegations made

8  in and the relief sought by the First Amendment

9  complaint, inquiry into immigration status does seem

10  reasonably calculated to lead to the discovery of

11  admissible evidence.

12        At the same time, counsel for plaintiffs

13  correctly notes that there is a substantial body of

14  case law recognizing the "chilling effect" of such

15  inquiries.  You can see DE-91 but among other things,

16  there was a cite to Judge Pollack's decision in Flores

17  v. Amigon as well as Judge Knaff's (ph) decision in Lu

18  v. Donna Karen International, et cetera, and I won't

19  burden the record with quotes from those cases but

20  suffice it to say, they are persuasive on the question

21  of chilling effect.

22        In response to these cases, the County

23  points to the substantial accommodations already in

24  place which would help mitigate these effects,

25  including the extant confidentiality order and

1   subsequent agreement to seal the deposition

2   transcripts.  See DE-95 at 4, where those matters are

3   discussed, as well as DE-36, which was the order of the

4   district court permitting plaintiffs to proceed

5   anonymously.

6           These steps certainly will help allay the

7   concerns raised.  I have to add that counsel for

8   plaintiffs acknowledged during argument today that at

9   some point, given the U visa requests and so forth, the

10  issue of plaintiffs' status must be explored in

11  connection with the prayer for relief.  I believe,

12  however, this may need to be explored prior to the

13  class certification phase of the case, so balancing

14  these issues is quite complicated.

15          Fortunately, the rules empower this Court to

16  take additional steps to minimize the burden and

17  expense imposed by the discovery process on any

18  particular party.  Here I cite Crawford-El v. Britain,

19  118 S.C. 1584, where the Supreme Court of the United

20  States told us, "The court may limit the time, place

21  and manner of discovery or even bar discovery

22  altogether on certain subjects as required to protect a

23  part or person from annoyance, embarrassment,

24  oppression or undue burden or expense."  They're citing

25  Rule 26(c).  They go on to say, "And the court may also

1   set the timing and sequence of discovery," again citing

2   26(d).  And that's the end of the Supreme Court's

3   quote.

4           Pursuant to this authority, this Court

5   hereby adopts the following procedure for this case:

6   Prior to the recommencement of depositions, or if they

7   have recommenced, prior to additional depositions,

8   counsel for plaintiffs shall provide counsel for

9   defendants with a list identifying the immigration

10  status of each plaintiff or other witness to be

11  deposed, accompanied by documents supporting the claims

12  of those reporting legal status.  Where appropriate, of

13  course, counsel may also indicate that one or more

14  individuals will invoke a privilege against self-

15  incrimination, which they may well be entitled to do.

16          Said list will have the same effect as an

17  interrogatory response or a response to a request for

18  admission and will be subject to the confidentiality

19  orders and agreements currently in place.  By providing

20  this information in a less adversarial setting, this

21  procedure will hopefully help further minimize the

22  "chilling effect" identified by plaintiffs' counsel and

23  hopefully avoid further delays in conducting

24  depositions in this matter.

25          Obviously, I cannot anticipate every

1   question that may arise.  I will leave it to counsel's

2   good judgment to try to implement the principles that

3   I'm setting forth today.  The Court is of course always

4   available to resolve further disputes as they

5   crystalize.  Based on that ruling, I am going to grant

6   in part and deny in part the protective order, granted

7   only to the extent set forth herein, which would be the

8   additional procedural protections that I've set forth

9   today.

10          With that out of the way, are there other

11  matters we should discuss while we're here today?

12          MS. BRENNAN:  I think with respect to

13  defendant Greene, your Honor, while we're all in the

14  room and defendant Greene is on the line, there are

15  just two housekeeping matters there.

16          Defendant Greene, this is Mallory Brennan

17  from Shearman & Sterling.  I represent the plaintiff in

18  this case.  You either have already received or should

19  receive shortly acknowledgments to be -- that you

20  should sign if you'd like to receive the confidential

21  materials in this case.  That's pursuant to Judge

22  Brown's order that was issued last month.  Those were

23  mailed to you.  I don't think we have a return mail

24  receipt but they should be there.  So if you can sign

25  and return those, we will include the deposition

1    transcripts and the plaintiffs' names together with --

2    I believe you had also requested a full set of the

3    docket.  That's something that plaintiffs would be

4    willing to undertake and prepare for you, so we will

5    send all of that together, assuming that meets with the

6    Court's approval.

7              THE COURT:  That's fine with me.

8              Mr. Greene, do you have those

9    acknowledgments?  Do you know what counsel is referring

10   to?

11             MR. GREENE:  I did receive something the

12   other day, your Honor.  I believe it's in fact what Ms.

13   Brennan is talking about.  There is some confusion in

14   reading them.  I hate to be signing something and then

15   limiting myself from that point forward if let's say

16   another situation was to arise.  So without being able

17   to get a clear and precise interpretation of what those

18   documents actually say -- I'm doing my best to try to I

19   guess translate them via the law library at the

20   location I'm at.  But at the current time, I can't say

21   that I will sign them or I won't.  I'm still trying to

22   figure out exactly what my limitations are once I do

23   sign them.

24             THE COURT:  Okay, so here's the thing.  I

25   now have an explanation as to why he didn't get the

1    documents.  That's fine.

2           Basically, if you want the documents that

3    are subject to the confidentiality order, you have to

4    make yourself subject to that order and I imagine that

5    that's what the acknowledgment suggests.

6           MR. GREENE:  Right.

7           THE COURT:  But understand I haven't seen

8    them so I don't know what they say, so do your best to

9    get through them.

10          MR. GREENE:  Okay.

11          THE COURT:  And if you want the material,

12   you need to sign it.  If not, we can revisit that at

13   some later point, all right?

14          MR. GREENE:  Okay, very good.

15          THE COURT:  Anything else?

16          MS. BRENNAN:  In light of the Court's order

17   today, we have an existing discovery cutoff deadline of

18   July 7th.  We will be putting --

19          THE COURT:  Wow, you're going to have a busy

20   weekend.

21          MS. BRENNAN:  Busy 4th of July, I know.  I

22   was conferring with Ms. Lopez earlier.  We will put

23   together a proposed revised schedule that makes sense,

24   so we'll be submitting that, but we won't take up your

25   time negotiating that right now.

```
 1              THE COURT:  Lest anyone not sleep this
 2    weekend, I will extend the -- I will give you some
 3    reasonable extension.
 4              MS. BRENNAN:  Thank you very much.
 5              THE COURT:  Anything else for the County?
 6              MS. LOPEZ:  No, your Honor, thank you.
 7              THE COURT:  Mr. Greene, while we have you,
 8    anything else for you, sir?
 9              MR. GREENE:  No, sir, thank you.
10              THE COURT:  Everyone had a good holiday
11    weekend.  We are adjourned.  Thank you.
12              MS. BRENNAN:  Thank you, your Honor.
13                   *  *  *  *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22

23

24

25 ELIZABETH BARRON                    August 15, 2017