1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3    -------------------------------X
                                    :
4    PLAINTIFFS #1-21,              :
                                    :   15-CV-02431 (WFK)
5              Plaintiffs,          :
                                    :
6         v.                       :
                                    :   225 Cadman Plaza East
7    THE COUNTY OF SUFFOLK, *et al.*, :  Brooklyn, New York
                                    :
8              Defendants.         :   May 29, 2019
     -------------------------------X
9
           TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
10             BEFORE THE HONORABLE LOIS BLOOM
               UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:        MARK DAVID VILLAVERDE, ESQ.
                                DAVID SAMUEL MARCOU, ESQ.
14                              Milbank Tweed Hadley & McCloy
                                28 Liberty Street
15                              New York, New York 10005

16                              SAM LOVIN, ESQ.
                                Milbank, LLP
17                              55 Hudson Yards
                                New York, New York 10001
18
                                ESPERANZA SEGARRA, ESQ.
19                              LatinoJustice PRLDEF
                                99 Hudson Street
20                              14th Floor
                                New York, New York 10013
21
     For the Defendants:        KYLE O. WOOD, ESQ.
22                              Suffolk County Department of Law
                                100 Veterans Memorial Highway
23                              PO Box 6100
                                Hauppauge, New York 11788
24

25

     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.

```
 1                                                                    2

 2

 3    APPEARANCES (Continued:)

 4    For Himself:              SCOTT GREENE, Pro Se
                                41 Westwood Drive
 5                              Shirley, New York 11967

 6    Court Transcriber:        RUTH ANN HAGER
                                TypeWrite Word Processing Service
 7                              211 N. Milton Road
                                Saratoga Springs, New York 12866
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  (Proceedings began at 12:17 p.m.)

2          COURT CLERK:  Civil cause for status conference,

3  docket number 15-CV-2481, Plaintiffs #1-21 against The County

4  of Suffolk, *et al*.

5          Will the parties please state your names for the

6  record?

7          MS. SEGARRA:  Esperanza Segarra of LatinoJustice

8  [indiscernible].

9          MR. VILLAVERDE:  Good afternoon, Your Honor.  Mark

10 Villaverde, Milbank, LLC for plaintiffs [indiscernible].

11         MR. WOOD:  Good afternoon, Judge.  Kyle Wood,

12 Suffolk County Department of Law here on behalf of

13 [indiscernible].

14         MR. GREENE:  Good afternoon, Your Honor.  Scott

15 Greene, *pro se*.

16         THE CLERK:  The Honorable Lois Bloom presiding.

17         THE COURT:  Good afternoon, Ms. Segarra,

18 Mr. Villaverde, Mr. Marcou, Ms. Lovin, Mr. Wood and

19 Mr. Greene.  This is a status conference.  I took this case

20 over from my colleague and last conference was the first time

21 that we had all the parties before the Court.  There were a

22 number of issues that were brought up at the last conference

23 and I asked for a status letter, which I got as document

24 No. 174.

25         Judge Brown had set discovery deadlines and my

4

1    number one point is the discovery deadlines have been extended

2    already.  We're at the fifth extension.  And I know from my

3    experience that this case discovery could go on for years.  It

4    could.  And I understand how there are a lot of burning

5    questions; how could this happen.  There is the DOJ reports.

6    There's a lot that is going on.

7            My intent is not to cut anybody off at the knees,

8    but my intent is to get you to that deadline, which was set by

9    Judge Brown, and to get everything done that is reasonably

10   humanly possible between now and then.

11           I started before we went on the record by saying

12   Mr. Wood is again by himself and I had put into my last order

13   that he shouldn't be left by himself in the case, especially

14   to do the IT work that, again, they -- they're getting half

15   the message by paying attention in some respect but they're

16   not, in my mind, getting the full message of what needs to be

17   done.

18           So, Mr. Wood, you said that it did work somewhat, so

19   what's happened since the last conference?  Not specifically

20   about the points in the letter, but I had basically said they

21   should consider hiring an outside vendor.  You should not be

22   left as the only person doing this -- this huge harness of all

23   this information to turn it over.  It's just an impossibility

24   if they're only assigning one attorney to the job.

25           So what's happened?

5

1          MR. WOOD:  Your Honor, in response to the Court's

2    order in our last conference what -- one of the main focus

3    [indiscernible] was addressing the May 15th deadline involving

4    emails [indiscernible] as well as the general affairs

5    attachment that [indiscernible] --

6          THE COURT:  I hear the attachments got done, so

7    we'll put that aside.  That's good news.  But you've only

8    gotten five out of the seven custodians.

9          MR. WOOD:  Yes, Judge.  The status was in terms of

10   the office to assign [indiscernible] counsel including most of

11   [indiscernible].  Again, I don't know how much the Court is

12   aware.  There are three federal [indiscernible].  There -- in

13   terms of numbers there was [indiscernible] away as appropriate

14   for the baseline at the Court's direction.  We were sort of

15   put all hands on deck with respect to [indiscernible] surface

16   and even though I didn't think [indiscernible] and we told

17   everybody that the understanding of what was going on we were

18   able to get this done.  And with that in mind, [indiscernible]

19   where we are right now in terms of state of production.

20          From what was available on this then we had

21   basically three or four of the custodians for reasonable

22   methods that came back based upon the service [ph.].  I

23   conferred with counsel on May 3rd about certain search terms

24   that were [indiscernible], so I think counsel was reasonable

25   in sort of [indiscernible] back saying they didn't want to --

6

1 they don't want to --

2          THE COURT:  "PR" is not a good search term.  Go

3 ahead.

