UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

PLAINTIFFS #1-21, *individually and on
behalf of all others similarly situated,*

                      Plaintiffs,

    -against-

THE COUNTY OF SUFFOLK, SUFFOLK
COUNTY POLICE DEPARTMENT,
EDWARD WEBBER, *individually and in his
official capacity,* MILAGROS SOTO,
*individually and in her official capacity,*
SCOTT GREENE, *individually and in his
official capacity,* BRIDGETT DORMER,
*individually and in her official capacity,*
SUPERVISORY JOHN DOE DEFENDANTS,
*individually and in their official capacities,*
and JOHN DOE DEFENDANTS, *individually
and in their official capacities,*

                    Defendants.

-----------------------------------------------------------X

**REPORT AND RECOMMENDATION
15 CV 2431 (WFK)(LB)**

**BLOOM, United States Magistrate Judge:**

       Plaintiffs #1-20[1] ("plaintiffs" or "the named plaintiffs"), filed this putative class action, on

behalf of themselves and others similarly situated, against the County of Suffolk ("Suffolk

County" or "the County"), the Suffolk County Police Department ("the SCPD"), Commissioner

Edward Webber, Lieutenant Milagros Soto, former-Sergeant Scott Greene, Officer Bridgett

Dormer, Supervisory John Doe Defendants ("Supervisory John Does"), and John Doe Defendants

("John Does"), alleging defendants violated their rights under the Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution, 42 U.S.C. § 1983, Title VI of the Civil Rights Act

---

[1] The Court granted plaintiffs' motion to proceed anonymously. ECF No. 36. Plaintiff #21 voluntarily
withdrew his claims and was dismissed from the litigation. ECF No. 157.

1

of 1964, 42 U.S.C. § 2000d, and the common law of the State of New York.[2] Specifically, plaintiffs allege that the SCPD violated the civil rights of Latinos through systemic discriminatory and unconstitutional policing policies, patterns, and practices. Plaintiffs allege that Suffolk County and the SCPD have known about these discriminatory practices for years, and thus their failure to take the necessary steps to investigate and eliminate these practices amounts to deliberate indifference. Plaintiffs allege that defendants' failure to act has facilitated and encouraged police discrimination against Latinos.

Plaintiffs move for class certification under Rule 23 of the Federal Rules of Civil Procedure, seeking declaratory and injunctive relief pursuant to Rule 23(a) and 23(b)(2) and damages pursuant to Rule 23(a) and 23(b)(3). Defendants oppose plaintiffs' motion.[3] The Honorable William F. Kuntz, II referred plaintiffs' motion to me for a Report and Recommendation in accordance with 28 U.S.C. 636(b)(1)(B).[4] For the reasons set forth herein, it is respectfully recommended that plaintiffs' motion should be granted in part and denied in part.

---

[2] Named plaintiffs 1–4, 6–10, and 12–20 each assert an individual claim of conversion against defendants Greene and Dormer. See Plaintiff's First Amended Complaint, ECF No. 21 ("Compl.") at ¶¶ 195–96.

[3] Defendants Suffolk County, the SCPD, Commissioner Webber, Supervisory John Does, Lieutenant Soto, Officer Dormer, and John Does are represented by the Suffolk County Department of Law. Defendant Scott Greene proceeds *pro se*. Defendant Greene has not filed an opposition to plaintiffs' motion for class certification. Therefore, reference to "defendants" hereinafter is to all defendants except Greene. Greene is named specifically if referenced.

[4] Plaintiffs' motion for class certification was filed at the same time as plaintiffs' motion *in limine* "For an Adverse Inference, or, in the Alternative, the Finding of a Rebuttable Presumption." ECF No. 275. Only plaintiffs' motion for class certification, ECF No. 250, was referred to me for a Report and Recommendation.

Defendants respond to both motions in one memorandum, but as plaintiffs highlight in their Reply in Support, ECF No. 279 ("Reply") at 6 n.15, the motions are separate, and as such, plaintiffs have submitted a separate reply to defendants' response to the motion *in limine*. As discussed below, I find that plaintiffs have filed sufficient evidence to grant the motion for class certification under Federal Rule of Civil Procedure 23(a) and 23(b)(2), regardless of the Court's decision on the motion *in limine*.

A class should be certified under Rule 23(b)(2) and plaintiffs' counsel should be appointed as class counsel pursuant to Rule 23(g). Plaintiffs' motion for certification under 23(b)(3) should be denied without prejudice.

## BACKGROUND[5]

Plaintiffs are twenty Hispanic[6] individuals who are present and former residents of Suffolk County. Compl. at ¶¶ 4, 9–29. Plaintiffs allege that they have been subjected to discriminatory policing by the SCPD[7] including race-based traffic and pedestrian stops as well as wrongful searches and detentions. They further allege that SCPD officers have taken their personal property, issued them unjustified traffic citations, and have otherwise harassed them. Id. at ¶ 1. As a result, plaintiffs report feeling fear, anxiety, loss, and embarrassment, especially when driving through

---

[5] The facts are drawn from plaintiffs' First Amended Complaint and the declarations, exhibits, and affidavits submitted with respect to plaintiffs' motion for class certification. "When deciding a motion to certify a class, the allegations in the complaint are accepted as true." K.A. v. City of New York, 413 F. Supp. 3d 282, 301 (S.D.N.Y. 2019) (quoting Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978)).

[6] Plaintiffs' complaint uses the terms "Latino" and "Hispanic" interchangeably to reference a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race. Compl. at ¶ 1 n.1.

[7] The SCPD is comprised of 2,700 sworn officers and over 600 civilian members. Public Safety, Suffolk County, https://www.suffolkcountyny.gov/public-safety, (last visited Mar. 6, 2021). "It is generally proper to take judicial notice of articles and [websites] published on the [i]nternet." Magnoni v. Smith & Laquercia, LLP, 701 F. Supp. 2d 497, 501 (S.D.N.Y. 2010) (citation and quotation marks omitted).

Suffolk County.[8] Id. at ¶ 5. See ECF Nos. 255–274, "Plaintiffs Affidavits."[9]

Plaintiffs also allege that defendants SCPD and Suffolk County are fully aware of this discrimination and have "ignored, covered these practices up, and more generally, failed to take the actions necessary to investigate and eliminate these practices." Compl. at ¶ 2. Plaintiffs commenced this action in 2015 to compel defendants to end their systemic discriminatory policing and to obtain monetary relief for plaintiffs' damages suffered as a result of these policies. Id. at ¶ 1.

## A. History: Department of Justice Investigation and Charges Against Scott Greene

In 2007, Marcelo Lucero, an Ecuadorian immigrant, was murdered by a group of teenagers in Suffolk County who referred to themselves as the "Caucasian Crew." Lucero was targeted and fatally stabbed because he was Latino. His brutal death turned the national spotlight to Suffolk County, where other Latino residents voiced their own experiences with anti-Latino violence and harassment.[10] Complaints of discriminatory policing began to accumulate against the SCPD—

---

[8] According to U.S. Census data, as of July 1, 2019, (based on population estimates) Suffolk County had a total population of about 1.48 million residents. Suffolk County's Latino population has grown substantially in the last decade. People identifying as Hispanic or Latino now comprise 20.2% of the population. See Suffolk County, New York, United States Census Bureau Quickfacts, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/suffolkcountynewyork/PST045219 (last visited Mar. 4. 2021). This number does not include individuals, such as some of the named plaintiffs, who live outside Suffolk County but who regularly drive through the County to get to work or to visit family and friends. As Suffolk County covers 912.05 square miles, driving is a daily necessity for many in Suffolk County.

[9] Defendants raise that each of the declarations signed by plaintiffs are written in English, and that plaintiffs' counsel failed to contemporaneously file certifications that the declarations were provided to plaintiffs in Spanish and/or accurately translated into English. See ECF No. 277, Response in Opposition ("Opp. Mem.") at 2 n.2. Defendants' point is well-taken. Plaintiffs' counsel should have had Spanish interpreters contemporaneously file certifications attesting that the affidavits were translated for each plaintiff prior to signing. This should be counsels' standard practice in the future even if counsel are native and fluent Spanish speakers. Nevertheless, the Court accepts the declarations for the instant motion.

namely, that the SCPD discouraged Latino victims from filing complaints and failed to investigate crimes and hate-crime incidents—contributing to an atmosphere of fear in the Latino community.[11]

In response to these complaints, in September 2009, the United States Department of Justice ("DOJ") and the United States Attorney's Office for the Eastern District of New York (collectively, the "United States") commenced an investigation into the allegations of discriminatory policing. During the course of that investigation, in 2011, the United States issued a Technical Assistance letter to the SCPD which outlined numerous recommendations to address its concerns about the SCPD's policing services.[12] Compl. at ¶¶ 3, 144–54.

