# EXHIBIT 1

1

2   UNITED STATES DISTRICT COURT

3   EASTERN DISTRICT OF NEW YORK

4   ------------------------------------x

5   PLAINTIFFS #1-21, individually
    and on behalf of all others
6   similarly situated,

7                    Plaintiff,
                                    Case No.
8      -against-                    15-CV-2431(ADS)

9
    THE COUNTY OF SUFFOLK; SUFFOLK
10  COUNTY POLICE DEPARTMENT COMMISSIONER
    EDWARD WEBBER, individually and in
11  his official capacity; SUPERVISORY
    JOHN DOE DEFENDANTS, individually
12  and in their official capacities;
    LIEUTENANT MILAGROS SOTO,
13  individually and in her official
    capacity; SCOTT GREENE, individually
14  and in his official capacity;
    OFFICER BRIDGET DORMER, individually
15  and in her official capacity;
    JOHN DOE DEFENDANTS, individually
16  and in their official capacity,

17                   Defendants.
    ------------------------------------x

18
                     225 Eastview Drive
19                   Central Islip, New York

20                   December 21, 2017
                     9:36 a.m.
21

22
            DEPOSITION OF MICHAEL CALDARELLI
23

24

25

1

2

3

4          DEPOSITION of MICHAEL CALDARELLI,

5    taken by Plaintiff, pursuant to Notice, held

6    at the above-mentioned time and place,

7    before Robin LaFemina, a Registered

8    Professional Reporter, Certified LiveNote

9    Reporter and Notary Public within and for

10   the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A P P E A R A N C E S:

SHEARMAN & STERLING LLP
Attorneys for Plaintiffs
    599 Lexington Avenue
    New York, New York 10022

BY:  JAMES ALICEA, ESQ.

LATINO JUSTICE PRLDEF
    99 Hudson Street
    New York, New York 10013

BY:  JOSÉ LUIS PEREZ, ESQ.

    JOANNA E. CUEVAS INGRAM, ESQ.

    NATHALIA A. VARELA, ESQ.

SUFFOLK COUNTY ATTORNEY'S OFFICE
Attorneys for Defendants
    H. Lee Dennison Building, 6th Floor
    100 Veterans Memorial Highway
    Hauppauge, New York 11788-4311

BY:  MEGAN O'DONNELL, ESQ.

ALSO PRESENT:

    MILAGROS SOTO

--oo0oo--

Caldarelli

A.      Yeah.  Actually at that time and

during my entire tenure there, Internal

Affairs was reporting to Chief White, and

they explained to me that they had some

concerns about the way things were going in

Internal Affairs, namely, the two big

concerns were that the cases -- that they

were losing the ability to discipline people

in cases because the 18 month statute of

limitations was expiring, and they also had

concerns that the evidence in cases was not

consistent with the findings in cases.

Q.      Did they I guess critique your

predecessor or fault or give any reasons why

they had these concerns?

A.      No.  As a matter of fact, I was

kind of concerned because I always found

Stanley to be -- you know, I like Stanley, I

consider him a friend, and exactly where the

disconnect is because, I mean, I know Mark

White also very well and I always found him

an easy guy to work with.  What had happened

there, I don't know.

Q.      Did they give any indication

                              Caldarelli
1
2     that it was a lack of resources or staffing?
3          A.     Yes.  Well, they did -- they did
4     say that we realize the unit is not adequately
5     staffed, and --
6          Q.     When you say they, who was that?
7     Was it Burke or White who was saying this?
8          A.     I guess you can generally say --
9          Q.     Collectively?
10         A.     -- it was the three of them; yes.
11    And both they and then at a later date
12    Commissioner Webber had said that they were
13    intending to transfer an additional five
14    lieutenants to the unit.
15         Q.     So was that something that was
16    told to you at this meeting or --
17         A.     Very --
18         Q.     -- that the plan was --
19         A.     Very early on; yes.
20         Q.     That the plan was to reassign
21    additional investigators?
22         A.     Yes.  There was a concession I
23    guess in this meeting that we realize you
24    need help up there.
25         Q.     So you were given I guess for

1                    Caldarelli

2   lack of a better word a mandate to kind of

3   like, I don't know, tighten up investigations

4   and comply with time constraints?

5        A.    I would say that's fair; yes.

6        Q.    And in essence also engage in

7   quality control in terms of what you

8   mentioned about the findings being consistent?

9        A.    I think that's fair.

10       Q.    You were talking about this 18

11  month period for having I guess cases

12  resolved or recommendations closed, not

13  closed, but recommendations made so that if

14  appropriate disciplinary action could be

15  taken against an officer?

16       A.    Correct.

17       Q.    Were there any instances cited

18  to you about cases where that had not been

19  done or cases had not been closed or moved

20  forward within this 18 month period?

21       A.    Well, I know that there were a

22  few cases where we did not have the ability

23  to, you know, discipline people because the

24  18 months had lapsed.  In terms of number,

25  difficult for me to say.

Caldarelli

Q.      When you say, you know, that

this had happened -- had this happened prior

to your arriving there or during your tenure

at IAB that, you know, again cases had

been -- could not move forward because the

18 month period had lapsed?

A.      Cases still moved forward, but

any substantiated findings would be precluded

from taking department disciplinary action.

Q.      And what would happen in those

cases?  They would just be placed in the

officer's file, personnel file?

A.      Yes.  They would be documented,

notice would be made, it would be posted in

the BlueTeam as well as in the hard copy of

the case.

Q.      But no formal disciplinary

action would be taken?

A.      Yes.  Correct.

Q.      And this 18 months, was this

pursuant to I guess, I don't know, collective

bargaining or civil service or --

A.      It's my understanding, sir, it

actually stems from I think it's New York

1                      Caldarelli

2    State law.

3         Q.      Okay.

4         A.      Whether it's labor law or the

5    executive law, I'm not sure.

6         Q.      And, again, did they give you

7    any indication about how widespread or how

8    prevalent this problem was of cases going

9    beyond the 18 month period?