4          MR. WOOD:  Right.  And it's [indiscernible], so

5 worked on that.  But notwithstanding that, we ultimately --

6 before we go back [ph.], then we have make the decision to

7 move and [indiscernible] deadline [indiscernible].

8          THE COURT:  I totally appreciate that.  Thank you.

9          MR. WOOD:  So we had everyone working on search

10 terms as we got them back.  There were -- of the seven

11 custodians.  We had one that, quite frankly, put aside because

12 106,000 pages came back and we knew we would never --

13          THE COURT:  Pages or hits?

14          MR. WOOD:  So it was pages, total pages.  The way

15 they're produced by the IT and the program that they -- that

16 they bought, so to speak, that they worked with produced the

17 emails based upon the responsive hits as sort of a giant .pdf.

18 That way, the attorneys could then sort of scroll down and go

19 through them and make the redactions or logs as best they

20 could based upon what we got back.

21          With that we realized that was something that

22 honestly with 106,000 pages we weren't going to be able to

23 accomplish.

24          THE COURT:  And that's crazy that they're all being

25 done as .pdf instead of being produced in native form.

7

1    MR. WOOD:  Well, Your Honor, it actually made it, I

2  thought, in a more useful way for counsel to review it once it

3  came back.  In other words, for us to look at it as a

4  scrolling document as opposed to opening up individuals'

5  timeline-wise based upon the number of attorneys we have and

6  the amount of review that had to be done, just so the Court is

7  aware, we produced I think 21,000-plus pages at this point.

8    There's another 20,000 pages on the six custodians,

9  Commissioner Webber -- which is essentially close to being

10  done.  There needs to be just some last review.  And that will

11  bring us up to over 40,000 pages.

12    So we're close to having six of the seven, based

13  upon what was available on the system produced to -- to the

14  plaintiffs.

15    THE COURT:  And the 106,000 pages was who?

16    MR. WOOD:  So that was Defendant Soto and she, not

17  surprisingly, based upon her positions within the office and

18  the time frame and so forth, we got a significant volume and I

19  would say not a tenable amount of volume.

20    I spoke with plaintiffs' counsel.  They understood

21  it to a certain degree, I think.  I don't want to speak for

22  them now obviously, but they have -- we have agreed, which I

23  think is reflective in the letter to try and -- you know, one

24  of the problems with this was we didn't know sort of what we

25  were going to have until we got it and I had to make the call,

8

1  which I did on like May 3rd or 5th or so forth and said, okay,

2  we're leaving the station, we've got to do something at this

3  point to get it done.  We've got less than two weeks and even

4  with everyone on deck it was --

5          THE COURT:  Well, I appreciate that -- you know,

6  again, I'm still scared for you because you're the only man

7  here and saying that there are three federal attorneys in

8  Suffolk County, that doesn't mean that they can't cross-

9  designate to work with you from another bureau.

10          And what I've found on city cases is when there are

11  bigger cases and they get the attention of somebody and maybe

12  you're the high-up somebody that I -- you know, I'm talking

13  about, I -- I just think it's an impossibility unless they

14  assign the staff.

15          MR. WOOD:  And again, I want to also tell the Court

16  and, again, I don't necessarily want to get too into the weeds

17  about the details of it.  There was a meeting on the 12th

18  floor with regard to the Court's directive and order --

19          THE COURT:  Good.

20          MR. WOOD:  -- at the -- just about highest level

21  within the County addressing those issues.  I just don't have

22  a decision or conclusion at this point.

23          THE COURT:  Okay.  That tells me enough.  Thank you.

24  And I'm going to continue to hammer that point in any order I

25  put out.

9

1          Look, we have a limited amount of time for me to go

2   over things.  I think I'm going to have monthly meetings with

3   you in court because even though it would reduce your time in

4   coming to the court, I think, one, for Mr. Greene to be able

5   to access it, we're all on the phone together, it's very

6   unwieldy when there are five different people talking.

7          So even though I don't really want to make you keep

8   coming back to court if you were asked on a time or two for

9   permission to do it by phone, I'll try to do it by phone, but

10  at the beginning to know that everybody is (1) understanding

11  each other; (2) we're advancing the ball here; and (3) that

12  everybody is getting access, I'm going to schedule it again in

13  court.  Okay.  It's sort of -- it's an important case.  We're

14  not that far away from the deadline that Judge Brown set.  We

15  need to get this done.  Okay.

16         So going down the list, I don't know who the 31

17  custodians that you attached as your attachment are.  I'm not

18  looking for a reason to extend this deadline.  They're

19  struggling to get you the first seven.  I'm not letting them

20  off the hook, but obviously in my mind there was a problem

21  with the search terms.

22         MR. MARCOU:  Your Honor, good afternoon.  We agree

23  that we can work on making the search terms more specific and

24  reducing the number of hits to make the burden more

25  manageable.  I think our view is that establishing a list of

1    custodians now will actually help ease the course going

2    forward in assessing that burden because, as the case is

3    today, if in evaluating search terms we're going to have to

4    run them over some universe of custodians just tests that

5    burden.  If we know what that universe of custodians is, we

6    can find out how many hits there are, how many pages are

7    involved, and we can make that assessment with actual

8    information [indiscernible] conjecture about what those search

9    terms may [indiscernible].

10            We believe that setting that custodian list now will

11   actually help clear the path going forward.

12            THE COURT:  Well, let me just ask on a related

13   question.  The County had produced the traffic stop data.

14   However, you can asked for things like the PIDs, the ID

15   numbers and that was for 23 officers who were involved in the

16   early alerts.

17            Is there cross-over between those 23 and the 31

18   custodians?