Around December 2013, the United States and the SCPD reached a limited settlement agreement ("the Agreement"). The Agreement acknowledged that the SCPD's policies were

---

[10] Exhibit A, ECF No. 252, Southern Poverty Law Center report titled "Climate of Fear: Latino Immigrants in Suffolk County, N.Y."

Plaintiff's exhibits submitted in support of this motion are labeled alphabetically and are found at ECF No. 252. Defendants' three exhibits in support of their opposition are labeled numerically and are located at ECF No. 277. Hereinafter, all exhibits are referred to as "Ex. _".

[11] See Ex. G, "DOJ Press Release." See also Exs. B, C, and E, "Letters from Cesar Perales, President and General Counsel of LatinoJustice PRLDEF to DOJ."

[12] The DOJ's Technical Assistance Letter outlines the investigation's preliminary findings and was "intended to assist SCPD in its efforts to provide constitutional police services." Ex. H, "Technical Assistance Letter" at D-11451. The findings included, *inter alia* that the SCPD's policies prohibited officers from questioning witnesses and victims about immigration status, but required officers to question a person arrested for a crime about his immigration status, regardless of the charge; that vague policy language rendered policies "vulnerable to abuse and [exposed] the SCPD to allegations of racial profiling" and "discrimination on the basis of national origin"; that the Hate Crimes Unit (HCU) detectives "rarely" followed-up with victims and possible victims; that vague and inconsistent departmental policies permitted officers to fail to report incidents; that the SCPD failed to track or trend hate crime data; that SCPD officer training was inadequate; that the SCPD's procedures for reviewing, investigating and tracking reports of police discrimination were inadequate; that procedures for handling complaints of officer discrimination and misconduct were inadequate; that the SCPD did not have a policy that explicitly forbade officers from discouraging citizens from making complaints regarding criminal or illegal conduct; that the SCPD did not have a system to regularly review its policies; that the SCPD did not have a predictive monitoring structure pertaining to officer conduct and that the scope of data collected was extremely minimal. See id. (quotation at D-11453). The letter recommends that the SCPD implement over 100 new policies and procedures.

insufficient to prevent discriminatory behavior towards Latinos, memorialized the recommendations set forth in the Technical Assistance Letter, and committed the SCPD to implementing new policies and procedures to "ensure that it polices equitably, respectfully, and free of unlawful bias." DOJ Press Release at 1; Compl. at ¶ 150; see Ex. I, "DOJ Agreement." The Agreement was to remain in effect until the SCPD "substantially complied" with the Agreement for at least one year. Compl. at ¶ 151; DOJ Agreement. Plaintiffs allege that despite being aware of these discriminatory practices and years of DOJ oversight and guidance, the SCPD and the County have failed to reform their unconstitutional police services and have allowed discriminatory practices to continue.[13]

At the same time that SCPD was under investigation for discriminatory policing, defendant Scott Greene, then a SCPD sergeant with 25 years on the force, was abusing his police power by stopping Latino motorists to steal their money. Compl. at ¶¶ 79–80. Greene's stop-and-rob scheme targeting Latinos persisted for years. In 2014, following a sting operation by the Suffolk County District Attorney's Office, in which an undercover Latino officer recorded Greene stealing $100 from his vehicle during a traffic stop, Greene was arrested and indicted by two state grand juries. Id. at ¶ 81–82. In January of 2016, a New York State jury found Greene guilty of multiple counts of grand larceny, petit larceny, and official misconduct for stealing money from over two dozen Latino individuals. In April of 2016, Greene pled guilty to additional charges of grand larceny and petit larceny. See Ex. M.

---

[13] It is worth emphasizing here that plaintiffs' arguments regarding the SCPD's failures are twofold. First, they argue that the SCPD is not in compliance with the terms of the Agreement as it stands, i.e., the provisions which require audits related to compliance to be made publicly available. Compl. at ¶¶ 152–53. Second, they argue that even if the SCPD was in full compliance, the requirements of Agreement do not go far enough, leaving significant gaps that fail to protect the Latino community and foster discriminatory behavior by the SCPD. Id. at ¶ 154.

All plaintiffs herein, except Plaintiff 11, were robbed by Greene. Some plaintiffs were instructed to leave their cars before Greene robbed them while he conducted warrantless searches; in other stops, Greene confiscated plaintiffs' wallets and took their money. Compl. at ¶¶ 90–131. Several plaintiffs were robbed by Greene on multiple occasions.[14] Plaintiffs allege that defendant Greene is not the only SCPD officer to engage in discriminatory behavior and some plaintiffs report being stopped by other officers since Greene's arrest, in their view, for no valid reason.[15] Each named plaintiff alleges that he or she was targeted for these stops by the SCPD because they are Latino. See Plaintiffs' Affidavits.

**B. Summary of Plaintiffs' Claims and Defendants' Responses**

    **1. The SCPD targets Latinos for stops, establishing a pattern and practice of discriminatory policing.**

Plaintiffs allege that SCPD officers have stopped, ticketed, searched, and/or arrested Latino motorists on the basis of their ethnicity. Compl. at ¶ 30. In support of this claim, they proffer an expert report,[16] which analyzed the SCPD's available traffic stop data and found that Latinos are disproportionately mistreated after being stopped. Ex. T, "Smith Report."[17] Defendants reject these findings without much elaboration. See Opp. Mem. at 13. ("[T]heir expert reports are based upon

---

[14] Granny Road was apparently a favorite location for Greene to target victims.

[15] See Affidavits of Plaintiffs 3, 5, 6, 8, 11, 13, 14, and 17.

[16] Michael R. Smith, J.D. PH.D. is a Professor and Chair in the Department of Criminology and Criminal Justice at the University of Texas at San Antonio with over 25 years of experience as a researcher on police behavior and the criminal justice system. See Smith Report at 3.

[17] "Notwithstanding the limitations on the data, we conducted bivariate post-stop analysis on the traffic stop data, which found statistically significant, higher percentages of Latino motorists who were arrested and ticketed compared to Whites across all years examined and lower percentages who were warned or released with no further action taken….in my opinion these results are … consistent with ethnicity-based enforcement." Id. at 51.

speculative allegations not supported by the record, or statistical formulas that show nothing more than the fact that Hispanic persons experienced traffic stops in Suffolk County.") Plaintiffs' expert report was based on an audit of SCPD's own traffic stop data. If the data shows no more than the fact that Latinos were stopped by the SCPD, that is likely due to the insufficiency of the collected data, as found by the DOJ's compliance reports and discussed below.

### 2. The SCPD has failed to collect reliable data and has failed to assess its data to prevent biased policing.

Plaintiffs allege that the data collected by the SCPD, including data collected since the DOJ Agreement, is unreliable and that if the data had been collected and audited properly, the SCPD would be on notice that their biased policing continues. Smith Report at 50–51.[18]

It is well established that the data collection is unreliable and that an assessment of the data was not timely made by the SCPD. The Settlement Agreement mandated that SCPD implement a system to collect traffic stop data so that the SCPD could properly analyze that data. Following the Agreement, The United States issued periodic reports that assessed the SCPD's compliance with the terms of the Agreement.[19] These reports reveal that the SCPD has never been in full

---

[18] See also Smith Report at 27. ("The primary takeaway from this review of the data is that SCPD data collection protocols changed every 2–3 years and never consistently captured the fields necessary to determine whether Latino motorists were treated disparately from White motorists in key post-stop outcomes.")

[19] There are seven Compliance Assessments from the DOJ.

compliance with the Agreement's data requirements.[20] Both the United States[21] and the SCPD[22]

acknowledge that the data that has been collected is unreliable. Further, the SCPD has admitted

---

[20] The most recent assessment states that the SCPD is in "partial compliance" with the Agreement's requirements for stop data. Ex. J, "October 2018 Assessment," 3. The report defines partial compliance as "the County has achieved compliance on some of the components of the relevant provisions of the Agreement, but significant work remains." Id.

[21] Other recent assessments state: "[a]s set forth in our last Report, the data collected by SCPD omits critical variables that are necessary for meaningful analysis of bias-free policing," such as "why a stop was initiated," and the results of conducted stops, "including whether a particular search revealed contraband or not." Ex. QQ, "January 2017 Compliance Assessment," 6–7; "[The SCPD] remains in partial compliance…due to the continued failure to implement an adequate data collections system." Ex. DDD, "March 2018 Compliance Assessment," 6. In 2017, "after months of preparation" leading up to the launch of a new data system, "SCPD discontinued using the system the very day it launched it" due to implementation issues. Id.; "We renew our recommendation that SCPD supervisors develop specific protocols for the substantive review of traffic stop data as a part of supervisors' regular supervisory activities and that SCPD provide renewed training for supervisors, many of whom have not received supervisor-specific training since attaining the rank of sergeant." October 2018 Assessment at 7.