10        A.      Well, let's put it this way.

11   Obviously it was enough of a problem that

12   it, you know, had their attention and it was

13   something that they wanted addressed.

14        Q.      Do you know how this came to

15   their attention?  Was there any type of

16   internal review, audit?

17        A.      They didn't exactly explain to

18   me what brought it to their attention.

19        Q.      Did there come a time after that

20   meeting with Burke and Meehan and White that

21   you learned of the reason why this had become

22   a concern?

23        A.      I'm sorry?

24        Q.      Did there come a time after that

25   meeting that you learned why or how this had

                        Caldarelli

 1

 2   come about?

 3        A.    Well, immediately upon going

 4   into the unit, you know, some of the problems

 5   were apparent, you know.

 6        Q.    For example?

 7        A.    Well, the caseload was far too

 8   heavy.

 9        Q.    Per investigation, connected

10   with the staffing issue?

11        A.    Correct.  Yes.

12        Q.    So when you say the caseload was

13   too heavy, how many cases was each assigned

14   correct or handling?

15        A.    I think at that time, if memory

16   serves me correctly, there were

17   approximately 15 to 16, somewhere 15 and

18   change that each investigator was carrying.

19        Q.    And what would have been the

20   appropriate, I don't know if there is a

21   guideline or like the amount, active number

22   of cases any one investigator should have?

23        A.    Well, let's put it this way.  I

24   was an investigator in Internal Affairs in

25   the late 1990s, and when I was there, I was

                          Caldarelli

1

2   a lieutenant, I don't think I ever carried

3   more than 10 or 12 cases at a time

4   approximately.  That was a reasonably

5   manageable caseload I thought.  So I would

6   have liked to have gotten it down to that.

7        Q.    Going to when you were appointed,

8   promoted to lieutenant, was that after you

9   went to Internal Affairs, was that after you

10  had been a patrol sergeant?

11       A.    Correct.

12       Q.    And when did you go to Internal

13  Affairs?

14       A.    It was in 1997.

15       Q.    And, again, you were promoted to

16  lieutenant as a result of a civil service

17  exam?

18       A.    Correct.

19       Q.    And upon being promoted to

20  lieutenant, were you then reassigned from

21  the precincts you were to Internal Affairs?

22       A.    Correct.

23       Q.    How long were you at Internal

24  Affairs at that time?

25       A.    I think it was a little less

1                    Caldarelli

2    than three years, maybe two and a half years.

3         Q.     And is that the normal, I

4    don't know, is there a normal way of how

5    investigators are assigned to Internal

6    Affairs?  Is it upon being promoted, that

7    that's one of the options?

8         A.     Yes.  I think two years was

9    considered like, you know, a stint, if you

10   will.

11        Q.     And who was the commanding

12   officer of IAB at the time?

13        A.     At the time when I first went

14   there?

15        Q.     Yes.

16        A.     Jack Henry.

17        Q.     Henry?

18        A.     Henry, common spelling.

19        Q.     Did he remain the commanding

20   officer during your entire tenure at that

21   time?

22        A.     No.  He retired at some point

23   during my initial tenure there.

24        Q.     And who replaced him?

25        A.     Philip Robilitto.

```
1                    Caldarelli
2    Cameron.
3         Q.    Steve --
4         A.    Stu --
5         Q.    Stu?
6         A.    Stuart Cameron.  He is the
7    current chief of the Department.
8         Q.    And was the planning community
9    department, was that also -- was that within
10   police headquarters?
11        A.    It's located in police
12   headquarters; yes.
13        Q.    Same floor as the Commissioner
14   or the chiefs?
15        A.    Correct.
16        Q.    Okay.
17              I take it in the Commissioner's
18   office, you were on the same floor as the
19   Commissioner or the Chief?
20        A.    Yes.
21        Q.    How would you describe your
22   relationship with Commissioner Webber -- I
23   mean Chief Webber -- I mean Commissioner
24   Webber?
25        A.    Initially it was good.  It
```

1                          Caldarelli

2    became strained.

3         Q.      When did it become strained?

4         A.      Sometime during my tenure as the

5    CO of Internal Affairs.

6         Q.      And what precipitated or caused,

7    in your opinion, the strain?

8         A.      I was substantiating too many

9    allegations in some people's minds.

10        Q.      Did Commissioner Webber ever say

11   that to you directly?

12        A.      No.

13        Q.      Did Chief Burke ever say that to

14   you directly?

15        A.      No.

16        Q.      Chief White?

17        A.      Yes.  Let me clarify though.

18   White told me some people think you're

19   substantiating too many cases, he said he

20   himself and the Commissioner were not among

21   them though.

22        Q.      White said that he and the

23   Commissioner were not?

24        A.      Were not amongst those voices.

25        Q.      So if the Commissioner was not

1                    Caldarelli

2    among those who thought that, why did your

3    relationship become strained?

4        A.      Well, basically I think the real

5    wedge finally came with another case,

6    totally unrelated to this one.

7        Q.      And what was that case?

8            THE WITNESS:  Can I say?

9            MS. O'DONNELL:  Is it current --

10    is it under pending investigation?

11            THE WITNESS:  Possibly.

12            MS. O'DONNELL:  From what I

13        understand, that the case that he is

14        referring to is under current

15        investigation.  Based on this witness's

16        testimony that it has nothing to do

17        with this case, I would instruct him

18        not to identify that case, but I

19        have -- I understand the relevancy

20        perhaps to the relationship that he had

21        with Commissioner Webber, so I have --

22        I'm not instructing him not to answer

23        questions about his relationship with

24        Webber, but just identifying the

25        particular case based on the current

1              Caldarelli

2      criminal investigation.

3              MR. PEREZ:  Yes.

4      Q.      Without jeopardizing any

5  criminal investigation or identifying any

6  specific individuals, what was the nature of

7  this other case?