19            MR. MARCOU:  Yes, there are.  So [indiscernible]

20   identified here are individuals who appear in the

21   investigations related to biased police incidences and

22   supervise [inaudible] touch [inaudible] --

23            THE COURT:  I'm sorry, Mr. Marcou, did you answer my

24   question, though?  There were 23 people; you were looking for

25   the PIDs from the early alerts.  Are those 23 part of the 31

1  of the new custodians?

2        MR. MARCOU:  Yes, Your Honor.

3        THE COURT:  Every single one of them, 23 or part of

4  the 31?

5        MR. MARCOU:  [Inaudible]

6        THE COURT:  We're not sure.

7        MR. MARCOU:  Yeah.  Your Honor, it is some.  I don't

8  think it's all.  It's a fair number of the IA supervisors and

9  those are just officers.  I think there are more than not

10 eight from supervisors that were on the list, which would mean

11 there was 23 wouldn't match up in terms of 31 total.  That's

12 my belief.

13       THE COURT:  Well, look.  You weren't asking in the

14 status letter because I told you I just want a status letter.

15 You weren't asking me to compel anything.  But I think it's

16 useful to you to hear where I am on these categories of what

17 information is listed because, again, I will not allow Suffolk

18 County to put their head in the sand and say, it's overload;

19 we can't.  That I will not allow.

20       But on the flip side, my job is to make sure that we

21 get through the finish line here.  I am not the one who will

22 be the decision-maker in the case and getting the case to

23 Judge Kuntz is my object.  Okay.

24       So you've made some progress in getting the

25 information for the seven custodians who were the original.

1  It looks like we're at 6.1 of the information.  I do want you

2  to get all seven of those custodians' information because they

3  were the ones that were supposed to be provided by May 15th

4  and I accept the Mr. Wood is diligently trying to get that

5  information.

6          I'm grateful that the attachments to the early

7  alerts have been taken care of.  Let's get to the easy things.

8  There was documents that had Post-Its on it that were copied

9  with the Post-It blocking out certain information.  Those are

10 things that they raised in this letter to me.  That should

11 just be done.  You know, again, this is -- this is on page 8,

12 I think.  Maybe not.  That's the redactions, but --

13          MR. MARCOU:  Page 7, Your Honor, at the top.

14          THE COURT:  Thank you.  So that just should be

15 rectified.

16          MR. MARCOU:  Your Honor, we've spoken about those,

17 the four sort of subsequent investigations, which we have

18 provided.  They've asked for attachments to that.  They're

19 being provided right now, I've been told.  In terms of the

20 copy -- I mean, I just think that have [indiscernible] --

21          THE COURT:  But somebody has to have the original.

22 It wasn't scanned in that way.

23          MR. MARCOU:  I want to say yes to that, Judge.  I

24 just want to tell you that in terms of what I got back, even

25 though we tried to rectify in terms of [indiscernible] same

1   thing back and where [indiscernible] down there and

2   [indiscernible] --

3          THE COURT:  Can I give you -- so you have to get

4   like a laundry list of all of these things that are not going

5   right and you have to send somebody from your office, a

6   paralegal to the police department to go to the actual file

7   because they don't know why they're being asked for it over

8   and over again and just send somebody.  It can't be that far.

9   You all have cars in Suffolk County.  Just send somebody.

10          MR. MARCOU:  Yes, Judge.

11          THE COURT:  Okay.  Let's get to the more important

12   things.

13          And, Mr. Greene, anytime you want to interrupt, just

14   raise your hand, okay?

15          Mr. Marcou, you obviously know a lot more about the

16   case, so does -- so do your colleagues, Ms. Lovin,

17   Ms. Segarra, Mr. Villaverde, than I do.  But when I look at

18   the things that you're starting to give here, the shape [ph.]

19   files, the code book, I understand everything is important,

20   but it can't be that everything is as important.

21          I happen to think that the Chris Love communications

22   sound very important.  I don't think that the shape files and

23   the code book if they tell you there's no specific code book,

24   it's just an amalgam of what's in the regs and what's in

25   the -- if that's the truth of the matter, let's not keep

1   hitting on every nail.  Let's only hit on those nails that are

2   really going to keep this house together.

3          So I have circled on mine the Chris Love.  I have

4   circled the unredacted versions of documents.  I do not think

5   both sides are going to get 20 depositions.  That sounds to me

6   to be ridiculous.  I know you're at four and he's at six.  I'm

7   going to have monthly meetings, so you'll tell me when we're

8   close to the limit and who else you need.

9          If I tell you 20 now, then I'll get another request

10  down the road for it to be more.  You have to be thoughtful

11  about it.  Ten is in that federal rule book for a reason.  You

12  need permission above ten.  I'm telling both sides this.  I

13  see that there are a lot of custodians and there are a lot of

14  documents and that there's a lot that needs to be done.

15  You've started to notice the depositions.

16          MR. MARCOU:  Yes, Your Honor.

17          THE COURT:  So those are in June?

18          MR. VILLAVERDE:  No, Your Honor, we -- the prior

19  notice depositions that Mr. Marcou is referring to have

20  already occurred.

21          THE COURT:  No, I'm talking about going forward.

22          MR. VILLAVERDE:  I think that request is going

23  forward [indiscernible].  We have not -- again, we just

24  received some additional emails.  Our goal was to receive as

25  many emails as possible to inform who would be the best

1   witnesses to depose in light of those productions.

2           THE COURT:  Well, I appreciate that, Mr. Villaverde,

3   and I'm being real with you, but if you're asking for 31 more

4   custodians, even if you limit what the search is, it's going

5   to be endless.  Why can't we take some depositions to get at

6   what we need here?  And if you needed to have more time for a

7   second round with somebody because something was withheld,

8   meaning more than the seven hours, then you bring that to me.