[22] A 2016 Report issued by the SCPD noted that after launching a new system in October 2014, due to a "computer glitch" it did not detect approximately "7,000 incomplete entries," rendering data unreliable from October 2014 until July 2015. Ex. X, "SCPD's February 2016 Report." The same report indicated 139 incomplete traffic stop entries for the month of December 2015 alone. Id. See also Ex. Z, "SCPD's March 2017 Report," 4 (the SCPD agreed with the DOJ's conclusion that "the existing capture fields require more specificity" to conduct a "meaningful analysis of the data"); Ex. R, Love Deposition I at 182 (Q: What steps are taken to ensure that the officer is inputting the information accurately, correctly? A: There would be none […]. Q: (same regarding the input of the correct race of the individual stopped) A: There are none).

Sergeant Christopher Love is an attorney assigned to the SCPD Legal Bureau. Ex. 3, "Affidavit of Christopher Love." He was designated as the County's Rule 30(b)(6) witness on policies related to complaints, the Settlement Agreement, and data collection.

that, at the time the instant motion was filed,[23] the SCPD never analyzed its stop data as required by the DOJ Agreement.[24]

In addition to the traffic stops and post-stop searches, plaintiffs allege that the SCPD uses traffic checkpoints in an unlawful, discriminatory manner to target Latinos. Compl. at ¶¶ 70–77. No checkpoint data was collected until 2018 and the SCPD still does not collect data on post-stop outcomes. Plaintiffs allege this data field is necessary at minimum to assess these stops for bias. See Smith Report. at 33–35. Similar to the traffic stop data, the SCPD has never analyzed checkpoint data to assess whether checkpoints were being disproportionately set up in Latino neighborhoods nor to otherwise assess its use of checkpoints.[25] In summary, plaintiffs argue that

---

[23] Defendants have filed a report commissioned from the John F. Finn Institute for Public Safety, Inc. as an exhibit with their pending motion for summary judgment. The Court notes that this report was completed in late September 2020, on the eve of defendants' summary judgment motion deadline, nearly seven years after defendants entered the DOJ Agreement, and nine years after the SCPD was formally put on notice regarding its insufficient data collection in the Technical Assistance Letter.

Plaintiffs request that the Court consider this report as well as additional declarations from their expert Michael Smith, Latino residents of Suffolk County, and by a community advocate that were filed in support of plaintiffs' opposition to defendants' motion for summary judgment. ECF No. 315. Plaintiffs state that these materials support their arguments related to the numerosity of the class under Federal Rule of Civil Procedure 23(a) and whether defendants have failed to remedy their institutional policies that continue to result in disparate treatment of the proposed class under Federal Rule of Civil Procedure 23(b)(2). The request is denied as consideration of additional evidence is unnecessary. While the Court may rely on the record as presently developed to decide whether certification is appropriate, Hardgers-Powell v. Angels In Your Home LLC, 330 F.R.D. 89, 98 n. 3 (W.D.N.Y. 2019) (considering evidence submitted in relation to motions for summary judgment as discovery was not yet completed when the motion for class certification was filed) and the district court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met," district judges are afforded "considerable discretion" to limit the extent of the hearing on Rule 23 requirements, Miles v. Merrill Lynch & Co., 471 F.3d 24, 41 (2d Cir. 2006).

[24] See Love Deposition I at 149–50 (Q: So R&D has not conducted an analysis of the traffic stop data[?] A: No. That's correct, they have not.); Id. at 115 (Q: So the [traffic stop] data has never been reviewed for atypical traffic stop activity? A: No. […] Q: "Commanding officers shall review the annual report" […] So that also has not been done? A: Correct).

[25] See Ex. W, "Love Deposition II" at 667–68.

by failing to collect accurate traffic stop and checkpoint data, the SCPD has employed a successful strategy to escape a finding of discrimination. Plaintiffs allege that, had data been accurately collected and timely assessed as required by the agreement, the SCPD would have been alerted to concerning trends regarding ongoing discriminatory policing.

>    ### 3. Defendants have failed to design and implement adequate policies and procedures regarding training, supervision, and discipline, thus allowing and/or encouraging biased policing.

Plaintiffs allege that defendants have maintained a policy, practice, and/or custom of unconstitutional conduct, by failing to design and implement adequate policies, procedures, training, supervision, and discipline policies to prevent discriminatory policing and other misconduct. Compl. at ¶¶ 155–67. In support, plaintiffs submit a second expert report which found that the SCPD's policy failures increased the known risk that SCPD officers might engage in discriminatory behavior or other misconduct. See Ex. BB, "Stewart Report."[26] The failure to adopt adequate policies, plaintiffs argue, also permitted Greene's crimes to continue unabated for years. See Supp. Mem. at 11.

In addition to the problems with the SCPD's data collection policies, discussed above, plaintiffs allege a number of additional policy, procedure, training, supervision, and discipline failures within the SCPD:

---

[26] Robert Stewart is a police practices expert with fifty years of experience in the field of law enforcement, first as a law enforcement officer, and later as a consultant for the DOJ and numerous state and local law enforcement agencies. Stewart has conducted audits of police departments of various sizes across the country. See Stewart Report at 1.

- First, plaintiffs argue that the SCPD failed to adopt an adequate bias-free policing policy within a reasonable time after the DOJ's Settlement.[27] Supp Mem at 11–12. In support of this claim, plaintiffs highlight that, despite the Technical Assistance Letter raising the issue in 2011, the SCPD did not issue an anti-bias policy until 2015. See Stewart Report at 22. Further, early proposals for the training program were found to be insufficient by the DOJ. See Ex. AA, "December 2015 Compliance Report," 15 ("both the pedagogical approach to teaching the subject and the substantive information provided require additional substantial revisions"). Bias-free policing trainings did not begin until 2018.[28] While the SCPD has now developed the trainings, and the DOJ has approved of the trainings as they read on paper, the SCPD has stated that the process of actually providing the training to all officers would take at least two years. October 2018 Compliance Report at 8. The Court notes that the Settlement Agreement requires the SCPD to "ensure that all sworn officers receive training on bias-free policing *at least annually*." Settle. Agree. at D-2266 (emphasis added).

- Second, plaintiffs allege that the SCPD has failed to adequately and timely investigate complaints of officer misconduct.[29] Supp. Mem. at 12. SCPD's policy is that IAB

---

[27] See Stewart Report at 27. ("Based on my experience, it should not take two years for a police department of the SCPD's size to provide bias-free policing training to all officers.")

[28] See Love Deposition I at 59. (Q: There was no specific training for bias-free policing prior to 2018? A. Correct…).

[29] The Court notes the significant risk inherent in delayed investigations of police misconduct. For example, Plaintiff 2 and Plaintiff 3 were robbed by Greene in June of 2012 and Plaintiff 2's sister-in-law, who speaks English, called the SCPD to file a report by telephone on behalf of both men. Compl. at ¶¶ 95–97, 99–102. Although Plaintiff 2 received a letter shortly thereafter, acknowledging the complaint, the men were not contacted by the SCPD for an in-person interview until January 2013, nearly six months after the incident. Compl. at ¶ 97. During those six months, Plaintiffs 1 and 16 were also robbed by Greene. Compl. at ¶¶ 90–91, 125. In addition to the risk of repeat offenses that results from delayed investigations, if community members do not have faith that their complaints will be timely investigated, they will not make them. See

investigations must be completed within 60 days and that any complaint not completed within 60 days requires written notice to the Police Commissioner. See Love Deposition I at 288–90. Case summary data reveals that the average number of days from complaint to completion ranged from a high of over three years (1,126 days) in 2012 to six months (182 days) in 2018. See Ex. CC, "IAB Case Summary." After reviewing IAB investigation files, plaintiffs' expert reported that the majority of the investigations that lasted more than 60 days did not contain a 60-day written notice in the file. Stewart Report at 43. These delays are particularly concerning because the statute of limitations for the SCPD to take disciplinary action against an officer is 18 months.[30] As of September 30, 2019, the IAB had more than 100 cases open for at least seven months including 13 that had been open for longer than 18 months. Id. at 45.