8      A.      Bear with me.  I'm going to take

9  my time because I want to make sure I don't

10  do anything that might cause problems for

11  any other entities.

12              There was a significant case, a

13  high profile case, received a lot of media

14  attention, and I found significant problems

15  with the people's conduct involved and I

16  reported as much.  Sometime after I submitted

17  the case, I received a phone call from

18  Webber.  He informed me that he did not

19  agree with my conclusions.  He made it sort

20  of a collective like we've reviewed your

21  case and we don't agree with it.  He said he

22  was going to have Chief Madigan who was the

23  Chief of Detectives at that time discuss the

24  problems with the case and the changes that

25  they wanted made.

1                    Caldarelli

2        Q.      Had you I guess in that

3    investigation substantiated allegations,

4    whatever they were?

5        A.      Correct.

6        Q.      And you made that recommendation

7    and put it in writing and submitted it to

8    the Commissioner?

9        A.      Correct.

10       Q.      And that's normal protocol?

11       A.      Yes.

12       Q.      As was done in the Greene case?

13       A.      Yes.

14       Q.      I think at one point Lieutenant

15   Corsino submitted a report to you, at some

16   point during the end of your tenure which I

17   think subsequent to your departure was

18   forwarded, or --

19       A.      Getting a little off topic, I

20   don't think the report ever reached me.

21       Q.      All right.

22               So you may not have seen the

23   Greene report?

24       A.      I don't think I did.

25       Q.      We will show that to you and see

1                    Caldarelli

2    if you recall that.  But typically the

3    investigator would prepare a report with his

4    findings and recommendations substantiated

5    or unsubstantiated and that would go to the

6    commanding officer for review, you would

7    make a determination, concur or not --

8         A.    Correct.

9         Q.    -- and then pass that along to --

10        A.    Correct.

11        Q.    So this -- and so Commissioner --

12   and so in this case you did substantiate --

13   were these findings that you made or you

14   were upholding or corroborating or supporting

15   the findings made by your investigator?

16        A.    No.  I overruled the investigator.

17        Q.    How often had you had occasion

18   to do that?

19        A.    It would happen on occasion.  By

20   and large in the vast majority of the time

21   when I disagreed with the conclusions that

22   my investigators found, I would sit down

23   with them and discuss them, I would ask them

24   tell me what leads you to this conclusion,

25   and then I would say, well, listen, I differ

| | |
|---|---|
| 1 | Caldarelli |
| 2 | with you, if I in fact differed with them, |
| 3 | and then I would say, well, here's how I see |
| 4 | it, and I would give them the option. I'm |
| 5 | not going to tell you what to write, it's |
| 6 | your report, your name's going on it. |
| 7 | However, I don't agree with you and I'm |
| 8 | going to say so in print. And if I thought |
| 9 | their reasoning was so egregiously wrong, I |
| 10 | would actually say to them I don't think the |
| 11 | bosses are going to see it my way, they're |
| 12 | going to see it your way and you're going to |
| 13 | look foolish in the process. I said I think |
| 14 | this is the right way to do this. I leave |
| 15 | it to you though. If you're not comfortable |
| 16 | making those changes, okay. |
| 17 | Q. And did you do that in the case |
| 18 | that's the subject of the question -- |
| 19 | A. What happened in that case is I |
| 20 | basically -- I wrote a very lengthy cover |
| 21 | report, which was in fact really the case at |
| 22 | the end of the day. |
| 23 | Q. And is that unusual, that you |
| 24 | would write a separate cover memo? |
| 25 | A. It should be. It should be. I |

Caldarelli

1

2    found though that I did do it fairly

3    frequently when I was the CO of Internal

4    Affairs.

5          Q.    Okay.

6                And was that part of the problem

7    that you heard from I guess Chief White that

8    others thought that you were doing it I

9    guess too often or substantiating or

10   overruling your own investigators?

11         A.    I think that that might have

12   been part of the problem, but ultimately the

13   streamline format to fill in the blanks I

14   think did help in that respect, and that

15   just enabled me to sign off on reports

16   saying I concur, which is really all I

17   should have been doing, but yeah, in this

18   particular case, no, I had written a rather

19   lengthy report of what I believed to be the

20   correct, you know, way to present the case

21   and the correct findings in the case.

22         Q.    Okay.

23                And you mentioned again that you

24   thought like your relationship with

25   Commissioner Webber had become strained.

1                          Caldarelli

2      Like what, can you give me an example of

3      what leads you to that conclusion?

4           A.      Well --

5           Q.      Did he treat you differently

6      afterwards or --

7           A.      I would say what basically had

8      happened is this was one case of -- maybe a

9      couple where there was some significant

10     problems, in my opinion, and --

11          Q.      Problems within the Department

12     or the investigation or how -- I'm sorry.

13          A.      Just to clarify, problems with

14     the police conduct involved.  And I set forth

15     my opinions on it, my findings clearly, and

16     basically, you know, I don't think it was

17     well received.

18               MS. O'DONNELL:  I don't think

19          what?  I just didn't hear the --

20               THE WITNESS:  It wasn't well

21          received.

22          Q.      Did you ever get indications

23     from anyone else I guess that your actions

24     as commanding officer or that too many

25     complaints were being substantiated or that

1                    Caldarelli

2      you were overruling, did you ever hear from

3      anyone else or get feedback that they were

4      unhappy or --

5           A.     Yes.

6           Q.     -- displeased with that?

7           A.     Yes.

8           Q.     And how did you hear of that?

9      From whom?

10          A.     People I knew from the Department

11     of similar rank, you know.

12          Q.     Other inspectors or I guess --

13          A.     Yes.

14          Q.     -- deputy inspectors?

15          A.     Yes.

16          Q.     That would be considered your

17     peers?

18          A.     Yes.

19          Q.     Was this like, I don't know,

20     scuttlebutt or --

21          A.     I guess you could call it that.

22          Q.     -- gossip or --

23          A.     Yes.

24          Q.     That you -- was it widely known

25     that you had fallen out of I guess disfavor

1                    Caldarelli

2    with the Commissioner's office or --

3         A.    I think you could safely say

4    that.