9           I'm just concerned -- and please, don't take this

10  the wrong way.  It's not just Milbank.  It's every large firm.

11  It's like you're never going to get it all, but you're going

12  to keep trying to get it all and you're not going to move to

13  that next level, which is getting the live testimony, which is

14  really what you need here.  You need as much of the

15  information so that you can have a deposition where you feel

16  prepared.

17          MR. VILLAVERDE:  Sure, Your Honor.  We -- obviously,

18  there's nothing that would stop us.  There are folks that

19  we'll be prepared to depose now.  You know, we may not close

20  the deposition, but there are depositions that we can be

21  taking in the near future and I understand the process you

22  have, you envision would be more of a no -- pre-determined

23  number in excess of ten, but if we need more than ten, we can

24  come back to Your Honor with specifics.

25          THE COURT:  That's exactly right.  And that's on

1   both sides.  And what gave me pause was you said 20, but not

2   counting 30(b)(6) and I'm like, oh, my God.  It's like this

3   could be endless.  There is such a big net here.  It could be

4   endless and you won't get to the deadline that's been set by

5   Judge Brown.

6           MR. WOOD:  The reason we -- just so you know, Your

7   Honor, the reason we proposed 20 is there are -- there are 20

8   plaintiffs remaining and we expect that the --

9           THE COURT:  That's their depositions, though.  You

10  don't have to depose every plaintiff.

11          MR. WOOD:  Understood.  We expect that the other

12  side will be seeking --

13          THE COURT:  That's their problem.

14          MR. WOOD:  -- 20 --

15          THE COURT:  That's not your problem.  I'm interested

16  in what your problem is, not what their problem is.

17          MR. WOOD:  Understood, Your Honor.

18          THE COURT:  And especially if Mr. Wood is the only,

19  you know, attorney assigned to this and he's going to have to

20  be at each of the depositions that you're going to plug in.

21  You need to start blocking off time now.

22          Ms. Segarra, you were in the front seat last time

23  and now I'm getting you in the back seat.  I know that your

24  office does big cases all the time.  I'm not saying anything

25  to try to hamper your diligence in getting at the information,

 1  but I find it's true unless I get the ball rolling here, we're

 2  going to be stuck where we are.

 3          MS. SEGARRA:  Understood, Your Honor.

 4          THE COURT:  Okay.  So that's what I would like you

 5  to do.  After this conference is over, I would like you to

 6  stay in the courtroom with Mr. Wood and start plugging in

 7  dates and getting who's going to be on those dates so that you

 8  will then send out your Rule 30 notices, but he'll already

 9  have gotten notice from you.  He can't, of course, say this

10  one is going to be available on this date until he checks, but

11  if the two of you block out a week or two weeks of dates,

12  three on this week, two on that week, another two on a

13  different week, and you then plug people in and he can tell

14  you, this is who's available, and you say, no, I want this

15  person first before that person, let's see how much you can

16  get accomplished cooperating.

17          He likewise is going to need dates from you for him

18  to depose your plaintiffs.  Mr. Wood?

19          MR. WOOD:  That's correct, Your Honor.  We're --

20  there -- about half of them has been completed but there is

21  additional ones that we would need to take.

22          THE COURT:  So that's something that I want you to

23  stay in the courtroom today after we leave putting your books

24  together.  That doesn't mean that you're locking in.  He has

25  to go to his clients, you have to go to your clients, but

1  let's get dates, okay?

2          I have a problem with the Chris Love documents.  I

3  do think -- it says that the County produced documents on

4  April 19th.  However, communications between DOJ and Chris

5  Love, who is the County's compliance point person, were not

6  included and that there's no explanation of why there aren't

7  communications in that time period.  Do you have any

8  explanation?

9          MR. WOOD:  Judge, only that we've -- we've gotten

10  the emails between Chris Love and DOJ.  They're part of what

11  we've been going over and looking at, as well as the judge --

12  excuse me -- Commissioner Webber's stuff, so that is part of

13  the queue right now in terms of the --

14          THE COURT:  Okay.

15          MR. WOOD:  -- reviews.

16          THE COURT:  You told me Soto is part of the queue,

17  Commissioner Webber, and now Chris Love.

18          MR. WOOD:  Chris Love, specific ones as to the DOJ

19  which we think are going to be -- in terms of review, I don't

20  know that there is going to be much review necessary for them

21  because they are DOJ emails with an outside agency and it's --

22          THE COURT:  They're not your attorney.

23          MR. WOOD:  It is what it is.  It is what it is, so

24  it's probably going to be once we -- and we do have them now.

25  Something we can produce reasonably soon.

1      THE COURT:  So when you're saying "reasonably soon,"

2  give me a date because that's going to have to go in an order

3  so that I can be a little bit helpful to you in getting your

4  office to live up to their obligations.

5      MR. WOOD:  Your Honor, I'd ask for three weeks.

6      THE COURT:  I find that's reasonable.  Would that

7  work for you?

8      MR. MARCOU:  Yes, Your Honor.

9      THE COURT:  Now, I want to say this on the record to

10 you, Mr. Wood.  If you weren't reasonable you would not be

11 getting what you asked for.  Okay.  Because I don't want for

12 any reason this to be taken in a transcript back to your boss

13 and the boss say, why didn't you ask for five weeks or six

14 weeks.  I am telling you I am finding you to be a credible,

15 upstanding attorney for the County of Suffolk, but if you were

16 giving me things that made me feel like I could not trust your

17 word you would not be getting this sort of leeway and I want

18 that to be on the record.