- Third, plaintiffs allege that the SCPD's process for investigating complaints suffers from significant flaws, that the process for receiving complaints discourages Latinos from filing complaints, and that the SCPD fails to adequately supervise IAB investigators.[31] Supp Mem. at 13–14. The SCPD's guidelines for IAB investigators, plaintiffs argue, bias officers against complainants. See Ex. EE at D-16324, D-16329 ("The effort you expend may be instrumental in negating a complainant's allegation"); Id. at D-16328 ("If someone

---

Love Deposition I at 287 ("The DOJ had recognized that we didn't have, I believe, very many Latino complaints of biased policing and [the DOJ] was concerned…"). Greene was not arrested until 18 months after Plaintiff 2's complaint was first made to the SCPD.

[30] Ex. GG, "Caldarelli Deposition," 119 ("I know that there were a few cases where we did not have the ability to, you know, discipline people because the 18 months lapsed.").

[31] For example, Inspector Armando Valencia, the Commanding Officer of the IAB from October 2014 until 2016 testified that he never undertook random audits of IAB officers and that he was unable to provide his understanding of the requirements under the DOJ agreement. See Ex. II, "Valencia Deposition," at 232–36, 242.

contradicts the complainant… every effort should be made to get that person on paper"). Plaintiffs argue it is no surprise that IAB investigators have never substantiated an allegation of biased policing, something that their expert cited as a "red flag."[32]

- Fourth, plaintiffs allege that the SCPD failed to implement an early intervention system for supervisors to identify and correct potential discriminatory policing against Latinos. Supp. Mem. at 15–16; Stewart Report at 31–35 (describing the SCPD's system as "reactive to negative officer incidents rather than proactively identifying potentially problematic conduct."). An early intervention system was recommended by the DOJ. See Technical Assistance Letter at D-11466 (The SCPD should use an early intervention system to "gather and track data for each officer's arrests by race or ethnicity of the subject" and "require supervisors… to review these data for every officer they supervise on a quarterly basis."). The SCPD reported that the system in place does not capture issues pertaining to bias. See Caldarelli Deposition at 311–12. Further, senior officers were unfamiliar with any early warning system. See Ex. JJ, "Burke Deposition" at 136 ("I don't recall [an early intervention notification system].").

It is unclear what portion of plaintiff's allegations defendants specifically object to. Defendants' opposition to the motion for class certification merely states, "these allegations [of deliberate indifference] are not supported by the record." Opp. Mem. at 3. Indeed, rather than countering the allegations set forth by plaintiffs in the voluminous record regarding department-

---

[32] "Although low substantiation rates for biased policing complaints exist in other large police departments, it is my opinion that the SCPD's zero substantiation rate is a red flag that, in and of itself, calls into question the adequacy of the SCPD's process for investigating complaints." Stewart Report at 52.

wide policy failures, defendants issue a blanket opposition to the instant motion based on two theories.

First, they maintain that defendant Greene was a lone-wolf bad actor.[33] In relation to the instant motion, they emphasize that what the named plaintiffs have in common—and argue that what separates them from the putative class members—is that they were all targeted by Greene. In support of this theory, defendants submit a portion of Plaintiff 11's deposition in which he states that "things are better" since Greene's arrest. That Greene is no longer an officer at the SCPD able to wield his official badge to harass Latinos is surely a relief for his victims as well as for Suffolk County; however, that one officer who was convicted of a crime has been removed from the force is an impossibly low bar for the County to claim that the SCPD has cured its discriminatory policies or practices.[34] Greene's arrest neither releases the SCPD of any potential wrongdoing in relation to its response or lack thereof to Greene's criminal conduct, nor does it address the persisting *department-wide* problems that plaintiffs detail in great length.

---

[33] "The named plaintiffs do not identify a single instance other than those incidents relative to Greene in which they were unlawfully deprived of personal property following a vehicular or pedestrian stop or detention by SCPD in Suffolk County; and fail to give any specific information, other than self-serving conclusory allegations, regarding other instances of alleged discriminatory policing they encountered after the arrest of Greene […] in fact, once Greene was arrested, there is no evidence, other than pure conclusory allegations by the plaintiffs, that any improper police actions continued." Opp. Mem. at 2.

While Greene was the only SCPD officer arrested and convicted for robbing Latinos during traffic stops, the Court takes no pleasure in noting that he was a *sergeant* and a 25-year veteran of the SCPD. Giving the SCPD the most generous benefit of the doubt, it challenges credulity no one in the SCPD had an inkling or a suspicion of Greene's activities. The egregious nature of his conduct and the fact that his actions persisted with impunity for years is shameful, especially because when complaints were made, had they been promptly and properly investigated, Greene would have been stopped.

[34] Plaintiff 11's deposition can be found at Ex. 2. Defendants also point out plaintiff's testimony suggests that "the checkpoints are now better." In the 2011 Technical Assistance Letter, The United States informed the SCPD that using checkpoints "primarily to request documentation of citizenship" would be an unacceptable practice. Again, a single statement by one plaintiff that the County's use of checkpoints has improved fails to rebut plaintiffs' showing that the SCPD's failure to timely change its unconstitutional policies, patterns, and practices led to discriminatory policing against Latinos.

The second defense that defendants repeatedly assert to oppose plaintiffs' motion is that if the United States believes that the County has failed to fulfill its obligations under the 2013 Agreement, there is an enforcement provision, and the United States could initiate court proceedings. See Settle. Agree. at 22–23. Defendants urge the Court to conclude that because the United States has never pursued court action against Suffolk County, there is no evidence of discriminatory policing. See Opp. Mem. at 3–4; Ex. 3.

This argument is unpersuasive. The United States may choose or decline to initiate enforcement proceedings for a variety of reasons. The absence of an enforcement action does not establish that the obligations outlined in the agreement have been fulfilled—in fact, the most recent report assessing compliance, notes only "partial compliance" in eleven areas covered by the Agreement. See October 2018 Assessment. Nor does the lack of an enforcement action establish the absence of other biased policies. As plaintiffs point out: "[t]he Agreement, to which Plaintiffs are not a party, is not a litmus test for constitutional policing." Reply at 12.


**PROCEDURAL HISTORY**

Plaintiffs commenced this action on April 29, 2015, ECF No. 1, and filed a First Amended Complaint ("FAC"). ECF No. 21. The Court granted plaintiffs' motion to proceed anonymously, ECF No. 7, and sua sponte stayed discovery with respect to defendant Greene, pending the outcome of his criminal case. ECF No. 36. Defendants answered plaintiffs' FAC, ECF No. 39, and the Court set an initial discovery schedule. See Jan 13, 2016 Order. The Court denied defendant

Greene's request for pro bono counsel, ECF No. 51,[35] but again stayed discovery regarding Greene pending the completion of his criminal case. See Mar. 21, 2016 Order.

After Greene's criminal case was adjudicated, the Court lifted the discovery stay, see Jul. 26, 2016 Order, and approved the parties' joint discovery schedule, see Sept. 9, 2016 Order. Defendant Greene filed his answer to plaintiffs' amended complaint with crossclaims against the County and SCPD and counterclaims against plaintiffs. ECF No. 176. The County defendants and plaintiffs responded to the respective cross and counterclaims. ECF Nos. 180, 182.

On March 25, 2019 this case was transferred from the Central Islip Courthouse to the Brooklyn Courthouse.[36] After several discovery conferences, see ECF Nos. 170, 206, 212, 222, 228, 223, the parties completed fact discovery on October 16, 2019.[37]

Plaintiffs now move for certification of the following class for declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2): "All Latino or Latina persons who, at any time after January 2012,[38] have been or in the future will be subject to a vehicular or

---

[35] However, the Court requested and obtained pro bono counsel to represent defendant Greene for the limited purpose of his deposition. See ECF Nos. 196, 222.

[36] Upon transfer, the case was reassigned to Judge Kuntz and me.

[37] The Court ordered the parties to fulfill outstanding discovery obligations by November 20, 2019. See ECF No. 212.

[38] Defendants raise that plaintiffs' claims would not reach back to January 2012 since the case was filed in April 2015 and there is a three-year statute of limitations in New York for civil rights claims under 42 U.S.C. § 1983. Owens v. Okure, 488 U.S. 235, 246 (1989); Pearl v. City of Long Beach, 296 F.3d 76, 77 (2d Cir. 2002) (accrual occurs for a § 1983 action when the plaintiff knows or has reason to know of the injury which is the basis of his action). Defendants argue that plaintiffs' claims should thus be limited to April 2012 to present.

This may be correct, but as the issue has not been fully briefed before the Court and it goes to the merits, the Court will not address it on the instant motion. A motion for class certification "is not an occasion for examination of the merits of the case." Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp., 222 F.3d 52, 58 (2d Cir. 2000); Shahriar v. Smith & Wollensky Restaurant Group, Inc., 659 F.3d 234, 251 (2d Cir. 2011) ("Wal-Mart has adopted that standard […] that at the class certification stage, a district judge should not

pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk." Supp. Mem. at 2. Plaintiffs also seek certification of the following class for monetary damages pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3):

> All Latino or Latina persons who, from January 2012 to the date of a final judgment, were unlawfully ticketed, searched, arrested, or otherwise subject to unlawful police action, including the unlawful deprivation of personal property, following a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk.