5         Q.    And that was again you believe

6    one of the reasons why you were transferred

7    out of --

8         A.    I'm certain of it.

9         Q.    -- Internal Affairs?

10        A.    Yes.

11        Q.    You mentioned that you retired

12   earlier this year.  Was that a voluntary

13   retirement?

14        A.    I was not pressured into retiring.

15        Q.    Okay.

16              How many years on the job did

17   you have?

18        A.    A little over 31.

19        Q.    So you vested your pension and

20   everything?

21        A.    Not fully.

22        Q.    Not fully?

23        A.    No.

24        Q.    But you decided to retire?

25        A.    Yes.

1                    Caldarelli

2         Q.    Why?

3         A.    I had it.

4         Q.    Had it with -- can you explain

5    what you mean by that?

6         A.    I was disgusted with the

7    Department.

8         Q.    Why were you disgusted?

9         A.    Because of some of the things

10   we're discussing here, sir.

11        Q.    Did you know whether anyone had

12   been transferred out of Internal Affairs

13   similar to you?

14        A.    Yes.

15        Q.    Who?

16        A.    Joe Capolino, my XO.

17        Q.    And where did he go?

18        A.    I believe it was the 4th Precinct.

19        Q.    And is he a deputy inspector

20   still or inspector, do you know?

21        A.    To the best of my knowledge, but

22   I'm out of touch.

23        Q.    What was his last command or

24   rank?

25        A.    He was working in the Chief of

1                    Caldarelli

2    without necessarily remembering the --

3        Q.      The complainant?

4        A.      Right.   The race of the

5    complainant.

6        Q.      Okay.

7        A.      It's possible certainly.   I

8    can't recall though at this point any one

9    particular name that comes out.

10       Q.      Okay.

11               And, again, kind of this

12   pushback, so other than I think you

13   mentioned I think it was Chief White had

14   kind of let you know that, you know, there

15   were others who felt that in fact you were

16   substantiating too many complaints, did he

17   ever indicate like who the others were?

18       A.      No.   No, he did not mention

19   anyone by name.

20       Q.      Did you have your own suspicions

21   or feelings of who you thought the others

22   were?

23       A.      Yes.

24       Q.      And who did you feel or believe

25   were the others?

1                    Caldarelli

2          A.     My opinion was that Burke,

3    Madigan and Meehan were aligned, Webber,

4    White and Fallon were aligned on the right

5    side of things.

6          Q.     So the first faction, Madigan,

7    Meehan and Burke?

8          A.     Yes.

9          Q.     Were aligned you say on the

10   other side?

11         A.     Yes.

12         Q.     And this is the Chief Burke who

13   is now currently incarcerated?

14         A.     It is.

15         Q.     Do you know if -- is it Chief

16   Meehan?

17         A.     Yes.

18         Q.     And is he still on the job?

19         A.     No.  He's retired, as is Madigan.

20         Q.     And the other ones you mentioned

21   were Commissioner Webber, Chief White and

22   who was the third person?

23         A.     Kevin Fallon.

24         Q.     Kevin Fallon.  And who was Kevin

25   Fallon?  What was his title?

1                    Caldarelli

2        A.    He was a chief.

3        Q.    Did any of the first three,

4    Burke, Meehan or Madigan, ever confront you

5    or tell you to chill out or, you know, why

6    are you hanging cops out to dry?

7        A.    I wasn't hanging out cops to

8    dry.  Cops were hanging cops out to dry.

9        Q.    No, I get that, but, I mean, did

10   they ever accuse you or say or do anything

11   that gave you that impression?

12       A.    Basically Madigan, that one

13   case, and, again, I have to -- I'm going to

14   tread very lightly here, but when he spoke

15   to me --

16       Q.    That's the one that you

17   mentioned I believe is still pending or

18   under investigation?

19       A.    I believe it's possibly, I don't

20   have access to all the details on that, but

21   yeah, that was one where he was clearly

22   displeased with, you know, my findings on

23   that case.  Meehan at one point had stopped

24   in my office and he actually said to me, he

25   goes, you're substantiating a lot of cases,

1              Caldarelli

2    Mike, do you have any idea what your ratio

3    is like compared to New York City?  I didn't.

4         Q.    That was not a factor for you,

5    right, comparing to what other police

6    departments did?

7         A.    It's what it is; yeah.

8         Q.    Did he ever say what the ratio

9    was --

10         A.    I don't think he knew himself.

11    I guess you could figure it out, you know.

12    I mean, I guess you could, but I would think

13    you would have better things to do.  I know

14    I did.

15         Q.    Other than this conversation,

16    I guess this conversation with Chief Meehan,

17    was this just in passing, or you said he

18    came into your office?

19         A.    Yes.  He would stop in and see

20    me occasionally.

21         Q.    Was your office again on the

22    same floor as the Commissioner or headquarters

23    or same building?

24         A.    Yes.  Same building as the

25    Commissioner, same building as the chiefs.

1                    Caldarelli

2        Q.      Different floor?

3        A.      No.  Same floor.

4        Q.      All the chiefs.

5                How did that comment make you

6    feel from Chief Meehan?

7        A.      Well, I took it as an indication

8    that there was disapproval in some circles

9    as to what I was doing, but, you know, but

10   so be it.

11       Q.      Do you recall when that

12   conversation took place?

13       A.      I'm sorry, I don't.  It was

14   probably sometime in 2013 I would think.

15       Q.      So it would have been like a

16   year before you eventually left?

17       A.      Yes.

18       Q.      You left in October of 2014?

19       A.      2014; yes.

20       Q.      Did there ever come a time in

21   cases where you had overturned the

22   investigating officer or substantiated

23   something that they had not where your

24   findings were subsequently reversed by

25   either a chief or the Commissioner?