19     MR. WOOD:  Thank you, Judge.

20     THE COURT:  So three weeks and we are presently at

21 the 30th, puts us to June 20th.  So this is going to be

22 specific.  It's going to be Soto.  What's the commissioner?

23     MR. WOOD:  Commissioner Webber, Your Honor.

24     THE COURT:  Webber with two B's or one?

25     MR. WOOD:  Two B's, Your Honor.

1          THE COURT:  And then Chris Love.  And I'm not even

2    going to include you trying to get the Post-Its off of the

3    documents because that's too small in my mind to be part of

4    the order.

5          I'm also going to say by June 20th you will have

6    agreed to deposition dates.  And this works for both sides.

7    And if you could agree to some before that time, so be it, but

8    by that date you'll have a schedule.  Okay.

9          On plaintiffs' list, you were looking for

10   Mr. Greene's pre-sentence investigation report and a facility

11   report and I don't think you're entitled to that and let me

12   tell you why.

13         Pre-sentence reports, at least in my experience, in

14   federal court are prepared by the Probation Department given

15   to the sentencing judge for the sentencing judge to come up

16   with what they believe is the just sentence.  There's

17   information in that pre-sentence report that goes to Greene's

18   childhood or anything that happened in his life.  I have no

19   idea what's in it.  He's not represented in this case.  He was

20   convicted of a charge.  Whatever is public is public, but I'm

21   not going to have information from the DA or from his pre-

22   sentence report which, again, in this court is prepared by an

23   arm of the court, probation, to aid the judge in coming to a

24   just sentence.  I'm not going to have that to be part of what

25   this case is about.

1          Whatever is public regarding Officer Greene, his

2    sentencing in court, transcripts, all of that can be used.

3    But I'm not going to order somebody to get things from the

4    court system who are not a party to this action or exchanged

5    during discovery.  Do you understand?

6          MR. MARCOU:  Yes, Your Honor.

7          THE COURT:  Okay.  As to anything that is public or

8    things such as the citizen complaint report, those should be

9    things that the County has gotten and you had said that they

10   had produced several documents related to the investigation.

11   However, they had not given you the digital media attachments

12   referenced within each report, the citizen complaint report,

13   the IA case file sheet, the IEA case notes for the

14   investigations, and the letter sent to the alleged victims.  I

15   don't know.  Did that -- was that something that was discussed

16   between you and Mr. Wood?

17         MR. MARCOU:  Yes, Your Honor.  On the May 21st meet-

18   and-confer we discussed these items and he indicated that a

19   number of them had been produced as part of the attachments to

20   various of these reports.  We're still going through those

21   documents, but until we're sure of what is not in there, we're

22   happy to continue to simply meet-and-confer on those.

23         THE COURT:  Thank you.

24         MR. VILLAVERDE:  And from our vantage point,

25   although as counsel and I discussed, part of that was there.

1   In terms of just being -- make sure we covered everything, I

2   again requested any attachments, audio or otherwise.  There's

3   three reports subsequent to Mr. Greene's particular IA report.

4   I asked for all the attachments.  I know that they have them

5   for Mr. Greene.  I asked for anything again to be produced for

6   those three, which we'll just given to them as well.

7               THE COURT:  Thank you.

8               Mr. Greene, I'm reminding you that you have to

9   respond to the plaintiffs' amended complaint by May 31st.

10              MR. GREENE:  It's been done.

11              THE COURT:  Very good.

12              MR. GREENE:  Today.  I did it downstairs.

13              THE COURT:  So you just filed it downstairs?

14              MR. GREENE:  Correct.

15              THE COURT:  Okay.  So --

16              MR. GREENE:  And then there's --

17              THE COURT:  You mailed theirs?

18              MR. GREENE:  Correct.

19              THE COURT:  Thank you.  Okay.  Look.  I know there

20  was more in both of your letters.  I will tell you that I

21  don't believe you're entitled to the Ponzo policy documents

22  because they're from 2007 and Judge Brown was fairly explicit

23  on setting time frames here saying that you weren't entitled

24  to documents and data from prior to 2012.  I do understand

25  that it sort of sets things in motion or in your mind it may

1   have set things in motion, but you have what you have.  I'm

2   not looking to expand.  I'm looking to get you through what it

3   is that you need to accomplish between now and the deadline.

4          So by June 20th the Soto, Webber, and Chris Love

5   documents agree to deposition dates.  Keep looking for the

6   attachments that they say are already there.  I'm not going

7   back to the Ponzo policy.  You have some additional issues.

8   We talked already about the depositions, the redactions.  I

9   need to make sure that you're not redacting what you believe

10  to be irrelevant.

11         MR. WOOD:  Judge, for clarity, again, I wanted to

12  make sure that we're talking about the same thing when I read

13  Section 6 with respect to the redactions.  What happened was,

14  we had early alerts that we were ordered to produce.  Those

15  early alerts came as sort of a string of alerts and on certain

16  pages you had stuff that had nothing to do with this case.

17         It was basically directing us, find anything that is

18  biased policing action or run for any Hispanic names, Latino

19  names.  But on those same pages were other reports at times

20  which have nothing to do with this case.  Those were the

21  redactions that were made with respect to that production

22  after Judge Brown.

23         So on those -- when they see redactions on those

24  early alert pages, that's what it should be for.  I can --

25         THE COURT:  You did say in a letter dated April 19th

1  that you have redacted certain documents with information

2  outside the relevant time period or involving investigations

3  or cases that don't touch on --

4            MR. WOOD:  Yes.

5            THE COURT:  -- it, so that's what you're saying?

6            MR. WOOD:  Right.  That's what I'm saying is it

7  didn't -- it wasn't in line with the Court's direction and we

8  just redacted it because it was on -- we couldn't get them as

9  individuals on a single page.