> Id. Judge Kuntz referred plaintiffs' motion for class certification to me for a Report

and Recommendation pursuant to 28 U.S.C. 636(b)(1)(B). ECF No. 313.

## DISCUSSION [39]

### I.     The Standard for Class Certification

At the class certification stage, a district court must engage in a rigorous analysis of the underlying facts in order to adjudicate the motion. Plaintiffs must establish that they have satisfied

---

assess any aspect of the merits unrelated to a Rule 23 requirement."). The Court has the discretion to modify the class definition at a later date. Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993).

[39] Defendants do not contest that plaintiffs have standing to bring this action and so I only address this threshold issue briefly. Article III of the Constitution requires a plaintiff to have standing to pursue the relief that he seeks before a federal court can hear a lawsuit. Concrete injury is a prerequisite to standing and a "plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." Deshawn v. Safir, 156 F.3d 340, 344 (2d Cir. 1998) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 105-06 (1983)).

Here, plaintiffs allege that defendants violated their rights on multiple instances by unconstitutional police stops. "The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." Floyd v. City of New York, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) (quoting Nicacio v. United States Immigration & Naturalization Serv., 768 F.2d 1133, 1136 (9th Cir. 1985)); Aguilar v. Immigration & Customs Enforcement Div. of the United States Dep't of Homeland Sec., 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011) (finding standing where one set of plaintiffs had been subjected to two unlawful searches and other plaintiffs feared future injury because the searches were part of defendants' "condoned, widespread, and ongoing" practice).

the requirements of Rule 23 by a preponderance of the evidence. Any factual findings here will not be binding at trial. See Miles, 471 F.3d at 41. The requirements for class certification are well established. Rule 23 of the Federal Rules of Civil Procedure sets forth a two-step process for certification of a class action. First, the party seeking certification must establish four requirements:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ P. 23(a). In the Second Circuit, there is a fifth prerequisite, known as the ascertainability requirement. In re Petrobras Sec. Litig., 862 F.3d 250, 264 (2d Cir. 2017) ("Rule 23 contains an implicit threshold requirement that members of a proposed class be readily identifiable.") (citations omitted). "[C]ertification is proper only if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011) ("Wal-Mart").

If the threshold requirements of Rule 23(a) are met, the proposed class must also fit within one of the subsections of Rule 23(b). Here, plaintiffs have moved for class certification under both Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2) provides for class certification where, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) provides for class certification where:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the

controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action[.]

Fed. R. Civ. P. 23(b)(3).

The moving party bears the burden of proving that all the requirements of Rule 23 are met, In re Gulf Oil/Cities Service Tender Offer Litigation, 112 F.R.D. 383 (S.D.N.Y. 1986). The Court can only certify a class after it determines that each requirement is met. Miles, 471 F.3d at 41. District courts in the Second Circuit must "assess all of the relevant evidence admitted at the class certification stage" and apply "the preponderance of the evidence standard" when resolving factual disputes relevant to each of the Rule 23 requirements. Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008) (quoting Miles, 471 F.3d at 42). The Court has discretion on questions of class certification because "the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted." Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 139 (2d Cir. 2001).

## A. Rule 23(a) Requirements

### 1. Numerosity

For class certification to be appropriate, the proposed class must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Second Circuit has held that "numerosity is presumed at a level of 40 members." Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

A motion for class certification cannot succeed where numerosity is based on pure speculation or bare allegations. See Weissman v. ABC Fin. Servs., 203 F.R.D. 81, 84 (E.D.N.Y. 2001) (citing Demarco v. Edens, 390 F.2d 836, 845 (2d Cir. 1968)); Reese v. Arrow Financial

Servcs. LLC, 202 F.R.D. 83, 90 (D.Conn. 2001) (holding that "bare assertions of numerosity are insufficient" and that a plaintiff seeking class certification must "provide some evidence of the number of class members to support the conclusion that the class is too numerous to make joinder practicable."). However, "[c]ourts have not required evidence of exact class size or identity of class members in order to satisfy the numerosity requirement," Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993), and plaintiffs may "rely on reasonable inferences drawn from the available facts." McNeill v. N.Y.C. Hous. Auth., 719 F.Supp. 233, 252 (S.D.N.Y. 1989); see also German v. Fed. Home Loan Mortg. Corp., 885 F. Supp. 537, 552 (S.D.N.Y. 1995) ("Precise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity.") (citation and internal quotation marks omitted).

Here, plaintiffs easily satisfy their burden establishing numerosity as they demonstrate that the proposed class likely exceeds forty members. The proposed 23(b)(2) class includes Latino and Latina individuals who, at any time after January 2012 have been subject to a pedestrian or vehicular stop and who may be subject to a stop in the future.[40] Plaintiffs proffer evidence that over one hundred thousand people have been stopped within that description and time period and that each year, the number within that group increases.[41]

---

[40] Defendants argue that the proposed 23(b)(2) class cannot include future members. See Def Mem at 15, ("the patently unworkable mechanism of allowing persons to be added to a class forever."). However, a class may include future members to establish numerosity. See Boucher v. Syracuse Univ.,164 F.3d 113, 119 n.11 (2d Cir. 1999) ("[A] class of current and future women students interested in playing varsity softball at Syracuse [. . .] would satisfy the numerosity requirement of Rule 23"); Robidoux, 987 F.2d at 936 ("requests for prospective injunctive relief which would involve future class members" weigh in favor of certification).

[41] Plaintiffs' report proffers that approximately 102,000 Hispanic drivers were stopped by the SCPD between 2014 and 2018 alone, just half the class period, and that the number of stops of Hispanic drivers has increased for each year within that period. See Smith Report at 46 t.4.

Defendants assert that plaintiffs must show how many potential class members were actually harmed by such stops.[42] However, the cases cited by defendants are distinguishable and proof of how many potential class members were actually harmed is not required.[43] The number of individuals stopped need not be precisely quantified for the Court to make a commonsense determination that it exceeds 40 individuals. See Floyd, 283 F.R.D. at 172 ("the language of the Rule's drafters is helpful: (b)(2) is meant for classes 'whose members are incapable of specific enumeration.'") (quoting Fed. R. Civ. P. 23 1966 Advisory Committee Note); see also McNeill, 719 F.Supp. at 252 (finding sufficient numerosity based on an estimate of over 1,000 potential class members and holding that "plaintiffs need not establish the precise number of class members in order to satisfy [...] numerosity.").

Lastly, insofar as practicability is the ultimate touchstone of the numerosity analysis, courts are instructed to consider all the circumstances surrounding the case, not merely the number of potential class members. See Robidoux, 987 F.2d at 936. The joinder of all parties need not be

---

[42] "[Plaintiffs] provide no evidentiary material at all attesting to the number of persons who supposedly were harmed…[plaintiffs] do not include any affidavits or declarations from any allegedly harmed persons other than the twenty plaintiffs." Opp. Mem. at 12–13. In support, defendants cite cases where courts found numerosity was not met because plaintiffs did not offer *any* evidence as to the existence of additional class members beyond speculation. See Kapiti v. Kelly, No. 07-CV-3782, 2008 WL 3874310 (S.D.N.Y. Aug 18, 2008) (holding that a court may make commonsense assumptions to support a finding of numerosity, but it cannot do so on the basis of pure speculation without any support); Jeffries v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus., 172 F. Supp. 2d 389, 394 (S.D.N.Y. 2001) (plaintiff did not offer any evidence as to numerosity); see also Wilner v. OSI Collection Services, Inc., 198 F.R.D. 393, 396 (S.D.N.Y. 2000) (finding that the plaintiff did not meet his burden of establishing numerosity where he did not include "one iota" of evidence as to the number of people who received a collection letter from the defendant).

[43] Defendants dedicate over five pages of their opposition to contesting numerosity. Defendants raise several other arguments, for example, "the paucity of evidence that any persons [...] have suffered a constitutional violation by any member of the SCPD, other than Greene." Opp. Mem. at 15. This argument irrelevant to the assessment of numerosity. Moreover, the Court notes that plaintiffs do allege incidents of unlawful stops by officers other than Greene. See e.g., Declaration of Plaintiff 5 at ¶ 9; Declaration of Plaintiff 14 at ¶ 10-11, 15-16.

impossible, rather, "the difficulty or inconvenience of joining all members of the class makes use of the class action appropriate." Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 504 F.3d 229, 244–45 (2d Cir. 2007). Relevant considerations include, "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits,[44] and requests for prospective injunctive relief which would involve future class members." Robidoux, 987 F.2d at 936. All these factors weigh in favor of certification of the present purported class; joinder of this class is impracticable. Therefore, the Court finds that plaintiffs satisfy the numerosity requirement for certification of the proposed class.