Caldarelli

1

2      A.      I don't know of that happening.

3   That conversation I had with Webber where he

4   told me that he disagreed with my --

5      Q.      About this one particular --

6      A.      Right.  After I refused to make

7   the changes that were requested to be made

8   of me, I don't know what happened.

9      Q.      Right.  And I think you said in

10  that case he was assigning it to the Chief

11  of Detectives for further action or something.

12     A.      He had assigned the Chief of

13  Detectives to discuss the matter with me.  I

14  don't know if he assigned Madigan to

15  actually take action.  I think, as I recall,

16  he said to me something like, all right,

17  Mike, I don't want to make you do anything

18  you don't want to do, I'll put something on

19  it or --

20     Q.      So Burke said that?  That was

21  Burke, not --

22     A.      Webber.

23     Q.      Oh, it was Webber, the

24  Commissioner?

25     A.      Yes.

Caldarelli

Q.     And Madigan was the Chief of

Detectives then?

A.     Correct.

Q.     So once you sent your report,

would you ever get something back like from

the Commissioner approved, disapproved or

concurred, not concurred?

A.     All cases would have come back

to Internal Affairs; yes.

Q.     Eventually just for final

administrative process?

A.     They would be filed in Internal

Affairs.

Q.     Did there come a time where you

were getting back complaints, I mean, files

from the Commissioner's office that indicated

whether in fact they were approving your

findings or your recommendations?

A.     Yes, though for the most part

though I wouldn't look at those cases, you

know, when they came back in, the civilian

staff would just file them.

Q.     Because they were already closed

cases?

Caldarelli

A.    Right.

Q.    Did they ever flag anything for
you where, again, whether you would have
been reversed, like, again, where you made
specific findings and the Commissioner or
somebody had reversed you or overturned you?

A.    They would not necessarily bring
that to my attention; no.  Occasionally I
would become, you know, become aware of
something like that, but it was not on a
regular basis.  I suppose they weren't
really obligated to tell me, you know, they
were bosses, if they wanted to overrule me,
they could.

Q.    Okay.

When Chief Meehan made that
comment, I mean, did you feel like they were
trying to intimidate you or the conversations
with Chief White?

A.    White?

Q.    Was it White?  I'm sorry.

A.    White never tried to intimidate
me.

Q.    No.  No.  But, I mean, White I

1              Caldarelli

2    think passed the message that there were

3    others, he tried to alert you that there

4    were others --

5         A.    He did that as a friend.  White

6    and I were friends for a long time.

7         Q.    Okay.

8         A.    He was -- he never attempted to

9    get me to do anything that I considered wrong.

10        Q.    But that comment by Meehan, did

11   you feel that that was an attempt to

12   intimidate you?

13        A.    Well, I think it was sort of I

14   guess what you could call a Sicilian

15   message.

16        Q.    I'm not sure how to treat that.

17   What do you define -- I don't know if there

18   are any Italians in the room.

19        A.    I am.

20        Q.    Besides you.  But what do you

21   do, sleep with the fishes?  I don't know.

22        A.    Precisely.

23        Q.    That's my only reference to

24   Sicilian message.

25              So was that an attempt to

1           Caldarelli

2    silence you?

3       A.    Yes.  As another example, like I

4    said, a friend of mine who was of like mind

5    once told me that someone else had told him

6    are you interested in Internal Affairs

7    during my tenure there, because they're

8    thinking about replacing Caldarelli, and I

9    think it was with the full knowledge that

10   this friend of mine was going to disclose

11   that to me and attempt to influence my actions.

12      Q.    Did you feel your job security

13   was at risk or your command?

14      A.    The command, absolutely.  As a

15   matter of fact, I was surprised it took them

16   as long to get rid of me as it did.

17      Q.    Because you said this conversation

18   with Meehan was like in 2013 and it was a

19   year later that you were finally reassigned?

20      A.    Yeah, and I'm not sure of the

21   date on that, but I think it's fair.

22      Q.    More or less.

23      A.    Yes.

24      Q.    Did they give you any indication

25   that if you didn't, I don't know, you know,

1                        Caldarelli

2    stop your practice of substantiating

3    complaints that you would be transferred out

4    or reassigned?

5        A.      No.  No.

6        Q.      Was this just more of an

7    internal feeling that you had?

8        A.      Well, based upon what, you know,

9    what I was hearing from people, it was, you

10   know, I mean, it was abundantly clear, you

11   know, but frankly the conditions that

12   existed there frankly when I was transferred,

13   although I felt it was wrong, it was a

14   relief.

15       Q.      Do you have any regrets about

16   your actions or behavior while commanding

17   officer?

18       A.      Not a one.

19       Q.      Would you change anything that

20   you did back then?

21       A.      No.

22       Q.      Did you have discussions again

23   with your XO at that time about what was

24   going on or the conversations or comments

25   with you?

                          Caldarelli

1

2         A.      Yes.

3         Q.      And what was his -- what was

4    your XO's -- did he share your sentiment in

5    terms of what was going on?

6         A.      Yes.  Joe was a decent, honest man.

7         Q.      Okay.

8                 Did he also feel his -- I guess

9    was his position I guess as your XO

10   intertwined with your command or --

11        A.      No.  As a matter of fact, I was

12   shocked when they transferred him out the

13   same day that they did me.

14        Q.      So you were both transferred out

15   the same day?

16        A.      Yes.

17        Q.      Why is that unusual?

18        A.      Well, I mean, you remove a CO,

19   that causes a certain amount of disruption,

20   and if I can harken back, when I went into

21   Internal Affairs, I relied very heavily on

22   Joe because he had a lot of institutional

23   knowledge, he had been there for a while and

24   he was invaluable.

25        Q.      To make the transition smoother

1                    Caldarelli

2      for the new commander?

3          A.    Yes.  So you remove both at the

4      same time, you know.

5          Q.    Okay.

6                Do you still keep in contact

7      with your former XO?

8          A.    Joe?  No.  No.  Actually I've

9      seen him -- he came to my father's funeral

10     when my father died.  I don't know if I've

11     seen Joe since then.