10           THE COURT:  Now, again, if you find that any of that

11  is contradicted anywhere, please raise it to me.  But since --

12  and I really can't -- I can't make them do their IT

13  differently than they do their IT.  I did recommend that they

14  hire an outside vendor so that they don't get themselves into

15  trouble, but they don't want to spend on that and they're

16  doing it the way that they're doing it.  So I understand that

17  there are multiple pages as one attachment, that they're going

18  to block out what is not -- what is not part of this case.

19         So if you find any of this is contradicted, please

20  raise it to me.  Okay.  I don't want them to have to do a

21  privilege log for every redaction because privilege log should

22  only be for privilege and they're saying it's not for

23  privilege.

24         Okay.  I guess the last thing that I have on my list

25  and then I'll hear from you, but I just want to get a new date

1   set.  Last thing on my list is I don't think running searches
2   were how many Latino names there are is really the way to get
3   at this information.  You know more than I do, but it just
4   seems to me that wanting them to produce information of name
5   searched and databases to see if the disproportionate number
6   of Latino names were searched, you have so much more direct
7   evidence here than that.  And I don't want you to be going so
8   far afield that we're not getting really focused and hone in.

9          I think Soto, Webber, Chris Love, that completes the
10  seven.  The 20 -- the 21, right, because it's about 23 of the
11  PIDs, if they overlap with 31, but I'm not talking about
12  having 93 search terms.  I'm not precluding you from getting
13  more electronic search done, but if they're bogged down with
14  106,000 pages to review for one person, why are we turning now
15  to 31 other people?

16         Why don't we get that one person, Soto, and get them
17  in a chair and have their statement taken under oath?

18         MR. MARCOU:  Okay.  So I guess I misspoke or wasn't
19  clearly understanding your question earlier with regard to
20  Exhibit A and the list of the names there.  So the 23 officers
21  that are identified those are our officers who are out making
22  traffic stops.  They're beat cops, for lack of a better word.

23         Our understanding from talking to Mr. Wood is that
24  those individuals may not necessarily have email addresses
25  assigned to them by the County.  So what motivated Exhibit A

1  and the names there, these are the individuals who

2  investigated the allegations against those 23 individuals.  So

3  that's the genesis of the bulk of the names on that list.

4          THE COURT:  So why don't you just start by asking,

5  who has emails that are assigned by the County?

6          MR. MARCOU:  Yeah, we've asked that question, Your

7  Honor, and our understanding is that individuals in

8  supervisory roles or those who are cycling through IAB are

9  assigned email addresses.

10          MR. WOOD:  Your Honor, that's correct.  Generally

11  the parole officers don't use email but will at certain times,

12  based on their position, get an email address through the

13  County.  So ultimately at some point --

14          THE COURT:  But they've given you a list and the

15  list has 31 people and, you know, put a check next to each one

16  that has a County email address and call it a day.  And then

17  I'm not going to let you ask 92 search terms for 31 more

18  people.  That's just ridiculous.  It's too burdensome for

19  them.

20          But if you know specifically from other documents

21  what it is that you think these people investigating these

22  incidents would have, I'm talking about less then ten search

23  terms.

24          MR. MARCOU:  Understood, Your Honor.  We're -- we

25  will work and I think for -- you know, we're fully prepared to

1   work to narrow down that list substantially to something much

2   more manageable.

3          THE COURT:  And again, I'm not ruling on it today.

4   I'm giving you the benefit of a check-in, which is how I

5   operate.  I'm much better with that than motions to compel

6   because motions to compel mean you've stopped cooperating.

7   Check in with a status letter like this affords us all an

8   opportunity to put our heads together here about how to best

9   solve this.

10         And I'm not talking about solving the ultimate

11  question of liability or damages.  I'm talking about solving

12  the discovery conundrum that we are in, okay?  You have

13  something you want to say?

14         MR. VILLAVERDE:  The only thing I would add, Your

15  Honor, and I -- you know, with respect to search terms, I

16  mean, we have inquired of the County defendants' attorney what

17  sort of abil -- functions they have in order to narrow the

18  results.

19         So, for example, I know I asked -- or we asked if

20  there's ability to weed out documents by doing a "but-not"

21  search and information like that would be helpful for us to

22  have so we can work with the County defendants to narrow

23  these.  We're not -- you know, in my own experience if you

24  don't have a lot as functionality you tend to have a lot of

25  hits that are sort of meaningless documents and, you know, we

1   would -- we -- our view of the 20,000 that were produced

2   recently there are a number of documents that had they just

3   met and conferred with us they could have been eliminating

4   probably thousands of pages of documents on some of these

5   issues.  So I just want to be clear that --

6           THE COURT:  So how do we get that to happen?

7           MR. WOOD:  What counsel is accurate.  Unfortunately,

8   we're out of time and that's one of the things that sort of

9   came about until we saw what we got.  We had to sort of -- to

10  progress forward.  But I agree, we do want to go back and we

11  have -- for instance, there are sick call reports that come

12  over and over again which we don't need for a number of

13  reasons.  Possibly certain patrol reports.  There's PLI

14  information that comes for certain people.  That word we saw

15  over and over again that we want to eliminate from further

16  searches.

17          So I think we're all on the same page and trying to

18  do that.  I don't want to overstep the County's

19  functionability, so to speak, with respect to that, other than

20  I think the general stuff can be done in terms of removing

21  those items.  But yes, that's -- that is accurate.  There's a

22  lot of stuff there that doesn't touch on --

23          THE COURT:  Well, again, you've not gotten a

24  June 20th for turning over Soto, Webber, Chris Love.  I want

25  you to agree to deposition dates before that date and I want

1    to put this one for a July conference.  And I'm sorry to say

2    July, but with you turning it over on June 20th and they need

3    time to process it and then I'm going to get you to send me a

4    letter saying, like you did today, where we are.