### 2. Commonality

"The commonality requirement is met if plaintiffs' grievances share a common question of law or fact." Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (citing In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 166–67 (2d Cir. 1987)). "Commonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class members." Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y. 1992) (citing Port Auth. Police Benevolent Ass'n v. Port Auth., 698 F.2d 150, 153–54 (2d Cir. 1983)); Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 156 (S.D.N.Y. 2008) ("Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment.") (quotation omitted).

---

[44] Defendants allege that other claimants may be more likely to bring individual actions since, "the individual named plaintiffs have claimed that their reluctance to come forward… was largely due to their status as undocumented immigrants." Opp. Mem. at 15. The Court does not credit this argument. Immigration status is not the only reason that individuals are hesitant to bring claims of misconduct against the police. See Floyd, 283 F.R.D. at 177 ("The vast majority of New Yorkers who are unlawfully stopped [by the police] will never bring suit to vindicate their rights.").

"A court may find a common issue of law even though there exists some factual variation among class members' specific grievances." Dupler v. Costco Wholesale Corp., 249 F.R.D. 29, 37 (E.D.N.Y. 2008) (citation omitted).

Here, plaintiffs allege that defendants violated their rights by perpetuating a pattern and practice of unlawful conduct. See Compl. at ¶¶ 168–196. Plaintiffs set forth numerous common questions of law and fact in their complaint, the resolution of which will resolve issues central to the validity of the named plaintiffs' claims.[45] Plaintiffs seek to represent a class that includes those who have suffered similar injuries caused by the same patterns and practices. These questions are similar to the common questions presented in other unlawful stop cases that Courts certified to proceed as class actions. See Floyd, 283 F.R.D. at 174 n.138; Davis v. City of New York, 296 F.R.D. at 166 n.50 (S.D.N.Y. 2013); Ligon v. City of New York, 288 F.R.D. 72, 82 (S.D.N.Y. 2013); Daniels v. City of New York, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) ("The fact that the claims of the proposed class stem from the same alleged unconstitutional conduct of the defendants proves the existence of common questions of law or fact.")

---

[45] Plaintiff's motion lists seven examples of common questions: did defendants "maintain a policy, practice, and custom of disproportionately subjecting Latino motorists to traffic stops, searches, tickets, arrests, and/or wrongful deprivations of property on the basis of their race or ethnicity"; did defendants "maintain a policy, practice, and custom of conducting traffic checkpoints in disproportionately Latino neighborhoods on the basis of race or ethnicity"; did defendants maintain a policy, practice, and custom of permitting and facilitating discrimination against Latinos"; did defendants demonstrate deliberate indifference to the need to identify and correct unlawful traffic stops by failing to adequately train, supervise and or discipline SCPD […] [officers]"; did defendants demonstrate deliberate indifference to the need to identify and correct unlawful traffic stops by failing to collect, audit, and analyze traffic stop data […]"; did defendants "demonstrate deliberate indifference to the need to identify and prevent unlawful biased policing by failing to investigate allegations of biased policing against Latinos"; and did defendants "demonstrate deliberate indifference to the need to identify and prevent unlawful biased policing by failing to investigate allegations of biased policing against Latinos." Supp Mem. at 24–25.

Defendants argue that due the heightened standard for commonality introduced by the Supreme Court in Wal-Mart,[46] plaintiffs' claims regarding, "defendants' asserted policies and practices can no longer be considered a sufficient common question under Rule 23." Opp. Mem at 18. This reading misconstrues the Wal-Mart decision. "[E]ven after Wal-Mart, Rule 23(b)(2) suits remain an appropriate mechanism for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member." Floyd, 283 F.R.D. at 173. Indeed, "[w]here plaintiffs were 'allegedly aggrieved by a single policy of the defendants,' and there is 'strong commonality of the violation and the harm,' this 'is precisely the type of situation for which the class action device is suited.'" Brown v. Kelly, 609 F.3d 467, 468 (2d Cir. 2010) (quoting In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 146 (2d Cir. 2001)). Further, after Wal-Mart, "courts have granted class certification in cases alleging Fourth and Fourteenth Amendment violations due to a police department's policy and/or practice of making unlawful stops and arrests[,]. . . reject[ing] the notion that the individual circumstances of a stop defeat commonality." Floyd, 283 F.R.D. at 174 (citations omitted).

Policies in law enforcement generally arise from a "centralized source" and employ a "hierarchical supervisory structure to effect and reinforce […] department wide policies." Id. at 173. Decision making within the sphere of private employment, as described in Wal-Mart, "is worlds away from centralized and hierarchical policing practices." Id. at n.134. Here, plaintiffs have shown that the types of policies, practices, and decisions at issue were made at high levels of the department. As such, I find that the questions of fact and law presented by plaintiffs' claims

---

[46] "The common contention […] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart at 564 U.S. at 350.

would "generate common answers apt to drive the resolution of the litigation." <u>Wal-Mart</u>, 564 U.S. at 350. Accordingly, the Court finds that plaintiffs satisfy Rule 23(a)'s commonality requirement.

### 3. Typicality

The purpose of the typicality requirement is to ensure that the class representatives "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 169 F.R.D. 493, 510 (S.D.N.Y. 1996). Thus, typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." <u>Robinson v. Metro-North Commuter R.R. Co.</u>, 267 F.3d 147, 155 (2d Cir. 2001). The factual background of each plaintiff's claim need not be the same so long as the disputed issue of law or fact occupies "essentially the same degree of centrality to the named plaintiff's claims as to that of other members of the proposed class." <u>Caridad</u>, 191 F.3d at 293 (internal quotation marks and citation omitted).

Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied where "injuries derive from a unitary course of conduct by a single system." <u>Floyd</u>, 283 F.R.D. at 175 quoting <u>Marisol A.</u>, 126 F.3d at 377; <u>see also</u> <u>Robidoux</u>, 987 F.2d at 936–37 (when the "same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims"). A lack of typicality may be found in cases where (1) the named plaintiff "was not harmed by the [conduct] he alleges to have injured the class," <u>Newman v. RCN Telecom Servs., Inc.</u>, 238 F.R.D. 57, 64 (S.D.N.Y. 2006), or (2) the

named plaintiff's claim is subject to "specific factual defenses" atypical of the class, <u>Floyd</u>, 283 F.R.D. at 161 (quoting <u>Oshana v. Coca-Cola Co.</u>, 472 F.3d 506, 514 (7th Cir. 2006).

For a Rule 23(b)(2) class, "where plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them . . . [there is] no need for *individualized* determinations of the propriety of injunctive relief." <u>Charron v. Pinnacle Grp. N.Y. LLC</u>, 269 F.R.D. 221, 23 (S.D.N.Y. 2010) (quoting <u>Brown</u>, 244 F.R.D. at 232). Indeed, the nature of the relief itself, "provides ample basis for a finding that the claims of the named plaintiffs are typical of those of the proposed class in satisfaction of Rule 23(a)(3)." <u>Marisol A.</u>, 929 F.Supp. at 691. Here, plaintiffs' theory of liability is that defendants have a pattern and practice of discriminatory and unlawful conduct that was directed towards both the named plaintiffs and the other members of the class. They seek injunctive and declaratory relief to address defendants' practices and policies.