12         Q.    Okay.

13               And when was that?

14         A.    January.

15         Q.    My condolences.

16         A.    Thank you.

17         Q.    Did he ever express again any

18     fears about the job or the work that you

19     were doing?

20         A.    Yes.

21         Q.    What, if anything, did he say to

22     you?

23         A.    He said, you know, they don't

24     like this, they're not going to, you know,

25     they're not going to take kindly to this.

1                    Caldarelli

2        Q.      When he was referring to they,

3    who was he referring to?

4        A.      The upper echelon of the police

5    department.

6        Q.      The three individuals you

7    mentioned, Madigan, Meehan and Burke?

8        A.      Yeah.  I think he might have

9    been including the entire upper echelon.

10       Q.      Did you feel you were being

11   treated unfairly by, you know, by the work

12   that you were doing there in terms of, you

13   know, you were running the unit as you

14   thought appropriate?

15       A.      Yes.

16       Q.      Why did you think you were being

17   treated unfairly?

18       A.      Well, I felt certainly that

19   there was a good possibility that not only

20   was I going to be transferred, but I

21   realized that my career was over, that there

22   was virtually no prospect for anything more

23   for me.

24       Q.      Meaning that it was unlikely

25   that you would be considered for further

1                      Caldarelli

2    consulted an attorney.

3        Q.      Did you consult with an

4    attorney --

5        A.      Yes.

6        Q.      -- in terms of what was

7    transpiring?

8        A.      Yes.  And I was and still am

9    represented by one.  I had discussed this

10   matter with other parties.  I don't care to

11   really get into much detail more than that.

12       Q.      You never took any I guess

13   formal action in terms of either filing a

14   complaint internally with Suffolk County

15   Police?

16       A.      No.

17       Q.      Or the County?

18       A.      No.

19       Q.      Or the Human Rights Commission

20   or some type of agency as that nature?

21       A.      My desire was to be left alone

22   to do the job the way I saw fit, and if they

23   couldn't do that, transfer me.

24       Q.      Did you ever document, you know,

25   I guess any of this like the treatment you

1                    Caldarelli

2    were receiving or your complaints or your

3    perceived mistreatment I guess for lack of a

4    better word?

5        A.    Well, I have one report that I

6    think I mentioned earlier where a chief had

7    basically overruled my findings, and I think

8    that the tone and tenor of that is very

9    illustrative, but did I keep a log?  No.

10   Actually -- I regret that I didn't, but Joe

11   Capolino had often urged me to do so, but

12   quite frankly, I was up to my neck in work

13   just trying to run Internal Affairs, let

14   alone documenting things like that.

15       Q.    Did you ever like I guess in an

16   exchange, was there, I don't know, was

17   e-mail used or letter, you would write an

18   internal memo, you know, disputing whatever

19   their characterizations of anything or their

20   treatment, or their characterization of your

21   work or how you sustained cases?

22       A.    There was never anything written

23   that I know of.

24       Q.    The report that you mentioned

25   that I guess you thought was indicative, was

Caldarelli

this something you kept a copy of?

    A.     Yes.

    Q.     And which case or complaint was
this one?

    A.     Forgive me, I'm not sure, there
might be some ongoing investigations in the
matter and I'm reluctant to --

        MS. O'DONNELL:  I think this is

    the --

    Q.     Is this related to the one we've
referenced earlier?

        MS. O'DONNELL:  Yes.  That's my

    understanding, that there is --

    A.     Yeah.

        MS. O'DONNELL:  -- quite

    possibly a pending criminal

    investigation.

        MR. PEREZ:  Okay.

        MS. O'DONNELL:  So I just

    instructed the witness not to identify

    the case.

        MR. PEREZ:  Okay.

    Q.     And as far as you know, this
potentially may still be an active

1                    Caldarelli

2    investigation with either the police or the

3    DA's office, to your knowledge?

4         A.    No, I don't think it is the DA's

5    office.

6         Q.    But it still may be active

7    within the police department?

8         A.    No.  Again, I -- please forgive

9    me, I don't want to do anything that might

10   compromise anything else.

11             MR. PEREZ:  Counsel, if you and

12        the County are aware of the report that

13        he's referring to, I would ask -- I'm

14        going to call for production of that

15        and we will reduce it to writing.  To

16        the extent as you've provided redacted

17        copies of other such reports, I'm going

18        to ask that you provide that.

19             MS. O'DONNELL:  Sure.  Put it in

20        writing and I'll take it under

21        advisement like all the other requests.

22             MR. PEREZ:  Okay.

23        Q.    Do you know whether your former

24   XO, Capolino, did he keep any type of log or

25   report?

1                     Caldarelli

2          A.      Not to my knowledge.

3          Q.      You mentioned again you thought

4    again that your career was at a standstill

5    because of the one case we talked about and

6    that you didn't change, that you received a

7    call, that you didn't change your

8    recommendation, but also that Burke had

9    mentioned or called about other cases.  Were

10   there -- you talked about those other cases

11   where I guess you substantiated findings

12   where you had discussions with him that he

13   was concerned about?

14         A.      It wasn't so much Burke.

15         Q.      Was it more then the Commissioner?

16         A.      Probably the next most significant

17   example would have been the Commissioner; yes.

18         Q.      And you said the most significant.

19   What case was that that you're referring to?

20         A.      That one I think I can discuss.

21   The O'Donnell case, the custody death case.

22         Q.      The?

23         A.      O'Donnell, the --

24                 MS. O'DONNELL:  The one that he

25         talked about earlier.  He said he was

1                    Caldarelli

2        confusing the name with my name.

3              MR. PEREZ:  Oh, your name.

4        Okay.

5              MS. O'DONNELL:  You may recall.

6        A.    O'Donnell, O'Connell.

7        Q.    I got you.

8        A.    It was an in custody death.

9        Q.    And forgive me, my brain is --

10   I'm not remembering what you mentioned --

11   certain things -- so tell me again what the

12   O'Donnell/O'Connell case was.

13       A.    I think his name was Kenneth,

14   but I'm not sure.  Again, a gentleman --

15       Q.    Is this the one that you talked

16   about you testified?