5              So I'm looking at the week of July 8th.  What's that

6    Monday look like for you?

7              MS. LOVIN:  Your Honor, I have a case management

8    conference in a different matter on that day.

9              THE COURT:  And what does the rest of the week look

10   like for you?

11             MS. LOVIN:  The rest of the week would -- any day

12   would be fine, Your Honor.

13             THE COURT:  And how about you, Mr. Wood?

14             MR. WOOD:  Your Honor, I have a Tuesday pre-motion

15   conference and I have an 11:30 phon conference on Wednesday.

16   Thursday and Friday are free, as well as Monday, which doesn't

17   work so --

18             THE COURT:  How about Friday?  Friday is the 12th.

19             MR. WOOD:  Friday, the 12th, is fine, Your Honor.

20             THE COURT:  Friday, the 12th?

21             MR. MARCOU:  I think that will work for us, Your

22   Honor.

23             THE COURT:  And if I put this on at 11:00 was that a

24   good time for everybody to get here traffic-wise?

25             MR. WOOD:  Your Honor, I take the train in, so at

1  10:00 or 11:00 is fine.  We were at noon today.  Whatever the

2  Court's calendar.

3         THE COURT:  Well, you tell me.  What's the best?

4         MR. WOOD:  11:30 maybe?  11:00.

5         THE COURT:  11:00 or 11:30, I could do either one.

6  Tell me.

7         MR. WOOD:  I prefer 11:00, Your Honor.

8         THE COURT:  11:00 it is.  11:00 it is.  I don't want

9  you to get stuck with the rush going out and, again, I'm

10  looking for an hour check-in.  I want a list like I had here.

11  I would like that -- would it be possible to get it by the --

12  you're exchanging these documents by the 20th.  I want you to

13  have enough time.  That's the deadline.  They can give you

14  documents before that, but that's their deadline.

15         I would like the letter to be by noon on the 28th.

16  Is that reasonable?

17         MR. MARCOU:  Yes, Your Honor.

18         MR. WOOD:  Yes, Judge.

19         THE COURT:  Okay.  And so 11:00, we'll see each

20  other again.  You'll have a schedule for a deposition.  You'll

21  raise to me by letter what's going on here.

22         Was there anything else that needed to be addressed

23  on behalf of plaintiffs today?  I know we could spend all day,

24  but I want you to have some time with Mr. Wood to talk about

25  it.  Of course, Mr. Greene, you're allowed to attend

31

1  depositions.  We just said if they were going to be
2  plaintiffs' depositions they were going to try to arrange for
3  you to be able to be there by phone so that nobody was
4  intimidated by you being in the room.
5          MR. GREENE:  I --
6          THE COURT:  We could talk about this again, but we
7  don't have anything scheduled now.
8          MR. GREENE:  Right, right.
9          THE COURT:  So if that's something you want to be
10  heard on and they want you to appear remotely and you want to
11  be there in person, you'll raise it, okay?
12          MR. GREENE:  Through a letter or through --
13          THE COURT:  Yeah, through a letter.  First talk to
14  them about it.  If they're saying that you shouldn't be there,
15  make your argument to them about you'll be a fly on the wall,
16  you won't say a thing or that you have the right to question
17  the person.  Make the argument.  Okay.
18          Was there anything else that plaintiffs need to
19  address?
20          MR. VILLAVERDE:  Your Honor, we'll meet-and-confer
21  with Mr. Wood after this and we did want to address with him
22  metadata and things that we can do so that he's able to
23  produce documents that are not one giant 10,000 .pdf.
24  That's -- I've never heard of that and it's -- we asked for
25  metadata and he didn't object, so we're going to see if we can

1    work with him on a day that this can be produced again.

2         THE COURT:  So not that I'm going to order this, but

3    I thought it would be a great idea for you to get the IT

4    person for a deposition the next two weeks because that way

5    you would know what they could and couldn't do because

6    filtering it all through Mr. Wood he has to go back to them.

7    You notice their -- there's a County IT person and get the

8    answers of what their IT could do.

9         But I understand that might not be in the offing

10   because of other plans that you have.  I just thought that

11   that would be the best way to get at this.  Mr. Wood would

12   have to prepare him but he'd have to answer the questions

13   honestly under oath.  I've had other cases where people

14   produced a .pdf.  It does not end well.

15        MR. VILLAVERDE:  Yeah, and it certainly makes life

16   more difficult for Mr. Wood who will be unable later to de-

17   dupe [ph.] documents because he's just got giant .pdfs.

18        THE COURT:  But again, for them they're doing it the

19   way they're thinking they have to do it because they're under

20   a time constraint and I'm giving them another time constraint

21   and Mr. Wood is not the IT person.

22        So maybe a conference call, if I could suggest, if

23   the deposition is going to be too confrontational here.  A

24   conference call where you at Milbank and you at Suffolk County

25   have your IT people on the phone together because they

33

1    understand each other.

2            MR. WOOD:  That was discussed actually among the

3    counsel, Your Honor.

4            MR. VILLAVERDE:  We had proposed to have someone

5    from our IT group speak with someone in their IT group to

6    resolve --

7            THE COURT:  But the attorney should be on the line,

8    too.

9            MR. VILLAVERDE:  We're happy to --

10           THE COURT:  So that you have some idea of what

11   they're talking about, okay?  Okay.  I will take it that

12   you'll get a lot more done between now and July 12th.  And I

13   will put out an order saying that by June 20th these three

14   remaining -- Soto, Webber and Chris Love -- and that you will

15   speak with each other about deposition dates and please

16   include Mr. Greene on any notices so he knows where it is.