Defendants challenge typicality on the grounds that there could be a variety of circumstances prompting a stop ("some […] might say that they were stopped for no basis whatsoever, some might say there was a basis for the stop…"). Opp. Mem. at 22. However, the facts giving rise to each claim need not be identical. The putative class members' and named representatives' claims need not arise out of "the same course of events" based on identical circumstances leading up to the stop, but rather the unconstitutional stops are due to the institutional practices that plaintiffs allege allowed for discriminatory policing.[47]

---

[47] Defendants also state that "if plaintiffs' theory that defendants are liable for allegedly failing to analyze traffic stop data in order to uncover discriminatory policing against Latinos describes a 'course of events' at all, it does so only in a general, abstract and remote sense as to be meaningless." Opp. Mem. at 22. Defendants' description of plaintiffs' theory is only partially correct. In addition to defendants' failure to maintain and analyze relevant data, plaintiffs also allege that defendants failed to train, supervise, and

Defendants further argue that the named plaintiffs' claims are not typical to the class in that "they were all singled out due to their undocumented immigration status, or due to the fact that they were driving with out-of-state license plates." Opp. Mot. at 22. Defendants also argue that the named plaintiffs are vulnerable to the defense that Greene acted on his own and that "future potential class members will not be at risk of being stopped and or robbed by Greene as he is no longer a police officer." Id. at 23. Neither of these arguments are persuasive. First, the Court does not credit defendants' suggestion that the named plaintiffs cannot represent citizen or permanent resident Latinos. Classes may be denied certification for typicality if the named plaintiffs fall *outside* the subclass they seek to represent. Kenavan v. Empire Blue Cross & Blue Shield, No. 91-CV-2393, 1996 WL 14446 (S.D.N.Y. Jan. 16, 1996) (dismissing the claim of the subclass for inadequacy of representation where neither of the named plaintiffs were members of the subclass). The inverse poses no problem for a finding of typicality. See Floyd, 283 F.R.D. at 177 (finding that Black named representatives could satisfy typicality to represent a subclass of Blacks and Latinos stopped because of their race). In the present action, plaintiffs allege that they were discriminated against because they are Latino, like the members of the class they seek to represent.

Second, while "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," Freidman-Katz v. Lindt & Sprungli (USA) Inc, 270 F.R.D. 150, 155 (S.D.N.Y. 2010) (finding that plaintiff's serious misrepresentations weighed in favor of finding she was not an adequate class representative), the "unique defenses" that defendants raise are not the types of defenses

---

discipline officers and to investigate claims of biased policing. Why this allegation would fall outside the meaning of a "course of events" is unclear to the Court and defendants do not elaborate. See Floyd, 283 F.R.D. at 171 (finding that named plaintiffs' claims arose from the same course of conduct, namely centralized police policies).

contemplated by this line of cases.[48] See also Spagnola v. Chubb Corp. 264 F.R.D. 76, 93 (S.D.N.Y. 2010) (finding that plaintiffs established typicality "if only barely" despite plaintiff's claims being subject to at least one dispositive defense); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 179 (2d Cir. 1990) (class representative corporation was inadequate due to the unique defense that it continued purchasing certificates of deposit through the defendant bank despite having notice of and having investigated the alleged fraud). As each class member would need to make "similar legal arguments to prove the defendant's liability," I find that plaintiffs are sufficiently typical to represent other members of the class. In re Drexel, 960 F.2d at 291.

### 4. Adequacy

Adequacy requires both that the plaintiffs themselves be adequate representatives of the class, specifically, that their interests not be "antagonistic to the interests of other members of the class," and also that plaintiffs' counsel be qualified, experienced, and able to conduct the litigation. Baffa, 222 F.3d at 60.

As to the first prong, courts assess the case on an individualized basis. In re Lilco Sec. Litigation, 111 F.R.D. 663, 672 ([there is] "no simple test for determining if a class will be adequately represented by a named plaintiff"). In order to qualify as class representatives, plaintiffs must "demonstrate that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class." Marisol A., 126 F.3d at 378. Courts have found the adequacy of named plaintiffs to be satisfied where the plaintiffs seek "broad based relief" and "the interests of the class members are identical despite the individualized problems of each plaintiff." Nat'l Law

---

[48] "Plaintiffs are vulnerable to the defense that Greene acted on his own and that Greene's conduct was not part of a widespread or pervasive pattern of conduct within SCPD" and "named plaintiffs' status as undocumented immigrants… sets them apart from other Latinos." Opp. Mem. at 23.

Ctr. on Homelessness & Poverty v. New York, 224 F.R.D. 314, 325 (E.D.N.Y. 2004). See also, Stinson, 282 F.R.D. at 371 ("Plaintiffs' interests are identical to those of the putative class, as all plaintiffs have been allegedly injured by the same unconstitutional actions on the part of Defendants."); Darquea v. Jarden Corp., No. 06-CV-722, 2008 WL 622811, at *3 (S.D.N.Y. Mar. 6, 2008) ("All claims alleged arise from the same wrongful conduct, and thus, Plaintiff's interests, recouping money invested, are similar to those of the proposed class. As such, named Plaintiffs will fairly and adequately protect the interests of the class."). Here, the named plaintiffs' interests are not antagonistic to the other members of the putative class.[49] As plaintiffs' interests are identical to those of the putative class, plaintiffs have demonstrated the first prong outlined in Baffa.

With respect to the second prong, the Federal Rules require that, in appointing class counsel, the Court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1). Plaintiffs are in excellent hands.[50] LatinoJustice PRLDEF is a non-profit organization

---

[49] Defendants allege that the interests of the proposed representatives and class members are "starkly at odds with future class members." Opp. Mem. at 24. Defendants provide no explanation for their assertion. They also assert, without any explanation, that the named plaintiffs are not proper representatives because, "their claims are totally precluded." Id. at 24–25. In order to defeat class certification, there must be "a showing of a genuine conflict" between the proposed class representative's interests and those of the other members of the class. In re Drexel, 960 F.2d at 291. "Only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." Hirschfeld v. Stone, 193 F.R.D. 175, 183 (S.D.N.Y. 2000). As there has been no showing of genuine conflict, defendants do not meet that standard.

[50] The Court notes that defendants also contest the adequacy of counsel, ("Plaintiffs do not demonstrate either component of adequacy of representation"), but state nothing more as to why plaintiffs' counsel is inadequate to represent the class. See Opp. Mem. at 24.

that routinely litigates civil rights cases and has experience in class action civil rights litigation. E.g., Ligon, 288 F.R.D. 72; Aguilar v. U.S. Immigration & Customs Enforcement, No. 07-CV-8224 (S.D.N.Y 2007). Milbank LLP is a global law firm. Its attorneys have experience with class actions, including cases alleging civil rights violations. E.g., Lovely H. v. Eggleston, No. 1:05-CV-06920 (S.D.N.Y. 2005); Garcia v. Los Angeles County Sheriff's Department, et al., No. 2:09-CV-08943 (C.D. Cal. 2009). To date, co-counsel have diligently prosecuted this action and pledge to continue to do so. See ECF No. 253, "Declaration by Atara Miller"; ECF No. 254, "Declaration by Jose Perez." Accordingly, I find that both the proposed class representatives and proposed class counsel are adequate to protect the interests of the class.

### 5. Ascertainability

In the Second Circuit, the ascertainability doctrine requires "only that a class be defined using objective criteria that establish a membership with definite boundaries." In re Petrobras Sec. Litig., 862 F.3d at 264. In other words, "the class description [must be] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Casale, 257 F.R.D. at 40. The standard for ascertainability "is not demanding." Gortat v. Capala Bros., Inc., No. 07-CV-3629, 2010 WL 1423018, at *2, (E.D.N.Y. Apr 9, 2010); see also B & R Supermarket, Inc. v. Mastercard Int'l, Inc., No. 17-CV-2738, 2021 WL 234550, at *19 (E.D.N.Y. Jan. 19, 2021) (noting that the Second Circuit has "explicitly rejected" a feasibility requirement). "It is designed only to prevent the certification of a class whose membership is truly indeterminable." Id.

Defendants challenge the ascertainability of the 23(b)(2) class, arguing that the proposed injunctive class is not ascertainable because the class includes "all persons of Latino heritage regardless of immigration status within Suffolk County without temporal limitation." First, as

previously discussed, classes for injunctive relief can include future members. See also Vogel v. City of New York, No. 14-CV-9171, 2017 WL 4712791, at *5 (S.D.N.Y. Sept. 19, 2017) (finding a class of all persons who have been *or will be arrested in the future* without probable cause and charged solely with gravity knife possession and whose charges were or are ultimately dismissed was sufficiently ascertainable). Second, defendants fail to demonstrate how Latino individuals with different immigration statuses would affect the ascertainability of the proposed class.

It is not even clear "that the implied requirement of definiteness should apply to Rule 23(b)(2) class actions at all." Davis, 296 F.R.D. at 165–66. At a minimum, ascertainability is "less important in a Rule 23(b)(2) class, since a chief objective of this rule is to provide broad injunctive relief to 'large and amorphous' classes not capable of certification under Rule 23(b)(3)." In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 116 (E.D.N.Y. 2012) (citing Marisol A., 126 F.3d at 378). Here, the proposed class is "defined using objective criteria" and membership is established with "definite boundaries." Petrobras, 862 F.3d at 266. The class is defined as any Latino or Latina persons stopped by the SCPD. It is limited temporally, from January 2012 to the date of final judgment, and geographically, to stops within Suffolk County. Accordingly, I find that plaintiffs' class is sufficiently definite to warrant certification under Rule 23(b)(2).[51] See Daniels, 198 F.R.D. at 415 ("general class descriptions based on the harm allegedly suffered by plaintiffs are acceptable in class actions seeking only declaratory and injunctive relief") (quoting Wanstrath v. Time Warner Entm't Co., No. 93-CV-8538, 1997 WL 122815 (S.D.N.Y. Mar. 17, 1997)).