17       A.    I was deposed.

18       Q.    You were deposed.

19       A.    I didn't actually testify in

20   court, but I was deposed.

21       Q.    Right.

22       A.    A gentleman was arrested in the

23   1st Precinct suffering from bipolar disorder,

24   he was lodged in the precinct overnight.

25   There was an altercation bringing him to --

1                  Caldarelli

2    when it was time to transfer him to court

3    the next morning and he ended up dead.

4        Q.    And you were deposed, it was a

5    wrongful death suit I guess against the

6    Department --

7        A.    Yes.

8        Q.    -- or the County and you were

9    deposed in that.

10       A.    Okay.

11       Q.    For lack of a better word, I

12   guess you garnered a reputation of I guess

13   being tough or calling it straightly or

14   fairly as you saw when you were reviewing

15   cases; is that fair?

16       A.    I believe that's why they

17   attacked me initially because when I was a

18   precinct DI, I wouldn't send cases up unless

19   they were done correctly.

20       Q.    And they brought you in or

21   specifically it was your mandate to kind of

22   shape up Internal Affairs?

23       A.    I think that's fair.

24       Q.    Did you, as your -- I guess

25   during your tenure, did you ever feel like

Caldarelli

1    the investigators under your command were

2    not sharing or coming -- as forthcoming with

3    you as you thought they should have been?

5        A.    No. Despite the fact that I

6    thought things had disintegrated between

7    myself and my superiors, I thought I had

8    fairly good rapport with the people who

9    worked for me.

10        Q.    And I think you mentioned this

11    earlier, you still encouraged them to kind

12    of do their investigations and make their

13    findings, and if you agreed or disagreed,

14    that you would engage with them on it?

15        A.    I always encouraged them, but at

16    the end of the day, it didn't matter,

17    because if I didn't like it --

18        Q.    It wasn't going up.

19        A.    -- I wouldn't sign it.

20        Q.    Okay.

21        And just, again, going back to

22    did you ever have any conversations,

23    interactions with I guess Chief Madigan?

24        A.    Yes.

25        Q.    Relating to this, you know, your

1                    Caldarelli

2    IAB, your finding of withholding or

3    substantiating complaints?

4         A.    Yes.  Actually there was the one

5    case, the one that I'm somewhat circumspect

6    about talking about, that was probably the

7    most salient example.

8         Q.    Did that case involve members of

9    the detective squad?

10        A.    The detective division; yes, sir.

11        Q.    Yes.  Okay.  So that would have

12   come under within his purview?

13        A.    Yes.  It also, just to be fair,

14   it also involved people outside of the

15   detective division.

16        Q.    Okay.

17              And so what did -- you said did

18   you have a direct conversation or interaction

19   with Madigan about that?

20        A.    Yes.

21        Q.    And when was that?

22        A.    I think it was in July '14,

23   maybe late June perhaps.

24        Q.    And was this a scheduled or

25   happenstance?

1                    Caldarelli

2        A.      It was something that he had

3    called me and he set a date, he said, Mike,

4    I need to discuss this case with you, please

5    come down to my office at such and such a

6    date.

7        Q.      And did you in fact go and

8    report to his office?

9        A.      I did.

10       Q.      And what, if anything, did he

11   tell you about that case?

12       A.      He actually said that he

13   disagreed completely with me, he felt that

14   the investigator who had initially

15   investigated the case got it right, he

16   thought the report was spot on, and

17   basically he wanted some changes made.

18       Q.      Can you recall who the

19   underlying investigator in that case was?

20       A.      Yes.

21       Q.      And who was it?

22       A.      Kelly Lynch.

23       Q.      Kelly Lynch?

24       A.      Yes.

25       Q.      Is that Kelly, K-E-L-L-Y?

1                    Caldarelli

2         A.    Yes.

3         Q.    And Investigator Lynch, when did

4    she come to Internal Affairs?

5         A.    Prior to my time there.

6         Q.    So she was already there when

7    you joined the squad?

8         A.    Yes.

9         Q.    Or took over as commander.

10        A.    Yes.

11        Q.    Did you indicate to Chief Madigan

12   why you thought, again, you made the

13   findings that you did or that the evidence

14   supported the conclusion that you drew?

15        A.    Initially I did, then I stopped.

16        Q.    Why did you stop?  Was this

17   during the same conversation?

18        A.    Yes.

19        Q.    Why did you stop?

20        A.    Because the chief had provided

21   me with a copy of his report in which he had

22   made voluminous notes which I felt just

23   illustrated the absurdity of his position.

24   Once I got full wind of the tone and tenor

25   of the conversation and saw what he had

1                    Caldarelli

2    written, my sole mission became to get out

3    of that room with that document in my hand.

4         Q.    And did he in fact give you that

5    document?

6         A.    Yes.

7         Q.    And this is something that he

8    had prepared in writing in advance of that

9    meeting?

10        A.    It was my IAB cover, it was a

11   lengthy one, approximately nine pages from

12   what I remember.  It was basically, for lack

13   of a better term, it became the case.

14        Q.    Okay.

15              Your memo?

16        A.    Case report; yes.

17        Q.    And had he written or made

18   notations on it or criticizing whatever

19   finds you had made?

20        A.    Considerable notations; yes.

21        Q.    Did any of the notations that

22   the chief had done address like change facts

23   or was this changing your conclusions or, I

24   don't know, the inferences?

25        A.    Deletion of material that I

1                    Caldarelli

2    considered essential.

3        Q.    Trying to change the narrative?

4        A.    Yes. It was clearly -- some of

5    the information that he requested if I

6    removed -- if it be removed, yes, of course,

7    my conclusion wouldn't make a great deal of

8    sense, but. . .