17           Anything further on behalf of Suffolk?

18           MR. WOOD:  No, Your Honor.

19           THE COURT:  Mr. Greene, anything further today?

20           MR. GREENE:  A couple questions.  Am I entitled to

21   the seven -- what is a custodian, if I may ask.  Is it just

22   a --

23           THE COURT:  Holder of the documents.

24           MR. GREENE:  Okay.

25           THE COURT:  That's a custodian.

1          MR. GREENE:  And can I have the name of the seven

2  that are apparently part of whatever their discussions are?  I

3  don't know who they're --

4          THE COURT:  Have documents been produced to

5  Mr. Greene?

6          MR. GREENE:  I guess prior to that, Your Honor, just

7  if I -- I did speak to Mr. Wood who suggested I speak to the

8  plaintiffs in regards to the confidentiality stipulation.

9          THE COURT:  Have you signed it?

10          MR. GREENE:  No.  And --

11          THE COURT:  Well, that's why you're not going to get

12  documents.  If you sign the confidentiality agreement then

13  they'll have to give you the documents.

14          MR. GREENE:  Okay.  Now, my question with that is,

15  does that document -- protective order I guess it's -- if I'm

16  saying it correctly -- did that cover all parties involved or

17  is it just the 1 through 21 plaintiffs?  Is that who it is --

18          THE COURT:  I'm not understanding.

19          MR. GREENE:  -- covering?

20          THE COURT:  No, it covers all the parties.  If you

21  sign on, then you're covered.  You asked me this at the last

22  conference.  You said, if you find out something during this

23  case --

24          MR. GREENE:  Correct.

25          THE COURT:  -- and it would help you in your appeal,

1  would it be something you could use and I said, no, that the

2  protective order is agreeing that the information that you get

3  in this case will be used only for this case.  That's

4  generally what a protective order is.

5          MR. GREENE:  I didn't know if it only covered the 1

6  through 21 plaintiffs because they wanted to remain anonymous

7  or if it meant everybody including -- I don't know, the people

8  in the police department that have been apparently -- I don't

9  know if they've been deposed, but spoken to --

10          THE COURT:  All defendants.

11          MR. GREENE:  All defendants.

12          THE COURT:  The fact you heard that Mr. Wood said

13  when he called upon the other attorneys in Suffolk County to

14  try to do some of the work that I had tasked him with, he got

15  them all to sign onto the protective order.  So it covers

16  everybody who's touching the case.

17          Anything else, sir?

18          MR. GREENE:  Is -- so I guess if I want to -- I'm

19  not -- at this point I'm not signing that.  Is there a way for

20  me to address --

21          THE COURT:  If you're not -- if you're not signing

22  it, then they're not going to turn over the documents.

23          MR. GREENE:  All right.  Can we modify it in some

24  fashion and so that --

25          THE COURT:  That's not for me to decide.

1          MR. WOOD:  Who would that --

2          THE COURT:  The parties who are exchanging the

3    information.  Again, Mr. Wood represents the Suffolk County

4    Attorney's office and the defendants.  Not you.

5          MR. WOOD:  Right.

6          THE COURT:  Who are named.  They have all agreed

7    with the plaintiffs who are represented by the attorneys who

8    sit across the aisle to not use any of the information that's

9    being exchanged for any purpose other than this lawsuit --

10          MR. GREENE:  Right.

11          THE COURT:  -- and to keep it confidential.  And if

12    you're not agreeing to that, they're not going to exchange the

13    information with you.

14          Now, again, there might be other things that you can

15    do, other requests.  I asked whether you got the handbook.

16          MR. GREENE:  Um-hum.

17          THE COURT:  Regarding -- you picked that up.  It has

18    a whole chapter about discovery.  But I can't make the parties

19    exchange information without some protection, if that's the

20    agreement that they've put in place and I or Judge Brown have

21    so ordered.

22          MR. GREENE:  Okay.  So if I have discoverable

23    things, I would request -- I should ask them and see if

24    they'll allow it.  If they say no address it with the Court?

25          THE COURT:  Your discovery requests are made under

1    the same rules.  They have to be made in writing.  They

2    generally have 30 days to respond to your requests.  Likewise,

3    they can make requests from you.  But if there's no

4    confidentiality order in place, I'm not going to direct them

5    to include you with everything that's been collected so far

6    because part of why they have exchanged this information is

7    they know the information will only be used for the purpose of

8    this litigation.

9              You can ask downstairs questions about protective

10   orders or you can read online about protective orders.

11   They're controversial.

12             MR. GREENE:  Um-hum.

13             THE COURT:  But in this context, again, there's law

14   enforcement privileges, there's attorney/client privileges,

15   there's data collection that is being assembled for the

16   purpose of this lawsuit.

17             MR. GREENE:  Okay.

18             THE COURT:  Okay.  So we have a new date and that is

19   July 12th at 11:00 and I'll expect a letter from both sides

20   and I'll expect that you'll make big progress and the 20th

21   will be the date for the turnover of the pages for the

22   custodians already in play and including Love.  And you will

23   then discuss how to narrow terms regarding any other

24   custodians that you want searched and you'll get deposition

25   dates, okay?

38

1          With that we are adjourned.  Thank you so much.

2          ATTORNEYS:  Thank you, Your Honor.

3   (Proceedings concluded at 1:07 p.m.)

4                       *  *  *  *  *  *

39

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    _____

7          Ruth Ann Hager, C.E.T.**D

8    Dated:  June 4, 2019