---

[51] The Court does not assess ascertainability of the proposed 23(b)(3) class for the reasons set forth in Section III of this Report.

## II.     Class Certification Under Rule 23(b)(2)

### A. Injunctive Relief or Corresponding Declaratory Relief is Appropriate with Respect to the Class as a Whole

To certify a class seeking prospective declaratory or injunctive relief, plaintiffs must show that defendants "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) is "most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief." Marisol A., 929 F. Supp. at 692.

Indeed, class certification under Rule 23(b)(2) is particularly appropriate in civil rights litigation. "When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident." Wal-Mart, 564 U.S. at 362–63. See also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614, (1997) ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions; Loper v. New York City Police Dep't, 135 F.R.D. 81, 83 (S.D.N.Y. 1991).

Defendants argue that class-wide relief is inappropriate in this action because Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." Opp. Mem. at 25 (quoting Wal-Mart, 564 U.S. at 361). These concerns are not relevant to the present action where plaintiffs seek injunctions prohibiting discriminatory policing and directing defendants to remedy their unconstitutional policies. See Amara v. CIGNA Corp., 775 F.3d 510, 522 (2d Cir. 2014) (Wal-

<u>Mart</u> "simply emphasized that in a class action certified under Rule 23(b)(2), 'each individual class member' is not 'entitled to a different injunction.'")[52]

Here, plaintiffs allege that defendants have conducted discriminatory police stops and have failed to institute adequate procedures and trainings to protect the rights of Latinos in the County. Plaintiffs seek, *inter alia*: analysis of traffic stop data by the SCPD for evidence of biased policing; appointment of an independent monitor to supervise the same, the establishment of a Citizen Complaint Review Board; and the implementation of a comprehensive training regimen for members of SCPD to prevent further violations of plaintiffs' constitutional rights. Compl. at ¶¶ 70–77. As plaintiffs have shown by a preponderance of the evidence that defendants have "acted or refused to act on grounds generally applicable to the class," and plaintiffs seek a class-wide injunction to reform the SCPD's policies, practices, and customs, which would benefit the class as a whole, plaintiffs' proposed class meets the threshold of Rule 23(a) and the requirements set forth in Rule 23(b)(2). Therefore, plaintiffs' Rule 23(b)(2) class should be certified.

### B. Galvan Doctrine

Under the doctrine established in <u>Galvan v. Levine</u>, 490 F.2d 1255 (2d Cir. 1973), ("the Galvan Doctrine"), district courts may decline to certify a class if doing so would not further the implementation of the judgment because an injunction or declaratory relief granted to an individual plaintiff would equally benefit the entire class, rendering certification "largely a formality." <u>Galvan</u>, 490 F.2d at 1261. <u>See</u> <u>Davis v. Smith</u>, 607 F.2d 535 (2d Cir. 1978). When considering the

---

[52] The Court notes that defendants repeat their argument that there is no basis for plaintiffs' allegations that defendants have acted or failed to act to their detriment, citing the Agreement between the United States, Suffolk County, and the SCPD. Opp. Mem. at 27. As discussed above, *supra* Section B(3) of this Report, this argument is not persuasive.

Galvan Doctrine, Courts focus on four factors in determining whether class certification is still necessary for an injunctive class to obtain relief.[53]

Defendants argue that the Galvan Doctrine should be applied and that certification is unnecessary since "potential class members seek the broadest permanent injunction imaginable" and injunctive relief would fully protect all potential class members. Opp. Mem. at 16. However, none of the four factors that weigh against certification are present here. It should be emphasized that defendants object to commonality and typicality of the proposed class. Bishop v. New York City Dep't of Hous. Pres. and Dev., 141 F.R.D. 229, 241 (S.D.N.Y. 1992) ("it is plainly inconsistent for Defendants to argue that any relief granted in connection with this action will be applied to benefit every member of the class, while at the same time they contest the existence of commonality and typicality.") Further, plaintiffs seek "the institution of a complex monitoring system," which weighs against the use of the Galvan Doctrine. Casale v. Kelly, 257 F.R.D. 396, 414 (S.D.N.Y. 2009). Accordingly, I find the application of the Galvan Doctrine to be inappropriate in the present action.

### III.    Class Certification Under Rule 23(b)(3)

Plaintiffs request certification of a class under Rule 23(b)(3) for the purpose of money damages. Under Rule 23(b)(3) a class action may be maintained if the court finds that "the

---

[53] The factors include: (1) An affirmative statement from the government defendant that it will apply any relief across the board militates against the need for class certification; (2) withdrawal of the challenged action or nonenforcement of the challenge; (3) the type of relief sought can affect the necessity of class certification: where the plaintiffs merely seek a declaration that a statute or policy is unconstitutional, denial of class certification is more appropriate than where plaintiffs seek complex, affirmative relief and; (4) courts also consider whether the named plaintiffs' claims are likely to become moot, making class certification necessary to avoid mootness. Finch v. N.Y. State Office of Children & Family Servs., 252 F.R.D. 192, 199, (S.D.N.Y. 2008).

questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Predominance is met if, "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002); see also Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 226 (2d Cir. 2006) (noting that "a plaintiff must show that those issues . . . subject to generalized proof outweigh those issues that are subject to individualized proof"). "[S]atisfaction of the typicality requirement of Rule 23 (a) . . . goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality," although predominance is a more stringent inquiry. Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590, 598 (2d Cir. 1986).

As to superiority of the class action device, Rule 23(b)(3) sets forth the following factors that the court should consider: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of the class action. Fed. R. Civ. P. 23(b)(3); Amchem, 521 U.S. at 615-16 (1997).

The damages class that plaintiffs seek to certify includes, "all Latino or Latina persons who, from January 2012 to the date of a final judgment, were unlawfully ticketed, searched, arrested, or otherwise subject to unlawful police action, including the unlawful deprivation of

personal property, following a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk." Supp. Mem. at 2.

Defendants argue that "whether each person's rights were violated, and what, if any, injury he sustained, entails individualized inquiry." Opp. Mem. at 30. The Court agrees. The certification of this damages class is not warranted on the instant record. See Vogel, 2017 WL 4712791, at *13 ("to identify the members of this proposed class, individualized inquiry (in the form of hearings or mini-trials) would be required to be conducted, i.e. as to whether there was or was not probable cause for each putative class member's arrest solely for possession of a gravity knife. Thousands of individual inquiries would be required"); c.f., In re Nassau County Strip Search Cases, 461 F.3d 219, 225 (2d Cir. 2006) (common issues predominated in a case challenging a blanket strip search policy since the class included "all persons arrested for misdemeanors or non-criminal offenses in Nassau County who thereafter were searched at the NCCC pursuant to defendants' blanket policy," thus obviating the need for individualized proceedings to determine class membership); Brown, 244 F.R.D. at 238 (finding predominance where "*regardless* of whether or not each putative class member was engaging in protected speech or expression at the time he was charged, by virtue of the charge itself, he was accused of engaging in such activity and *penalized* based on that accusation") (emphasis in original). Here, a stop, ticket, search, or arrest by itself would not determine an individual's membership in the damages class. Damages would also need to be determined on an individual basis. Because of the individual nature of any claim for damages, I recommend that certification for the proposed 23(b)(3) class damages class should be denied.[54]

_____

[54] Plaintiffs have expressly reserved their rights to pursue damages incidental to the injunctive or equitable relief sought pursuant to Rule 23(b)(2). Supp. Mem. at 34 n.141. See Amara, 775 F.3d at 520 (Wal-Mart "does not foreclose an award of monetary relief when that relief is incidental to a final injunctive or declaratory remedy"); Stinson v. City of New York, 282 F.R.D. 360, 381 (S.D.N.Y. 2012) (damages claims for civil rights violations were incidental because they were "not the motivation behind [plaintiff's] suit").

## CONCLUSION

It is respectfully recommended that plaintiffs' motion for class certification should be granted in part and denied in part. The Court should certify the proposed class under Rule 23(b)(2) and deny certification of the proposed class under Rule 23(b)(3). The Court should appoint plaintiffs as class representatives and plaintiffs' counsel as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

## FILING OF OBJECTIONS TO REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections. See Fed. R. Civ. P. 6. Such objections shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002); Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

_____/S/_____<br>
LOIS BLOOM<br>
United States Magistrate Judge

Dated: March 12, 2021
      Brooklyn, New York