9        Q.    And you refused to do that?

10       A.    I did.  I agreed to make -- he

11   did make one or two grammatical changes, a

12   spelling change or two.  That I had no

13   objection to.  But the -- anything that

14   impacted the sum and substance of my findings,

15   I refused.

16       Q.    And is that the copy of the

17   document that you said you kept or you kept

18   on file?

19       A.    Yes.

20            MR. PEREZ:  And I will reiterate

21        again that we will call for the

22        production of that document.

23            MS. O'DONNELL:  Put it in

24        writing.

25       Q.    Is that, as far as you know,

Caldarelli

1
2    part of the official case file now with the
3    chief's notations on it or was that just
4    something that he gave to you?
5        A.    I doubt that very much.
6        Q.    Would you be willing to share
7    that document?
8        A.    I have no objection, sir.
9    However, again, I do fear that it might
10   compromise another matter, but I have no
11   personal objections.  I'll show it to anyone
12   who asks me.
13       Q.    Okay.  I would ask you then if
14   you would share it with Ms. O'Donnell.
15           MS. O'DONNELL:  Right.  And I
16       also think that it's important to note
17       that this witness has stated that he
18       has a private attorney, so I think that
19       that private attorney should also be
20       part of this discussion.
21           MR. PEREZ:  Well, I have
22       nothing --
23           MS. O'DONNELL:  So we will take
24       it under advisement.
25       Q.    Inspector, I leave it to you

1                    Caldarelli

2    whether you want to consult with your

3    attorney.  At least in terms of this

4    particular matter or litigation, Ms. O'Donnell

5    is the attorney of record for the County,

6    and I encourage you to show it, share it

7    with her.

8                MS. O'DONNELL:  Right.  And I

9          just want to state for the record that

10         obviously the scope of any federal

11         deposition is very broad, as you know,

12         the witness can be questioned about

13         relevant evidence or evidence that may

14         lead to relevant evidence.  I think

15         that we're getting to a point now where

16         we're getting even beyond that.  I'm

17         just making a statement for the record,

18         I'm not obstructing your questions at

19         all or instructing this witness not to

20         answer, but I do think we're getting

21         close to that.

22                MR. PEREZ:  Okay.  I appreciate

23         your professional courtesy,

24         Ms. O'Donnell.  I beg to differ in

25         terms of whether this is relevant or

1                    Caldarelli
2       leading to relevant evidence.  I think,
3       again, given the nature of the
4       investigation and the unexplained basis
5       for delays in this investigation, which
6       permeated an environment in which
7       Latinos were routinely being stopped
8       and robbed leads to questions about the
9       conduct of the Department it appears at
10      high ranking levels and the impetus or
11      motivation, so we can agree to disagree
12      about the relevance or leading to
13      relevant information, but --
14             MS. O'DONNELL:  Fair enough.
15             MR. PEREZ:  Fair enough. And I
16      think this might be a chance for a
17      quick break.
18             MS. O'DONNELL:  Sure.
19             MR. PEREZ:  Okay?
20             MS. O'DONNELL:  Yes.  How long?
21      About ten minutes?
22             MR. PEREZ:  Yes.  Actually
23      before we do this, I just have one last
24      question and then we'll take a break.
25      Q.    I forgot something else I wanted

1                    Caldarelli

2        A.      No.  Fallon remained in the

3   Police Commissioner's office.

4        Q.      And Chief Webber actually

5   eventually retired?

6        A.      He retired, he became the Police

7   Commissioner and then he retired I guess a

8   little over -- no, it was two years ago.

9        Q.      And, again, going back to your

10  testimony again this morning where you

11  mentioned I guess having close to weekly

12  briefings or discussions with Commissioner

13  Webber, do you recall who else was part of

14  those meetings?  Was Chief White part of

15  those meetings?

16       A.      At times.

17       Q.      At times.  Were any of the other

18  chiefs that you mentioned, Fallon, Madigan,

19  Meehan or Burke?

20       A.      Maybe once in a while Burke, but

21  it was rare.

22       Q.      Was any support staff or, I

23  don't know, does the Commissioner have an

24  executive assistant or administrative

25  assistant present?

1                    Caldarelli

2       A.    No.  No.  Those are for the most

3  part myself and Webber, perhaps Mark White

4  on occasion, on rare occasions maybe, maybe

5  Burke.

6       Q.    Were any notes taken, did you or

7  the Commissioner or anybody take any notes

8  or transcribe from those meetings?

9       A.    You know, what I would sometimes

10  do is I would sometimes just write out things

11  to discuss with the Commissioner, you know.

12       Q.    Bullet points or general

13  guidelines?

14       A.    Right.  It was usually

15  handwritten, so not really bullet points.

16       Q.    Generally what would you do with

17  them, sir?

18       A.    Frankly, sir, I don't know if

19  I -- Im pretty certain I don't have them

20  being that I'm retired now.  Whether I got

21  rid of them, whether they're in a drawer in

22  my old office in IAB or in planning or the

23  Commissioner's office, I don't know.

24       Q.    As far as you know, did the

25  Commissioner take notes on your discussions

                    Caldarelli

1

2    or --

3        A.      I would say not really on a

4    regular or heavy basis.  I don't remember

5    that; no.

6        Q.      When you were reassigned from

7    Internal Affairs, was anyone besides you and

8    the XO also reassigned or transferred out at

9    that time?

10       A.      Not to my knowledge.  If it was

11   though, I think it would have been purely

12   incidental.

13       Q.      Okay.  Coincidental?

14       A.      Yes.

15               MR. PEREZ:  Let's take our

16       break.

17               MS. O'DONNELL:  Sure.

18               MR. PEREZ:  I have 3:00, so

19       3:10.

20               MS. O'DONNELL:  Sounds good.

21               (Whereupon, a brief recess was

22       taken.)

23   CONTINUED BY MR. PEREZ:

24       Q.      Inspector, during your tenure at

25   Internal Affairs, were you aware of any