# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PLAINTIFFS #1-21, individually and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE COUNTY OF SUFFOLK; SUFFOLK COUNTY POLICE DEPARTMENT; EDWARD WEBBER, individually and in his official capacity; MILAGROS SOTO, individually and in her official capacity; SCOTT GREENE, individually and in his official capacity; BRIDGETT DORMER, individually and in her official capacity; SUPERVISORY JOHN DOE DEFENDANTS, individually and in their official capacities; and JOHN DOE DEFENDANTS, individually and in their official capacities,

     Defendants.

Case No.: 2:15-cv-02431-WFK-LB

## **CLASS ACTION SETTLEMENT AGREEMENT**

## I.   INTRODUCTION

### A.   The Action

1.   This class action lawsuit for declaratory and injunctive relief as well as compensatory and punitive damages (the "<u>Action</u>") was filed by Plaintiffs #1-21 on behalf of themselves (collectively, "<u>Named Plaintiffs</u>")[1] and others similarly situated on April 29, 2015, against, *inter alia*, the County of Suffolk (the "<u>County</u>"), the Suffolk County Police Department (the "<u>SCPD</u>"), Edward Webber, and Milagros Soto (collectively, "<u>County Defendants</u>") (together with Named Plaintiffs, the "<u>Parties</u>"). Prior to this settlement agreement, one of the Named Plaintiffs withdrew from the action.

2.   Named Plaintiffs allege that County Defendants, through the SCPD, engage in policing policies, practices, and customs that violate the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S. § 2000d. County Defendants deny Named Plaintiffs' allegations.

3.   On March 12, 2021, Judge Bloom recommended that the Court certify the proposed class pursuant to Rule 23(b)(2) (the "<u>Class</u>"), and deny, without prejudice, the motion to certify the proposed class seeking damages pursuant to Rule 23(b)(3). The Court adopted Judge Bloom's report and recommendation in its entirety on April 5, 2021. The certified class consists of all Latino or Latina persons who, at any time after January 2012, have

---

[1] On November 5, 2018, Plaintiff #21 released all claims in the Action. For all activities that took place after that date or will take place in the future, references to Named Plaintiffs or Plaintiffs excludes Plaintiff #21.

been or in the future will be subject to a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk.    Plaintiffs #1-20 were approved as the class representatives (the "Class Representative Plaintiffs") and Milbank LLP and LatinoJustice PRLDEF were appointed as class counsel (the "Class Counsel"). Following the class certification decision, Plaintiffs #1-20 retained their individual claims for damages notwithstanding that the Rule 23(b)(3) class was not certified.

4.    On March 24, 2022, the Court referred this Action to Mediation through the EDNY Trial Ready Rapid Mediation Pilot. The Parties informed the Court on July 26, 2022, that they had agreed in principle to a settlement of this Action. On July 29, 2022, the Court directed the Parties to prepare agreements that memorialize the Parties' agreement to settle within 60 days. The Court has granted four requests by the Parties for extensions of time to file the settlement agreements.  The deadline was extended to December 26, 2022, February 9, 2023, March 1, 2023, and March 6, 2023.

5.    On March 29, 2021, the Office of the Suffolk County Executive issued the Police Reform & Reinvention Task Force Final Report (the "Reform Plan").

6.    The Parties have prepared this settlement agreement (the "Class Action Settlement Agreement"), which memorializes the Parties' agreement to settle the Class's claims against County Defendants (the "Class Action

Settlement").[2]   The Parties have also prepared a separate settlement agreement that memorializes the Parties' agreement to settle Plaintiffs #1-20's individual, non-Class claims for damages against County Defendants (the "Individual Settlement Agreement").

7.      The Individual Settlement Agreement addresses claims for damages held by the Named Plaintiffs[3] due to alleged injuries suffered by them in their individual capacities.   The relief provided to the Named Plaintiffs in the Individual Settlement Agreement is not on account of any claim held by the Class.   There is no overlap between the claims released in this Class Action Settlement Agreement and the claims released in the Individual Settlement Agreement.

B.      Jurisdiction

1.      This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

2.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391.

3.      The Court shall retain jurisdiction to enforce the terms of this Class Action Settlement Agreement.

---

[2] For the avoidance of doubt, Defendant Scott Greene is not party to this Class Action Settlement Agreement. This Class Action Settlement Agreement does not contemplate any settlement of the Class's claims in the Action against Mr. Greene.
[3] Excludes Plaintiff #21.

## II.   DEFINITIONS

A.   Terms in this Agreement shall be defined as follows:

1.   "Action" means the above-captioned class action lawsuit for declaratory and injunctive relief.

2.   "Attorneys' Fees" means attorneys' fees, costs, and disbursements in connection with the Action.

3.   "BWC" or "BWCs" means body-worn camera(s).

4.   "Class" means all Latino or Latina persons who, at any time after January 2012, have been or in the future will be subject to a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the County of Suffolk.

5.   "Class Counsel" means Milbank LLP and LatinoJustice PRLDEF.  Should these entities change their names or merge with other entities, those new entities shall also qualify as Class Counsel.

6.   "Class Member(s)" means any Latino or Latina persons who, at any time after January 2012, have been or in the future will be subject to a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the County of Suffolk.

7.   "Class Notice" means a notice substantially in the same form as Appendix I to the Class Action Settlement Agreement attached as Exhibit A to the Miller Declaration.

8.   "County" means the County of Suffolk.

9.   "County Defendants" means the County of Suffolk, the Suffolk County Police Department, Edward Webber, and Milagros Soto.

10.    "DEMS" means Digital Evidence Management System.

11.    "Effective Date of Class Action Settlement" or "Effective Date" is the date that the Court enters an order granting final approval of the Class Action Settlement Agreement and dismissing all claims against the County Defendants in the action other than the Separately Released Claims, which will only occur after the Suffolk County Ways and Means Committee approves both the Class Action Settlement Agreement and the Individual Settlement Agreement.  On the Effective Date, the Class Action Settlement Agreement will become effective and binding on the Parties; except that, the releases set forth in Section IV.H. will not become effective unless or until payment of amounts contemplated in Section IV.F. are complete, which may occur up to 30 days following the Effective Date.

12.    "Fairness Hearing" means the hearing, following notice to the Class and an opportunity to object, in which the Court will consider whether the Class Action Settlement Agreement can be finally approved under Federal Rule of Civil Procedure 23(e)(2).

13.    "Final Order" means entry by the Court of an order substantially in the form of Appendix IV to this Class Action Settlement Agreement, granting final approval of this Agreement as binding upon the Parties and the Class Members and dismissing the Class claims against the County Defendants with prejudice.

14.    "HRC" means the Suffolk County Human Rights Commission.

15.     "IAB" means the Suffolk County Police Department Internal Affairs Bureau.

16.     "Joint Motion for Preliminary Approval of Class Action Settlement Agreement" means the Joint Motion for Preliminary Approval of the Class Action Settlement Agreement and Approval of Notice to the Class of Class Action Settlement, filed by the Parties on March 6, 2023.

17.     "Miller Declaration" means the Declaration of Atara Miller, Esq. in Support of the Joint Motion for Preliminary Approval of the Class Action Settlement Agreement and Approval of Notice to the Class of Class Action Settlement, filed on March 6, 2023.

18.     "Named Plaintiffs" means Plaintiffs #1-21 for the time period up to and including November 5, 2018, on which date Plaintiff #21 released all claims in the Action.   For the time period November 6, 2018 to present, all references to "Named Plaintiffs" refers solely to Plaintiffs #1-20.

19.     "Parties" means Named Plaintiffs and County Defendants.

20.     "PLAB" means Precinct Level Advisory Board.

21.     "Notice Date" means the date by when the Class Notice is distributed in accordance with the procedures set forth in the Joint Motion for Preliminary Approval of the Class Action Settlement Agreement.

22.     "Released Parties" means each County Defendant and any and all current or former employee or agent of the SCPD, in their individual and official capacities, and their heirs, executors, administrators and assigns, and

Suffolk County and its agencies, <u>other than</u> Defendant Scott Greene who is expressly not released through this Class Action Settlement Agreement.

23. "Released Claims" means any and all claims for relief arising out of or related to the facts and circumstances alleged in the Amended Complaint for which the Class could recover, for all dates up to and including the Effective Date of this Class Action Settlement Agreement. For the avoidance of doubt, the Released Claims do not include the Separately Released Claims.

24. "Separately Released Claims" means any claims for damages by the Named Plaintiffs in their individual capacities and not in their capacities as Class Representative Plaintiffs, which claims are addressed in the separate Individual Settlement Agreement executed substantially contemporaneously herewith.

25. "SCPD" means the Suffolk County Police Department.

## III. SUBSTANTIVE TERMS

A. The SCPD shall establish a Precinct Level Advisory Board ("<u>PLAB</u>") for each SCPD Precinct. PLABs will assist SCPD in the following areas: addressing community concerns; fostering new relationships with community leaders; expanding the community engagement reach of each precinct; and providing clear lines of communication between the SCPD and the community it serves. The SCPD will publish notice explaining the goals of the PLABs, the eligibility and selection process for members of the PLABs, and the initial openings on the PLABs.

1. The method of selecting the members of a PLAB shall be as follows:

a. **Eligibility.** Except as otherwise provided, any person over the age of twenty-one who resides within the boundaries of an SCPD precinct, works within the boundaries of an SCPD precinct, or serves as a member of a civic organization, a non-profit organization, or a religious organization that operates within the boundaries of an SCPD precinct is eligible to serve on that precinct's PLAB.  No current, full-time employee of the SCPD, the Suffolk County District Attorney's Office, or Class Counsel is eligible to serve on any PLAB, nor can elected or appointed political officials.

b. **Selection.** Each PLAB shall have no fewer than eight and no more than twelve members, each of whom will serve a two-year term. No person may serve more than three terms on a PLAB. The Commanding Officer, in consultation with a representative of the Police Commissioner, will appoint the members of his or her precinct's PLAB. Any person eligible to serve on a PLAB may submit his or her name to the appropriate precinct for the Commanding Officer's consideration.

c. **Vacancies.** If a PLAB member vacates his or her position for any reason prior to the conclusion of a term and the membership of the PLAB falls below eight, the Precinct will publish notice of the vacancy and the Commanding Officer shall select an eligible resident of the precinct to serve the remainder of the vacated term.

2.      Rules and procedures.  A PLAB may adopt rules and procedures that will govern PLAB meetings.  A PLAB may form committees to address issues of particular concern.

3.      Meetings

    a.      **Schedule**

        (1)      It is expected that each PLAB shall hold quarterly meetings at times and places designed to maximize attendance.  The precinct shall be made available as a meeting space should the PLAB choose to meet there.

        (2)      All meetings of the PLAB shall be open to the public.

        (3)      The SCPD shall publish notifications for PLAB meetings in the Alerts and Advisories section of each precinct's landing page on the SCPD website. Each precinct shall publish notice of the PLAB meeting on each social media platform used by the SCPD or the precincts.

    b.      **Participation of the Precinct**

        (1)      The Commanding Officer for each precinct or his or her designee of the rank of Captain or above shall attend at least one PLAB meeting each quarter for that precinct in person.

        (2)      The Community Liaison Officer for each precinct or another member of the Community Relations Bureau shall attend at least one PLAB meeting each quarter for that precinct in person.

        (3)      A minimum of two patrol officers will attend at least one PLAB meeting each quarter in person for each precinct to provide an opportunity for community members to become familiar with the officers who are tasked with providing public safety for their neighborhoods unless there is a staffing shortage.

(4)   A COPE Officer will regularly attend PLAB meetings each quarter.

(5)   Annually, at a regularly scheduled quarterly meeting, the Commanding Officer will be available to present up-to-date data on the precinct's stop activities, drawn from the Traffic and Pedestrian Stop Data Dashboards, including but not limited to:

a.   Total number of stops for the quarter preceding the PLAB meeting;

b.   Demographic breakdown of stops for the quarter preceding the PLAB meeting;

c.   Breakdown of the number of stops that resulted in summonses, searches, or arrests;

d.   Demographic analysis of the individuals who were summonsed, searched, or arrested after a stop; and

e.   Comparison of the stop data for the quarter preceding the PLAB meeting to the stop data for the same quarter in the prior calendar year.

(6)   During each PLAB meeting, SCPD participants will be available for questions from PLAB members and members of the public to ensure clear lines of communication between the SCPD and the community it serves.

B.   The SCPD will have patrol officers attend the Precinct's monthly community meeting.

C.   The SCPD shall maintain and post language access statistics on a quarterly basis via its website.

D.   The SCPD shall provide language assistance services in accordance with the procedures set forth in SCPD Policy 333 and shall make residents aware that such

services are available to them free of charge via the SCPD website and in-person posters and informational flyers available at every precinct.

1.      Each SCPD officer will be required to utilize a paper or electronic version of Language Identification Memorandum Book Insert (PDCS-7044) or similar industry-standard application or platform to identify the language spoken by an individual of limited English proficiency.

2.      The SCPD shall ensure the navigability of its website to align with the goals and spirit of SCPD Policy 333 by including a link on its home page that will translate its webpages into Spanish.  The links on the Spanish version of the website should direct users to versions of available vital documents, as defined by the SCPD Language Access Plan and SCPD Policy 333, that have been translated into Spanish.  The SCPD may maintain the Spanish versions of the vital documents on one webpage.

E.      The SCPD will create an updated version of its implicit bias training.  The updated version of implicit bias training will be created in conjunction with a consultant with experience and knowledge of best practices.  It will incorporate the SCPD's own traffic stop data, as well as the annual analysis of that data performed by an independent third party (who may or may not be affiliated with the consultants(s)).  In conjunction with the consultant, the SCPD will develop standards for in-house trainer certification as part of any train-the-trainer model and

will determine the appropriate mode of training. The updated version of the SCPD's implicit bias training will meet the following standards:

1.      The training shall involve approximately eight hours of training, unless otherwise determined in consultation with the consultant, to be completed by each sworn member who has not yet completed the SCPD's existing implicit bias training. For those sworn members who have completed the SCPD's existing implicit bias training, the SCPD, in conjunction with the consultant, will develop appropriate training that incorporates the analysis of SCPD's traffic stop data. For purposes of the Implementation and Termination sections of this Class Action Settlement Agreement, substantial compliance shall require the creation of an updated version of the implicit bias training and the development of a Department-wide training schedule applicable to all sworn members. As per the Implementation Timeline, attached hereto as Exhibit A, Schedule 1, substantial compliance shall involve three-quarters of sworn police officers having completed Implicit Bias 2.0 training. Implicit Bias 2.0 training shall consist of the following: 8 hours (including Traffic Stop data analysis) for new recruits and supervisors; 4 hours (including Traffic Stop data analysis) for officers who have completed legacy Implicit Bias training. The SCPD's intention, in accordance with the training benchmarks in the Implementation Timeline, attached hereto as Exhibit A, Schedule 1, is to set the Department on the path to training the entirety of its sworn force.

2.   Supervisory and command officers (those at the rank of Sergeant or higher) shall receive training appropriate to their supervisory and leadership roles, including the following, to the extent these subjects remain best practices in reducing implicit bias in policing: instruction on techniques for reviewing and analyzing traffic stop data; identification of potential bias issues and addressing trends in the data when they are discovered; identification of subordinates who may be acting in a biased manner; guidance on how they should respond to officers who exhibit biased policing behaviors; thinking about how bias might manifest in their own behavior; and guidance on how to speak about bias to individuals (e.g., officers and individual community members), organizations, and across media.

F.   The SCPD shall maintain and update on a quarterly basis, its public-facing Traffic and Pedestrian Stop Data Dashboards.

1.   The Traffic Stop Data Dashboard will reflect data captured by SCPD officers during traffic stops.

2.   The Pedestrian Stop Data Dashboard will reflect data captured by SCPD officers during pedestrian stops that involve detentions of pedestrians based on reasonable suspicion.

3.   Raw data sets shall be made available to the general public on the Traffic and Pedestrian Stop Data Dashboards for download in .CSV file formatting from the SCPD's website. Precinct information of where the stop occurred will be included in the publicly available raw data sets.

4.      County demographic information will be included on the Traffic and Pedestrian Stop Data Dashboards by utilizing links to the demographics of the five western towns of Suffolk County.

G.      The documentation of traffic stops shall be stored in the Traffic Stop Database. Documentation fields include but are not limited to the following:

1.      **Date and Duration of Stop.** Documentation will include date and duration of stop, and publicly available raw data will include times of stops.

2.      **Location of Stop**. Documentation will include street address or other identifiable location where no street address exists.

3.      **License Plate Data.** License plate data will be collected, anonymized in accordance with Dynamic Data Masking in SQL Server procedures or similar anonymizing program, and included in the publicly available raw data sets. The publicly available data will include the state of issue for each anonymized license plate.

4.      **Primary Reason for Stop.** For each traffic stop, the officer conducting the stop shall record the primary reason for the stop from the categories listed below:

a.      Speeding;

b.      Cell call/text;

c.      Red light;

d.      Stop sign;

e.      Seatbelt;

f.      Other moving violation;

- 15 -

g.      Missing/expired registration/inspection/plate violation;

h.      Obstructed view;

i.      Other Equipment violation;

j.      Reasonable suspicion of a crime; or

k.      Probable cause of a crime.

5.      **Actions Taken by Officer(s)**: The Officer conducting the stop will capture the following data documenting any additional police actions taken during a traffic stop:

a.      Force Used During Stop: "Yes" or "No";

b.      Canine Called: "Yes" or "No";

c.      Language Assistance Provided: "Yes" or "No."

d.      Vehicle Searched: "Yes" or "No";

e.      Reason for Search: "Plain view"; "Probable Cause of a Crime / Automobile Exception"; or "Founded Suspicion of a Crime with Recorded Consent"; and

f.      Outcome of Search: "Illegal Weapon"; "Illegal Drugs"; "Other Contraband / Other Evidence"; or "Negative Contraband/Evidence."

g.      Aided.

6.      For the vehicle occupants, the Officer conducting the stop will document the number of occupants and whether police action was taken with regard to each: "Yes" or "No."

7.     If there is no inquiry of vehicle occupants other than the operator, the SCPD will not document the non-operator occupants' demographic information.

8.     For all operators, and for any occupants against whom police action is taken (pursuant to Section 5 above), the SCPD will document the following:

   a.    Apparent Race/Ethnicity: "Asian/Pacific Islander"; "Black/African American"; "Hispanic"; "White (Non-Hispanic)"; or "Other."

   b.    Apparent Gender: "Male" or "Female."

   c.    Approximate Age: "16-25 / 26-35 / 36-45 / 46-55 / 56-65 / 66 to Over."

   d.    Request for Passenger ID: "Yes" or "No"

   e.    Exit Vehicle: "Yes" or "No."

   f.    Reason for Exit Vehicle: "Spontaneous"; "Verbal Request/Command"; or "Force Used."

   g.    Handcuffed: "Yes" or "No."

   h.    Where Placed: "Inside Police Unit" or "Outside Police Unit."

   i.    Search Conducted: "Yes" or "No."

   j.    Reason for Search: "Founded Suspicion of a Crime with Recorded Consent"; "Reasonable Suspicion / Protective Frisk"; or "Probable Cause of a Crime / Automobile Exception."

   k.    Outcome of Search: "Illegal Weapon"; "Illegal Drugs"; "Other Contraband / Other Evidence"; or "Negative Contraband/Evidence."

l.      Disposition: "Verbal Warning / Driver Education"; "Traffic Summons"; "Field Appearance Ticket"; "Arrest"; "Lights-on Voucher"; "Aided"; or "No Police Action Taken."

m.     Total Summons: "1-10" (dropdown menu).

9.     The SCPD will document pedestrian stops involving the detention of pedestrians based on reasonable suspicion. Documentation fields include but are not limited to the following:

a.     Date and Duration of Stop: Documentation will include date and duration of stop, and publicly available raw data will include times of stops.

b.     Location of Stop: Police officers will input the street address and hamlet where the stop occurred.

c.     Force Used During Stop: "Yes" or "No";

d.     Canine Called: "Yes" or "No";

e.     Language Assistance Provided: "Yes" or "No."

f.     Police Action Taken: "Yes" or "No."

g.     Apparent Race/Ethnicity: "Asian/Pacific Islander"; "Black/African American"; "Hispanic"; "White (Non-Hispanic)"; or "Other."

h.     Apparent Gender: "Male" or "Female."

i.     Approximate Age: "16-25 / 26-35 / 36-45 / 46-55 / 56-65 / 66 to Over."

j.     Handcuffed: "Yes" or "No"

k.     Was Pedestrian placed in police vehicle? "Yes" or "No"

l.   Search Conducted: "Yes" or "No."

m.   Reason for Search: "Founded Suspicion of a Crime with Recorded Consent"; ""Frisk for Weapon"; or "Search incident to lawful arrest"

n.   Outcome of Search: "Illegal Weapon"; "Illegal Drugs"; "Other Contraband / Other Evidence"; or "Negative Contraband/Evidence."

o.   Disposition: "Verbal Warning/Education"; "Summons Issued"; "Field Appearance Ticket"; "Arrest"; "Aided"; or "No Police Action Taken."

p.   Total Summons: "1-10" (dropdown menu).

H.   All SCPD officers will be trained that when encountering minor vehicle equipment violations police officers will provide drivers with a verbal warning/ education unless there are additional facts or circumstances justifying a ticket for the equipment violation offense.

I.   In conjunction with the U.S. Department of Justice, the SCPD shall have competitively procured an independent third party to review the SCPD's traffic and pedestrian stop data on an annual basis.

J.   The SCPD shall publish an intuitive and easy-to-read guide that clearly defines all Traffic Stop and Pedestrian Stop data-related terms.

K.   SCPD Precinct Commanding Officers and/or their designees and/or compliance officers will identify and address atypical patterns of traffic stops by similarly situated officers (i.e., those officers who are policing essentially the same

population in essentially the same way), including but not limited to reasonable suspicion stops and/or enforcement activity, by reviewing summary analyses generated by the internal traffic stop data portal.  This quarterly review process will involve consideration of traffic stop and enforcement activity patterns to identify substantial statistical differences between officers and ensure data integrity.  SCPD Precinct Commanding Officers and/or their designees and/or compliance officers will review the squads within the command for substantial statistical differences with regard to the overall number of stops, the stops-to-searches percentage, and the percentage of searches resulting in seizure for each squad/team/unit.

L.      Precinct-level intervention techniques will include, but are not limited to, the following: counseling; mentoring; retraining; enhanced supervision; change of assignment; conferral with SCPD leadership; transfers; or referral to the Internal Affairs Bureau.

M.      The Office of the SCPD Chief of Patrol will review precinct traffic stop data which will include the following:

   a.      Primary reason for stop;

   b.      Percentage of drivers stopped by race/ethnicity compared to precinct demographics;

   c.      Percentage of stops that resulted in a vehicle search;

   d.      Percentage of vehicle searches that resulted in the seizure of illegal drugs, weapons, or other contraband / other evidence;

   e.      Percentages of stops that resulted in a use of force; and/or

   f.      Percentage of stops that resulted in a custodial arrest.

N.      SCPD will train its officers that searches based solely on consent during routine traffic stops are not permissible. SCPD officers must have a founded suspicion of criminal activity before asking for consent to search.  SCPD will train its officers regarding SCPD's policy that officers should only ask questions during traffic stops pursuant to legal justification.  SCPD shall include in its regular training on search and seizure law an explanation of the four levels of suspicion set forth in *People v. De Bour*, 40 N.Y. 2d 210 (1976).

O.      During traffic and pedestrian stops where no arrest, summons, field appearance tickets, or lights-on vouchers are issued, an officer will provide a business card which includes the officer's last name, command, shield number, and central complaint number if applicable unless the officer encounters physical resistance, flight, or other factors rendering such procedure impractical as set forth in department order 21-207.  Police officers' business cards will be available in English as well as Spanish and will provide Internal Affairs Bureau and Human Rights Commission contact information (email or phone number).  The SCPD will also provide contact information for the Internal Affairs Bureau and Human Rights Commission on its website.

P.      Upon initiating a traffic stop, an officer shall inform the motorist of his/her name and agency affiliation and the reason for the stop unless the officer encounters physical resistance, flight, or other factors rendering such procedure impractical as

set forth in department order 21-207.  This procedure will be reflected as part of Departmental-wide training.

Q.    The SCPD will comply with its Body-Worn Camera Policy 422 and Body-Worn Camera Procedure 422 (attached as Exhibit A, Schedules 2, 3) relative to the deployment of body-worn cameras ("<u>BWC</u>" or "<u>BWCs</u>") by the SCPD.  The SCPD shall deploy BWCs as standard police worn equipment for all authorized officers who regularly engage with the public in the course of their professional duties.  For the purpose of this section, the term officers shall not include supervisors and detectives. The SCPD will implement a Digital Evidence Management System ("DEMS") in order to store, organize, manage, review, and transmit BWC recordings.  It is understood between the Parties that the SCPD anticipates modifying its BWC policies and procedures to reflect best practices determined after implementation.  It is within the discretion of the Suffolk County Police Commissioner to promulgate and modify BWC policies and procedures in order to balance public safety, officer safety, transparency, personal privacy, evidentiary value in both criminal prosecution and internal investigations, and the resources involved in managing the resulting volume of BWC footage.

R.    A civilian oversight review process will be managed by the Suffolk County Human Rights Commission ("HRC") as follows: (1) providing an additional mechanism for in-person and online means by which the public may file complaints of officer misconduct; (2) reviewing in tandem Internal Affairs Bureau (IAB) investigations of police misconduct complaints being investigated by the IAB and over which the HRC has jurisdiction pursuant to its powers and duties under Suffolk County Code

Section 119-3; (3) accessing the Department's shared data portal to monitor the status of open complaints; and (4) offering recommendations on additional steps to be taken by the Internal Affairs Bureau as part of a particular police misconduct investigation.

1.     HRC shall have the power to receive complaints from the public regarding SCPD conduct.   When HRC receives a complaint, it shall forward all information that was provided at the time the complaint was filed to IAB.

2.     After IAB opens an investigation for cases over which HRC has jurisdiction, it shall notify HRC, regardless of whether that investigation began as a referral from HRC, a referral from another source, or a self-initiated investigation.

3.     For cases over which HRC has jurisdiction under Suffolk County Code Section 119-3, HRC shall have real-time access to all information contained in the shared data portal in the course of its investigation.

4.     At any time, HRC may review and provide commentary or suggestions to IAB regarding the conduct of any IAB investigation over which HRC has jurisdiction under Suffolk County Code Section 119-3, including recommending any additional steps that HRC believes to be appropriate.

5.     Each time IAB completes an investigation over which HRC has jurisdiction under Suffolk County Code Section 119-3, it shall notify HRC that the investigation is complete and of the proposed disposition resulting from the investigation.   HRC shall report whether (a) it recommends further investigative actions and, if so, which actions; (b) it does not recommend

further investigative actions; and (c) if it does not agree with IAB's proposed disposition, it proposes an alternative disposition.

S.    HRC will issue an annual report summarizing its review activities, observations, and recommendations.

T.    The SCPD shall issue an annual IAB public report that will include the following information: number of complaints by type of allegation; case disposition per investigation; bias policing allegations as opposed to all other allegations; bias policing dispositions; bias policing allegations by race or ethnicity; bias policing allegations by race or ethnicity per year; bias policing allegations by precinct/race or ethnicity; and time to complete investigations.

U.    The Commanding Officer of SCPD's Hate Crimes Bureau or his or her designee shall be the contact person for all U-Visa matters, using appropriate language access resources, conducting outreach to crime victims, providing information regarding U-Visas, and responding to inquiries.

V.    In the background checks of its police officer candidates, the SCPD shall investigate whether the candidates have ever been associated with any white nationalist, white supremacist, or hate group, affiliation, or organization. Subject to the approval by the United States Department of Justice the following question will be added to the SCPD applicant background check: "Are you now, or have you ever been, a member or a supporter of any organization that promotes crimes or acts of prejudice motivated by bias against anyone because of their race, color,

gender, gender identity, genetic information, sexual orientation, age, ethnicity, national origin, citizenship status, or religion?"

W.    Except as to the overnight shift, the SCPD will provide a certified Spanish Speaking Police Operations Aide or other similar-type title to provide language assistance at the front desk of the Third Precinct to ensure that LEP individuals have the ability to speak to a person in their native language.

X.    The SCPD will use best efforts, including web-based announcements in Spanish and English, to recruit and hire certified Spanish Speaking Police Operations Aides or other similar-type title for open positions, other than the overnight shift, at the front desks of the First, Second, and Fifth precincts in addition to providing the certified Spanish Speaking Police Operations Aide or other similar-type title in the Third Precinct as set forth above.

Y.    The Department will maintain a website reflecting the progress of implementation of the Reform Plan in substantially the same form as the following website: <https://bipub.suffolkcountyny.gov/views/SCPDReformTracker/ReformReinventi onTaskForce?%3Adisplay_count=n&%3Aembed=y&%3AisGuestRedirectFrom Vizportal=y&%3Aorigin=viz_share_link&%3AshowAppBanner=false&%3Asho wVizHome=n>.

## IV.    OTHER TERMS

A.    <u>Implementation Timeline</u>

1.    County Defendants shall begin implementing this agreement in accordance with the agreed-upon Implementation Timeline, attached hereto as Exhibit A, Schedule 1, upon the Effective Date.

2.      County Defendants expect to comply substantially with the provisions of this agreement within two years and will maintain compliance for one additional year.

B.      Reporting Requirements

1.      County Defendants' Counsel will provide regular written reporting, as per the timeline below in Section IV.B.1.a., to Class Counsel regarding County Defendants' compliance with the terms of the Class Action Settlement Agreement and will respond to reasonable inquiries from Class Counsel regarding such compliance and the Reform Plan.

a.      County Defendants shall provide such written reports starting one year from the date of this agreement, and every year thereafter for the duration of this Class Action Settlement Agreement.

b.      Each report shall include:

(i)      A description of the steps the County Defendants have taken during the reporting period to implement this Class Action Settlement Agreement; and

(ii)     A detailed description of the planned steps to be completed during the upcoming reporting period.

2.      Class Counsel will notify County Defendants of any questions or concerns regarding the report and the County Defendants' compliance with this agreement.  County Defendants will respond in writing to Class Counsel's questions or concerns within six weeks from the receipt of such questions or concerns.

3.       County Defendants shall designate a person within the Suffolk County Attorney's Office to respond to such inquiries.  Any dispute as to the appropriateness of Class Counsel's requests shall be resolved in accordance with the procedures provided in Section IV.C. below.

C.    <u>Dispute Resolution</u>

1.       Any dispute regarding compliance with the terms of this Class Action Settlement Agreement, including any motion for contempt or disagreement about substantial compliance or the maintenance of compliance, will be adjudicated by Judge Bloom, unless Judge Bloom is unwilling or unavailable to adjudicate such dispute.

2.       In the event that Judge Bloom is no longer presiding over the Action, the Parties may agree to have any dispute adjudicated by another magistrate judge assigned to the Action.

3.       If no magistrate judge is available adjudicate a dispute, Judge Kuntz will adjudicate any dispute.

4.       The Parties shall meet and confer in good faith before presenting any dispute to the Court.

5.       Class Counsel shall give notice of any non-compliance with the terms of this Class Action Settlement Agreement to County Defendants and shall allow County Defendants 90 days to cure such non-compliance before engaging in the dispute resolution process above.

D.    <u>Scope of Enforcement</u>

This Class Action Settlement Agreement is binding upon the members of the Class, each Class member's successors and agents, and upon County Defendants, and County Defendants' successors in office and agents. Only Class representatives and County Defendants shall have standing to seek enforcement of any of the provisions of this Class Action Settlement Agreement, which does not confer, and is not intended to confer any rights upon any other party.

E.    <u>Termination</u>

1.    Prior to termination, the County Defendants must demonstrate substantial compliance with all provisions of this agreement and the maintenance of such compliance for one year. Substantial compliance shall mean that the County Defendants have met or achieved all or nearly all of the components of this Class Action Settlement Agreement.

2.    If there is a disagreement between the Parties about whether there has been substantial compliance, this disagreement will be resolved in accordance with the dispute resolution provisions of Section IV.C. of this Class Action Settlement Agreement.

3.    The County Defendants must maintain such compliance with this Class Action Settlement Agreement for one year, following the agreement of the Parties that County Defendants have reached substantial compliance or after a judicial determination of the date that substantial compliance was achieved by the County Defendants. After the one year maintenance period, the County Defendants will ask the Class Representative Plaintiffs through

Class Counsel to join in their motion for the Court to order the termination of this Class Action Settlement Agreement.  If the Class Representative Plaintiffs decline to jointly move to terminate the Class Action Settlement Agreement, the County Defendants may separately move for an order terminating the Class Action Settlement Agreement based on a showing that they have maintained substantial compliance for one year.

    a.    Any motion for termination shall include the following:

        (i)    The County Defendants' efforts to implement the foregoing provisions of this Class Action Settlement Agreement;

        (ii)    The dates when the County Defendants began to implement the foregoing provisions; and

        (iii)    Copies of department orders, training materials, reports, and any other documentation that may corroborate their efforts to implement the foregoing provisions.

    b.    Judge Bloom shall be the final decision maker as to whether County Defendants are in substantial compliance with this Class Action Settlement Agreement and have maintained such compliance for one year following a motion to terminate the Class Action Settlement Agreement, unless Judge Bloom is unwilling or unavailable to entertain such motion.  In the event that Judge Bloom is unwilling or unavailable to entertain such motion, Judge Kuntz, or any other district court judge to whom the Action is transferred, will decide the motion.

4.    The Class may conduct limited discovery in connection with any motion to terminate this Class Action Settlement Agreement based on substantial compliance and the maintenance of substantial compliance. The Parties will meet and confer regarding such discovery in an effort to conduct such discovery on an informal basis. The Class may make a motion to Judge Bloom if the Parties are unable to agree as to the scope of such discovery. In the event that Judge Bloom is unwilling or unavailable to entertain such motion, Judge Kuntz, or any other district court judge to whom the Action is transferred, will decide the motion.

F.    <u>Attorneys' Fees</u>

1.    County Defendants agree to pay $2,250,000.00 (two million, two hundred and fifty thousand dollars) in full satisfaction of Named Plaintiffs' claims for attorney's fees, costs, and disbursements in connection with the Action ("<u>Attorneys' Fees</u>"). County Defendants agree to pay the Attorneys' Fees directly to Counsel after receipt of a writing from Named Plaintiffs authorizing such direct payment. County Defendants agree that the Attorneys' Fees are not on account of any attorneys' fees and costs or disbursements that may be incurred in the future in connection with an action or proceeding to address non-compliance with the terms of the Class Action Settlement Agreement and Individual Settlement Agreement. The Parties reserve the right to seek fees and costs incurred in connection with any action or proceeding to address material non-compliance with the terms of the Class Action Settlement Agreement.

G.  Confidentiality

    1.  The Class Action Settlement Agreement was reached as a product of a mediation governed by a mediation agreement that included terms of confidentiality.  The confidentiality terms of the mediation agreement continue to govern all communications related to proposals and counter proposals made during mediation and any negotiations related to and leading up to the Class Action Settlement Agreement.  The Parties agree to keep confidential any communications or discussions that take place pursuant to Section IV.C., governing Dispute Resolution.  Notwithstanding the foregoing, (i) the Parties are permitted to make public statements related to the Class Action Settlement Agreement and any disputes that may arise, where the information being disclosed is public information; and (ii) the Parties may disclose any information that should otherwise be kept confidential, if necessary to address disputes that arise in connection with implementation of or compliance with the Class Action Settlement Agreement.

H.  Releases

    1.  The Class Representative Plaintiffs, solely in their capacity as such, and on behalf of the Class, release and discharge each County Defendant and any and all current or former employee or agent of the SCPD, in their individual and official capacities, and their heirs, executors, administrators and assigns, and Suffolk County and its agencies, other than Defendant Scott Greene who is expressly not released through this Class Action Settlement

Agreement (collectively, and excluding Defendant Greene, the "Released Parties"), from the Released Claims. For the avoidance of doubt, the Released Claims do not include the Separately Released Claims.

2.      At the Fairness Hearing, the Parties will request that the Court grant their motion finally approving the Class Action Settlement Agreement and dismissing all claims in the Action against the County Defendants other than the Separately Released Claims. Release and dismissal of the Separately Released Claims is addressed in the separate Individual Settlement Agreement. The release of the Released Claims contemplated in this provision will not become binding and effective until payment of the amounts in Section IV.F is complete, which the Parties agree may be up to 30 days after the Effective Date. For the avoidance of doubt, the obligation to pay the amounts in Section IV.F. becomes binding on and enforceable against the County Defendants on the Effective Date, notwithstanding that payment of said amounts may occur thereafter.

I.      <u>No Admission of Liability</u>

The execution, delivery, and acceptance of this Class Action Settlement Agreement does not constitute and shall not be construed as an admission of liability or wrongdoing whatsoever on the part of any Party, and no portion of this Class Action Settlement Agreement can be used as an admission of any liability or wrongdoing in any legal or administrative forum.

J.      Costs and Expenses

1.      Each Party shall bear his, her, or its own costs and expenses incurred in connection with the negotiation, drafting, consummation, and execution of this Class Action Settlement Agreement.

K.      Representations and Warranties

1.      **Voluntary Consent**. Each of the Parties represents and warrants that this Class Action Settlement is given and executed voluntarily, without any duress or undue influence of any kind or nature.

2.      **Legal Authority and Capacity**. Each of the Parties represents and warrants that the person or persons executing this Class Action Settlement Agreement has full and complete legal authority and capacity to do so, and thereby binds the entity on whose behalf he, she, or it is signing.

3.      **Independent Counsel**. Each of the Parties represents and warrants that he, she, or it has been represented by counsel of its own choosing with respect to this Class Action Settlement Agreement and has been counseled and advised with respect to any legal rights and remedies released and waived hereby, or has independently determined not to seek the advice of counsel.

L.      Modification and Waiver

This Class Action Settlement Agreement, including without limitation the Releases, may not be altered, amended, or modified in any way, nor may any right or obligation set forth herein be waived, except in a writing signed by all of the Parties with at least the same formalities as are observed herein.  A waiver as to any particular term shall not operate as a waiver as to any other terms.

M.     Invalidity

If any part of this Class Action Settlement Agreement (other than the Releases) is held, by a court of competent jurisdiction, to be invalid and therefore unenforceable, then that part shall be severed, and each and every other part of this Class Action Settlement Agreement shall continue in full force and effect; provided, however, that if such finding of invalidity substantially alters the intent of the Parties, as manifested herein, then the Parties shall renegotiate this Class Action Settlement Agreement in good faith to effectuate such intent.

N.     Entire Agreement

This Class Action Settlement Agreement contains the entire agreement between and among the Parties hereto, and fully supersedes any and all prior agreements or understandings pertaining to the subject matter hereof.   Every representation, warranty, and covenant made prior to or contemporaneously with this Class Action Settlement Agreement is merged into this Class Action Settlement Agreement, and in entering into the Class Action Settlement Agreement no Party is relying on any other statement, representation, or warranty, written or oral, as inducement or consideration for entering into this Class Action Settlement Agreement.

O.     Agreement Drafted by All Parties

The Parties acknowledge and agree that this Class Action Settlement Agreement shall be deemed to have been drafted jointly by the signatories hereto.  Ambiguities shall not be construed against the interest of any Party by reason of it having drafted all or any part of this Class Action Settlement Agreement.

P.     <u>Headings</u>

The headings and captions contained in this Class Action Settlement Agreement are inserted only as a matter of convenience and in no way define, limit, extend, or describe the scope of this Class Action Settlement Agreement or the intent of any provision hereof.

Q.     <u>Counterparts</u>

This Class Action Settlement Agreement may be executed in counterparts which, taken together, shall constitute one original. Facsimile and/or electronic signatures shall have the same force and effect as originals thereof.

R.     <u>Notice to the Class</u>

The Parties agree that Notice to the Class of the proposed Class Action Settlement Agreement will be given in accordance with the procedures set forth in the Joint Motion for Preliminary Approval of Class Action Settlement Agreement or as otherwise directed by the Court.  The proposed form of Notice to the Class of Preliminary Approval of the Class Action Settlement Agreement is set forth at Appendix I.  The proposed order granting preliminary approval of the Class Action Settlement Agreement and Notice to the Class is set forth at Appendix III.

S.     <u>Legislative Approval</u>

In addition to Court approval, the Class Action Settlement Agreement and the County Defendants' obligations herein are first subject to approval by the Suffolk County Ways and Means Committee.

T.    Dismissal of the Action

The Action will be dismissed with prejudice against the County Defendants on the

date that the Court grants final approval of the Class Action Settlement Agreement.

A proposed order granting final approval of the Class Action Settlement and

dismissing the Action with prejudice is attached hereto as Appendix IV.


Respectfully submitted,

By: _____
Andrew Case, Esq.
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 219-3360


By: _____
Atara Miller, Esq.
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
(212) 530-5000

*Counsel for Plaintiffs #1-20*


Respectfully submitted,

By: _____
Christiana S. McSloy, Esq.
Chief Deputy County Attorney
Suffolk County Attorney's Office
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788
(631) 853-2944

*Counsel for County Defendants*

# SCHEDULE 1

<u>**Implementation Timeline**[1]</u>

**Within Six Months from the Effective Date:**
- The SCPD will publish notice explaining the goals of the PLABs, the eligibility and selection process for members of the PLABs, and the initial openings on the PLABs; any person eligible to serve on a PLAB may submit his or her name to the appropriate precinct for the Commanding Officer's consideration.
- The SCPD will establish a PLAB for each SCPD Precinct. The Commanding Officer, in consultation with a representative of the Police Commissioner, will appoint the members of his or her precinct's PLAB.
- The SCPD will have patrol officers attend each Precinct's monthly community meeting.
- The SCPD shall maintain and post language access statistics on a quarterly basis via its website.
- The SCPD shall provide language assistance services in accordance with the procedures set forth in SCPD Policy 333 and shall make residents aware that such services are available to them free of charge via the SCPD website and in-person posters and informational flyers available at every precinct.
- Each SCPD officer will be required to utilize a paper or electronic version of Language Identification Memorandum Book Insert (PDCS-7044) or similar industry-standard application or platform to identify the language spoken by an individual of limited English proficiency.
- The SCPD shall ensure the navigability of its website to align with the goals and spirit of SCPD Policy 333 by including a link on its home page that will translate its webpages into Spanish. The links on the Spanish version of the website will direct users to Spanish-translated versions of available vital documents, as defined by the SCPD Language Access Plan and SCPD Policy 333. The SCPD may maintain the Spanish versions of the vital documents on one webpage.
- The SCPD shall maintain and update on a quarterly basis, its public-facing Traffic and Pedestrian Stop Data Dashboards. The Traffic Stop Data Dashboard will reflect data captured by SCPD officers during traffic stops, including additional information provided for under the Class Action Settlement Agreement. The Pedestrian Stop Data Dashboard will reflect data captured by SCPD officers during pedestrian stops that involve detentions of pedestrians based on reasonable suspicion. Raw data will be sets shall be made available to the general public on the Traffic and Pedestrian Stop Data Dashboards for download in .CSV file formatting from the SCPD's website. Precinct information of where the stop occurred will be included in the publicly available raw data sets. County demographic information will be included on the Traffic and Pedestrian Stop Data Dashboards by utilizing links to the demographics of the five western towns of Suffolk County.
  - All SCPD officers will have been trained that when encountering minor vehicle equipment violations police officers will provide drivers with a verbal warning /

---

[1] All events on this timeline involving the internet are contingent upon the restoration of Suffolk County websites' full operability in the wake of the 2022 cyberattack against the County. In addition, as the Class Action Settlement Agreement and the Individual Settlement Agreement are contingent upon one another, the "effective date" is when the Court has given its final approval to both settlement agreements.

education unless there are additional facts or circumstances justifying a ticket for the equipment violation offense.

- SCPD Precinct Commanding Officers and/or their designees and/or compliance officers will begin identifying and addressing atypical patterns of traffic stops by similarly situated officers (i.e., those officers who are policing essentially the same population in essentially the same way), including but not limited to reasonable suspicion stops and/or enforcement activity, by reviewing summary analyses generated by the internal traffic stop data portal. This review process will occur quarterly and will involve consideration of traffic stop and enforcement activity patterns to identify substantial statistical differences between officers and ensure data integrity. SCPD Precinct Commanding Officers and/or their designees and/or compliance officers will review the squads within the command for substantial statistical differences with regard to the overall number of stops, the stops-to-searches percentage, and the percentage of searches resulting in seizure for each squad/team/unit. Precinct-level intervention techniques will include, but are not limited to, the following: counseling; mentoring; retraining; enhanced supervision; change of assignment; conferral with SCPD leadership; transfers; or referral to the Internal Affairs Bureau.

- The Office of the SCPD Chief of Patrol will begin reviewing precinct traffic stop data which will include the following:

    Primary reason for stop;
    Percentage of drivers stopped by race/ethnicity compared to precinct demographics;
    Percentage of stops that resulted in a vehicle search;
    Percentage of vehicle searches that resulted in the seizure of illegal drugs, weapons, or other contraband / other evidence.
    Percentages of stops that resulted in a use of force; and/or
    Percentage of stops that resulted in a custodial arrest.

- SCPD will have trained its current officers that searches based solely on consent during routine traffic stops are not permissible. SCPD officers must have a founded suspicion of criminal activity before asking for consent to search.

- SCPD will have trained its current officers and will continue to train officers regarding SCPD's policy that officers should only ask questions during traffic stops pursuant to legal justification.

- SCPD shall have included in its regular training on search and seizure law an explanation of the four levels of suspicion (*De Bour*).

- Upon initiating a traffic stop, an officer shall inform the motorist of his/her name and agency affiliation and the reason for the stop unless the officer encounters physical resistance, flight, or other factors rendering such procedure impractical as set forth in department order 21-207. This procedure will be reflected as part of Departmental-wide training.

- HRC shall have commenced a civilian oversight review process in accordance with the Class Action Settlement Agreement terms: HRC shall have the power to receive complaints from the public regarding SCPD conduct. When HRC receives a complaint, it shall forward all information that was provided at the time the complaint was filed to IAB.

- After IAB opens an investigation for cases over which HRC has jurisdiction, it shall notify HRC, regardless of whether that investigation began as a referral from HRC, a referral from another source, or a self-initiated investigation.
- For cases over which HRC has jurisdiction under Suffolk County Code Section 119-3, HRC shall have real-time access to all information contained in the shared data portal in the course of its investigation.
- At any time, HRC may review and provide commentary or suggestions to IAB regarding the conduct of any IAB investigation over which HRC has jurisdiction under Suffolk County Code Section 119-3, including recommending any additional steps that HRC believes to be appropriate.
- Each time IAB completes an investigation over which HRC has jurisdiction under Suffolk County Code Section 119-3, it shall notify HRC that the investigation is complete and of the proposed disposition resulting from the investigation. HRC shall report whether (a) it recommends further investigative actions and, if so, which actions; (b) it does not recommend further investigative actions; and (c) if it does not agree with IAB's proposed disposition, it proposes an alternative disposition.

- The Commanding Officer of SCPD's Hate Crimes Bureau or his or her designee shall be selected as the contact person for all U-Visa matters, using appropriate language access resources, conducting outreach to crime victims, providing information regarding U-Visas, and responding to inquiries.

- In the background checks of its police officer candidates, the SCPD shall investigate whether the candidates have ever been associated with any white nationalist, white supremacist, or hate group, affiliation, or organization. Subject to the approval by the United States Department of Justice the following question will be added to the SCPD applicant background check: "Are you now, or have you ever been, a member or a supporter of any organization that promotes crimes or acts of prejudice motivated by bias against anyone because of their race, color, gender, gender identity, genetic information, sexual orientation, age, ethnicity, national origin, citizenship status, or religion?"

- Except as to the overnight shift, the SCPD will provide a certified Spanish Speaking Police Operations Aide or other similar-type title to provide language assistance at the front desk of the Third Precinct to ensure that LEP individuals have the ability to speak to a person in their native language.

- The SCPD will begin its use of best efforts, including web-based announcements in Spanish and English, to recruit and hire certified Spanish Speaking Police Operations Aides or other similar-type title for open positions, other than the overnight shift, at the front desks of the First, Second, and Fifth precincts in addition to providing the certified Spanish Speaking Police Operations Aide or other similar-type title in the Third Precinct as set forth above.

- The SCPD will maintain a website reflecting the progress of implementation of the Reform Plan in substantially the same form as the following website: <https://bipub.suffolkcountyny.gov/views/SCPDReformTracker/ReformReinventionTaskForce?%3Adisplay_count=n&%3Aembed=y&%3AisGuestRedirectFromVizportal=y&%3Aorigin=viz_share_link&%3AshowAppBanner=false&%3AshowVizHome=n>.

**Within Nine Months from the Effective Date**
- Consultant retained to update revision of the SCPD's implicit bias training. In conjunction with consultant, revision of implicit bias training curriculum and materials incorporating traffic stop data analysis complete. Revised implicit bias training incorporating traffic stop data analysis begins.
- The SCPD shall publish an intuitive and easy-to-read guide that clearly defines all Traffic Stop and Pedestrian Stop data-related terms.

**Within One Year from the Effective Date**
- The documentation of traffic stops shall be stored in the Traffic Stop Database. The SCPD will have begun publishing documentation fields that include but are not limited to the following:
    - **Date and Duration of Stop.** Documentation will include date and duration of stop, and publicly available raw data will include times of stops.
    - **Location of Stop**. Documentation will include street address or other identifiable location where no street address exists.
    - **License Plate Data.** License plate data will be collected, anonymized in accordance with Dynamic Data Masking in SQL Server procedures or similar anonymizing program, and included in the publicly available raw data sets. The publicly available data will include the state of issue for each anonymized license plate.
    - **Primary Reason for Stop.** For each traffic stop, the officer conducting the stop shall record the primary reason for the stop from the categories listed below:
        Speeding;
        Cell call/text;
        Red light;
        Stop sign;
        Seatbelt;
        Other moving violation;
        Registration/inspection/plate violation;
        Obstructed view;
        Other equipment violation;
        Reasonable suspicion of a crime; or
        Probable cause of a crime.
    - **Actions Taken by Officer(s)**: The Officer conducting the stop will capture the following data documenting any additional police actions taken during a traffic stop:
        Force Used During Stop: "Yes" or "No";
        Language Assistance Provided: "Yes" or "No."
        Vehicle Searched: "Yes" or "No";
        Reason for Search: "Plain view"; "Probable Cause of a Crime / Automobile Exception"; or "Founded Suspicion of a Crime with Recorded Consent";
        Outcome of Search: "Illegal Weapon"; "Illegal Drugs"; "Other Contraband / Other Evidence"; "Negative Contraband / Evidence"; and

Aided.

- For the vehicle occupants, the Officer conducting the stop will document the number of occupants and whether police action was taken with regard to each: "Yes" or "No."

- If there is no inquiry of vehicle occupants other than the operator, the SCPD will not document the non-operator occupants' demographic information.

- For all operators, and for any occupants against whom police action is taken (pursuant to Section [] above), the SCPD will document the following:

  Apparent Race/Ethnicity: "Asian/Pacific Islander"; "Black/African American"; "Hispanic"; "White (Non-Hispanic)"; or "Other."

  Apparent Gender: "Male" or "Female."

  Approximate Age: "16-25 / 26-35 / 36-45 / 46-55 / 56-65 / 66 to Over."

  Request for Passenger ID: "Yes" or "No";

  Exit Vehicle: "Yes" or "No."

  Reason for Exit Vehicle: "Spontaneous"; "Verbal Request / Command"; or "Force Used."

  Handcuffed: "Yes" or "No."

  Where Placed: "Inside Police Unit" or "Outside Police Unit."

  Search Conducted: "Yes" or "No."

  Reason for Search of Driver: "Founded Suspicion of a Crime with Recorded Consent"; "Reasonable Suspicion of a Crime / Frisk for Weapon"; or "Probable Cause of a Crime / Automobile Exception."

  Outcome of Search: "Illegal Weapon"; "Illegal Drugs"; "Other Contraband / Other Evidence"; or "Negative Contraband / Evidence."

  Disposition: "Verbal Warning / Education"; "Traffic Summons"; "Field Appearance Ticket"; "Arrest"; "Lights-on Voucher"; "Aided"; or "No Police Action Taken."

  Total Summons: "1-10" (dropdown menu).

- The SCPD will document pedestrian stops involving the detention of pedestrians based on reasonable suspicion. Documentation fields include but are not limited to the following:

  Date and Duration of Stop: Documentation will include date and duration of stop, and publicly available raw data will include times of stops.

  Location of Stop: Police officers will input the street address and hamlet where the stop occurred.

  Force Used During Stop: "Yes" or "No";

  Language Assistance Provided: "Yes" or "No."

  Police Action Taken: "Yes" or "No."

  Apparent Race/Ethnicity: "Asian/Pacific Islander"; "Black/African American"; "Hispanic"; "White (Non-Hispanic)"; or "Other."

  Apparent Gender: "Male" or "Female."

  Approximate Age: "16-25 / 26-35 / 36-45 / 46-55 / 56-65 / 66 to Over."

  Handcuffed: "Yes" or "No."

  Was Pedestrian Placed in Police Vehicle? "Yes" or "No."

  Search Conducted: "Yes" or "No."

5

Reason for Search: "Recorded Consent"; "Frisk for Weapon"; or "Search Incident to Lawful Arrest."
Outcome of Search: "Illegal Weapon"; "Illegal Drugs"; "Other Contraband / Other Evidence"; "Negative Contraband / Evidence."
Disposition: "Verbal Warning / Education"; "Summons Issued"; "Field Appearance Ticket"; "Arrest"; "Aided"; or "No Police Action Taken."

- In conjunction with the U.S. Department of Justice, the SCPD shall have competitively procured an independent third party to review the SCPD's traffic and pedestrian stop data on an annual basis.

- During each traffic or pedestrian stop where no arrest, summons, field appearance tickets, or lights-on vouchers are issued, officers will have begun providing a business card which includes the officer's last name, command, shield number, and central complaint number if applicable unless the officer encounters physical resistance, flight, or other factors rendering such procedure impractical as set forth in department order 21-207. Police officers' business cards will be available in English as well as Spanish and will provide Internal Affairs Bureau and Human Rights Commission contact information (email or phone number). The SCPD will also prominently post contact information for the Internal Affairs Bureau and Human Rights Commission on the SCPD website.

- IAB issues First Annual Report that will include the following information: number of complaints by type of allegation; case disposition per investigation; bias policing allegations as opposed to all other allegations; bias policing dispositions; bias policing allegations by race or ethnicity; bias policing allegations by race or ethnicity per year; bias policing allegations by precinct/race or ethnicity; and time to complete investigations.

- HRC issues First Annual Report summarizing its review activities, observations, and recommendations.

- County Defendants' Counsel provides Plaintiffs' Counsel with first annual compliance report.

**Within Eighteen Months from the Effective Date**

- Independent third party issues first annual report on stop data.

- The SCPD will comply with its Body-Worn Camera Policy 422 and Body-Worn Camera Procedure 422 (attached as Exhibits A and B) relative to the deployment of body-worn cameras ("BWC" or "BWCs") by the SCPD. The SCPD shall deploy BWCs as standard police worn equipment for all authorized officers who regularly engage with the public in the course of their professional duties. For the purpose of this section, the term officers shall not include supervisors and detectives. The SCPD will implement a Digital Evidence Management System ("DEMS") in order to store, organize, manage, review, and transmit BWC recordings. It is understood between the Parties that the SCPD anticipates modifying its BWC policies and procedure to reflect best practices determined after implementation. It is within the discretion of the Suffolk County Police Commissioner to promulgate and modify BWC policies and procedures in order to balance public safety, officer safety, transparency, personal privacy, evidentiary value in both criminal prosecution and internal investigations, and the resources involved in managing the resulting volume of BWC footage.

**Two Years from the Effective Date**
- Three-quarters of sworn police officers will have completed Implicit Bias 2.0 training: 8 hours (including Traffic Stop data analysis) for new recruits and supervisors; 4 hours (including Traffic Stop data analysis) for officers who have completed legacy Implicit Bias training.
- Expected achievement of substantial compliance; one-year period of maintaining compliance begins.
- Independent third party expected to issue second annual report on stop data.
- IAB issues second annual report that will include the following information: number of complaints by type of allegation; case disposition per investigation; bias policing allegations as opposed to all other allegations; bias policing dispositions; bias policing allegations by race or ethnicity; bias policing allegations by race or ethnicity per year; bias policing allegations by precinct/race or ethnicity; and time to complete investigations.
- HRC issues second annual report summarizing its review activities, observations, and recommendations.
- County Defendants' Counsel provides Plaintiffs' Counsel with second annual compliance report.

**Thirty Months from the Effective Date**
- Independent third party expected to issue second annual report on stop data.

**Three Years from the Effective Date**
- IAB issues third annual report that will include the following information: number of complaints by type of allegation; case disposition per investigation; bias policing allegations as opposed to all other allegations; bias policing dispositions; bias policing allegations by race or ethnicity; bias policing allegations by race or ethnicity per year; bias policing allegations by precinct/race or ethnicity; and time to complete investigations.
- HRC issues third annual report summarizing its review activities, observations, and recommendations.
- County Defendants' Counsel provides Plaintiffs' Counsel with third annual compliance report.

# SCHEDULE 2

# BODY-WORN CAMERAS

## 422.1 PURPOSE AND SCOPE

To establish policy and guidelines for the use of body-worn cameras and for the management, storage, retrieval, and dissemination of body-worn camera recordings.

## 422.2 POLICY

The Suffolk County Police Department (the "Department") recognizes the need to utilize emerging technologies to further the police mission. The use of body-worn cameras ("BWC" or "BWCs") by law enforcement has proven effective in reducing violent confrontations against police officers, use of force incidents, and complaints against police officers. The use of BWCs will improve the Department's ability to:

The use of such devices will improve the Department's ability to:

1. Objectively document law enforcement interactions with the public.

2. Review critical incidents and develop training to enhance performance.

3. Increase officer safety.

4. Record, document, and preserve evidence and strengthen prosecution.

5. Improve transparency and accountability.

6. Encourage lawful and respectful interactions between police officers and the public, thereby increasing public trust.

The Department further acknowledges that while recording interactions with the public is of great value, it can also raise privacy concerns. Officers utilizing BWCs shall be sensitive to the privacy of victims, witnesses, and any third parties who may be present. While the Department understands and respects individual privacy interests, there will be times when the value of recording an encounter outweighs those interests. In those situations, officers will operate their BWCs in accordance with this policy.

BWC technology is not a substitute for a thorough and complete report or supplementary report. In addition, BWCs cannot capture an officer's senses, observations, reasonable beliefs and perceptions, or physiological responses (i.e., tunnel vision or auditory exclusion) during critical incidents.

## 422.3 DEFINITIONS

Activate: changing a BWC's status from Buffering Mode to Recording/Event Mode.

Body-Worn Camera ("BWC" or BWCs") a Department-authorized and issued camera designed to be worn on an officer's person that is capable of capturing audio and video recordings. BWC does not include any form of electronic recording device worn by an officer while acting in an undercover capacity.

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police
Department

Suffolk County Police Department
NY LE Policy Manual

## BODY-WORN CAMERAS

Buffering Mode: refers to a BWC's status when it is powered on and passively recording video only. While in buffering mode, a BWC records and rewrites the previous 60 seconds of video only —audio is not recorded during this time.

BWC Administrator: a designated Department Member, appointed by the Police Commissioner or his/her designee, having full user rights and access to the Digital Evidence Management System allowing him/her to: (1) receive, protect, access, manage, store, retrieve, review, redact, and disseminate digital evidence and BWC recordings; (2) conduct audits and quality control reviews; (3) act as a liaison with the BWC vendor; (4) act as a liaison with appropriate prosecutorial and/or other government agencies; and (5) fulfill other BWC-related duties as directed by the Police Commissioner or his/her designee.

BWC Recording(s): digital files and data, including video, audio, photographs, and metadata captured by a BWC and stored digitally.

Categorize/Tag: adding metadata to a BWC recording such as: Central Complaint number, title, and category to facilitate the retrieval and retention of BWC recordings.

Deactivate: to stop actively recording and return the BWC to Buffering Mode.

Digital Evidence and Discovery Unit: a designated unit given the authority to receive, protect, store, retrieve, redact, and disseminate digital evidence and BWC recordings pursuant to applicable law and Department policy. This unit shall also act as a Department liaison with appropriate prosecutorial and/or other government agencies.

Digital Evidence Management System ("DEMS"): a remote computer server and collection of hardware, software, and firmware designed to provide for the storage, organization, management, review, and transmission of BWC recordings and digital evidence.

Law Enforcement Related Activity: situations during an officer's official duties that may involve a member of the public that include, but are not limited to: (1) calls for service; (2) investigative or enforcement activities; (3) victim and witness interviews; (4) use of force situations; (5) searches of a person or his/her property; (6) traffic stops; (7) vehicle pursuits; (8) foot pursuits; (9) search warrants; (10) arrests; (11) transports; (12) interactions with person(s) who appear to be suffering from mental illness; (13) domestic incidents; and (14) confrontational/adversarial public contacts.

Marker: a specific flag marked by an officer that serves as a reference point to navigate to an important moment during a BWC recording.

Recording/Event Mode: a BWC's status when it is powered on and actively recording audio and video.

Stealth Mode: a BWC configuration where LED lights, sounds, and vibrations are turned off while continuing to record audio and video.

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police
Department

Suffolk County Police Department
NY LE Policy Manual

*BODY-WORN CAMERAS*

**422.4  REGULATIONS**

1.    Officers shall successfully complete Department training relating to this policy prior to being issued a BWC. BWC training shall also include the proper operation of BWCs and the categorization, uploading, and transmission of BWC recordings.

2.    Officers shall follow existing officer and public safety policies and tactics. Officer and public safety shall be the primary considerations.

**422.5  RECORDING**

Officers shall manually activate their BWCs prior to engaging in law enforcement related activity, as defined above, in accordance with Department training. Additionally, officers may manually activate their BWCs at any time not otherwise prohibited by this policy when they reasonably believe, based on their training, knowledge, and experience, that there is a need to document an incident. This policy is not intended to describe every possible situation in which officers should activate or deactivate their BWCs. Officers shall use sound judgment for discretionary activations and be guided by this policy and their supervisors. Supervisors shall exercise their discretion when ordering officers to activate or deactivate their BWCs based on a valid and articulable reason.

422.5.1  PUBLIC NOTIFICATION AND DOCUMENTATION

1.    Officers should notify member(s) of the public that the interaction is being recorded as soon as reasonably practical, unless such notification could compromise safety or impede an investigation.  Consent is not required to start or continue recording.

      *Note: For example, "Sir/Ma'am, I am wearing a body camera and this interaction is being recorded."*

2.    Officers shall indicate the existence of a BWC recording in all required reports (i.e., Field, Incident, Domestic, PMI, etc.).  Arresting officers shall indicate the same in the Online Arrest Report or Arrest Worksheet (PDCS-1086).

422.5.2  ACTIVATING BWC

1.    Officers shall activate their BWCs prior to arrival at an incident location.

2.    In the event of an unanticipated or exigent circumstance, officers shall activate their BWCs as soon as it is feasible and safe to do so after taking necessary action to preserve officer and public safety.

*Note: Officers should consider adding markers to identify key moments or important events during an incident, as necessary (i.e., interviews, notifications, suspect's spontaneous utterance, recovering evidence, capturing sensitive material or personnel, such as undercover officers or confidential informants. Officers should add markers in the DEMS while reviewing BWC recordings prior to sharing with a supervisor or the District Attorney's Office.*

*Note:  At no time shall officers disregard officer safety, the safety of the public, or compromise proper tactics to begin a recording.*

*BODY-WORN CAMERAS*

---

422.5.3  MANDATORY ACTIVATION OF BWC

1. Officers shall activate their BWCs prior to engaging in, or assisting another officer with, law enforcement related activity as defined above.

2. A supervisor may, at his/her discretion, direct an officer to activate the officer's BWC to ensure compliance with this policy.

See Procedure for further guidance: OFFICER RESPONSIBILITIES, FAILURE TO ACTIVATE BWC WHEN REQUIRED

See Procedure for further guidance:  SUPERVISOR RESPONSIBILITIES, FAILURE TO ACTIVATE BWC WHEN REQUIRED

422.5.4  BODY-WORN CAMERA PROCEDURES
See the following procedures for further guidance on the start of tour:

• OFFICER RESPONSIBILITIES

• DESK SUPERVISOR/OIC RESPONSIBILITIES

• POLICE TECHNOLOGY BUREAU RESPONSIBILITIES

• FIELD SUPERVISOR RESPONSIBILITIES

See the following procedures for further guidance on actions during the tour:

• OFFICER RESPONSIBILITIES DURING TOUR

• SUPERVISOR RESPONSIBILITIES DURING TOUR

See the following procedures for further guidance on actions at the end of tour:

• OFFICER RESPONSIBILITIES, END OF TOUR

**422.6  PROHIBITED RECORDING**
Officers shall not intentionally activate their BWCs for any of the following:

1. While on break or otherwise engaged in personal, clerical, non-enforcement, or non-investigative activity.

2. While assigned to a post as a desk officer in a Department facility.

3. During Departmental meetings, inspections, trainings, briefings, after-action debriefings, and communications regarding strategy and resource capabilities.

4. While conducting operations at an established incident command post, unless specifically authorized by the incident commander.

5. While discussing the details of an ongoing criminal case or investigation with investigators, district attorneys, or other law enforcement officials.

6. During telephone communications with a judge, magistrate, or member of the District Attorney's Office.

Suffolk County Police Department
NY LE Policy Manual

## BODY-WORN CAMERAS

7. During a private conversation that the officer is not a party to.

8. Inside dressing rooms, locker rooms, or restrooms, unless the officer is present in an official capacity in response to law enforcement related activity.

9. Any off-duty activity, including but not limited to, secondary employment.

10. Interviewing a confidential informant.

11. Communications with an undercover officer.

12. Interviewing a victim of a sex crime, as soon as the nature of the offense becomes apparent.

13. Strip searches.

14. When present in a court facility, except during lodging or custodial exchange of prisoners (see 22 NYCRR 29.1).

15. When present in a medical facility, except CPEP or DASH.

16. Explosive detection screening or when an explosive device may be present.

*Note: Notwithstanding the above prohibitions, officers shall activate their BWCs when affecting an arrest in a Department, court, or medical facility.*

For further guidance see procedure: MAKING A PROHIBITED RECORDING

### 422.7  DEACTIVATION OF BWC

1. Once officers activate their BWCs, they shall continue recording until the investigative, enforcement, or other event involving a member of the public has ended.  Officers should state the reason for the deactivation prior to deactivating their BWCs.

*Note: For example, "I am turning off my BWC at the complainant's request," I am turning off my BWC to discuss investigative strategy with my supervisor, " "I am turning off my BWC as per my supervisor's directions."*

2. In the case of an arrest, the arresting/transporting officer shall continue recording during transport to a Department or medical facility, as applicable.  Officers shall deactivate their BWCs while inside Department or medical facilities, unless instructed otherwise by a supervisor.

*Note: A supervisor may, at his/her discretion, direct an officer to activate the officer's BWC inside a Department or medical facility (i.e., prisoner intake, resisting arrest charges, belligerent prisoners, DWI/DUI arrest, etc.).*

3. Officers shall consult with a supervisor prior to deactivating their BWCs for low battery or limited recording capacity concerns.

4. Officers may choose to deactivate their BWCs if the individual with whom they are interacting specifically requests deactivation.  Officers may also deactivate if, in the officer's judgment, a recording would be inappropriate because of the victim or witness's physical condition, emotional state, age, or other sensitive circumstances (i.e., a nude or elderly aided). Prior to deactivating, officers shall consider the

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police Department

Suffolk County Police Department
NY LE Policy Manual

*BODY-WORN CAMERAS*

requester's desire for privacy or confidentiality and make a determination based on the circumstances while bearing in mind the possible evidentiary value of the BWC recording and any officer safety concerns. Officers may consult a supervisor for guidance as needed when making such a determination.

*Note: Officers are not obligated to initiate or cease recording solely at the request of the individual with whom they are interacting. Consideration may be given to record in Stealth Mode.*

5.  Officers may deactivate their BWCs during an incident if they are no longer actively engaged in the investigation or interacting with a member of the public (i.e., holding a post at a controlled scene).

    *Note: If an officer stops recording at any time during an incident, the officer shall not be precluded from resuming recording at a later time if deemed necessary or if required by this policy. The officer shall resume recording until the event that prompted the re-activation concludes.*

6.  A supervisor, at his/her discretion, may direct an officer to deactivate the officer's BWC if the supervisor has a valid and articulable reason for ceasing recording (i.e., to prevent a prohibited recording, reasonable concerns regarding officer safety, BWC battery, BWC recording capacity).

## 422.8  SPECIAL PATROL BUREAU CONSIDERATIONS

### 422.8.1  EMERGENCY SERVICE SECTION

In addition to the above requirements, Emergency Service ("ES") officers shall activate their BWCs in the following situations:

1.  Cell extractions.

2.  Jumpers.

3.  Rescue calls.

4.  Perpetrator searches.

5.  Executing arrest and/or search warrants.

6.  Making entry into a location during a barricaded person incident.

7.  When directed by an ES supervisor.

    *Note: ES officers will not be required to activate their BWCs for any bomb related calls for service, unless directed by an ES supervisor.*

    *Note: ES officers shall not activate their BWCs during briefings, tactical discussions, or operational/resource capability discussions. In the event that a briefing or tactical discussion regarding resource capabilities or after-action debriefing is recorded on a BWC, the ranking ES or Special Patrol Bureau supervisor shall confer with the Assistant Deputy Commissioner, Risk Management Bureau, in regard to the content of the recording and action to be taken to safeguard sensitive tactical information.*

Suffolk County Police Department
NY LE Policy Manual

*BODY-WORN CAMERAS*

---

**422.8.2   CANINE SECTION**

In addition to the above requirements, Canine officers shall activate their BWCs when directed to do so by a Canine Section supervisor, or ranking Special Patrol Bureau supervisor.

At scenes controlled by ES (e.g., barricaded subject, search warrant, tactical/high risk assignment), Canine officers shall not activate their BWCs until directed to do so by a Canine supervisor or ranking Special Patrol Bureau supervisor.

**422.8.3   MARINE BUREAU**

Due to the nature of their duties, Marine Bureau officers shall not be equipped with BWCs while assigned to a vessel for maritime patrol/enforcement. Marine Bureau officers assigned to such duties shall safeguard their BWCs to prevent water damage or loss. At all other times, Marine Bureau officers shall be equipped with their BWCs and shall activate their BWCs when engaging in law enforcement related activity in accordance with Department policy.

**422.9   CRITICAL INCIDENTS**

Critical Incidents include situations involving:

(a)   Death/Serious injury to an officer

(b)   Officer involved firearms discharges

(c)   Officer use of force incidents involving death/serious physical injury

See the following Procedure for further guidance:   **CRITICAL INCIDENTS**

**422.10   ACCESSING AND VIEWING BWC RECORDINGS**

1.   Officers shall not access, copy, publish, share, edit, delete, alter, or modify any BWC recordings, or portions thereof, except as authorized and in accordance with applicable law and Department policy.

   *Note: All BWC recordings and equipment are for official Department use only and remain the sole property of the Department. Officers shall have no expectation of privacy or ownership interest in the content of BWC recordings, except to the extent enumerated in the BWC Memorandum of Agreement dated 11/29/2021.*

2.   Officers shall not disseminate BWC recordings in any manner outside of the Department, except as authorized by this policy, without the approval of the Police Commissioner or his/her designee.

3.   Officers may access and review their own BWC recordings to the extent permitted in the BWC Memorandum of Agreement dated 11/29/2021 for official purposes, including but not limited to:

   (a)   Conducting a criminal investigation.

   (b)   Reviewing an incident to refresh their recollection prior to writing a routine statement or report.

   (c)   Preparing for courtroom testimony or courtroom presentation.

---

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police
Department

Suffolk County Police Department
NY LE Policy Manual

*BODY-WORN CAMERAS*

(d) Providing a statement or testimony pursuant to an internal or administrative inquiry.

(e) Training and professional development.

(f) Preparing for civil litigation.

*Note: Officers may review BWC recordings made by other officers for the reasons stated above only after receiving supervisory approval.*

*Note: Officers shall not use BWC recordings for confirmatory identifications (show-ups). Show-ups must be done in person, and not by a witness viewing a BWC recording of the suspect.*

4. Supervisors, Police Academy staff, BWC Administrators, and Internal Affairs staff may also review BWC recordings to ensure compliance with Department policies and procedures, and for:

(a) Administrative inquiries.

(b) Civil claims.

(c) Promoting meritorious conduct.

(d) Investigating reports of misconduct.

(e) Providing feedback.

(f) Assessing overall performance and compliance with Department policies.

(g) Taking necessary remedial action to address any performance or tactical deficiencies observed.

(h) Determining training value.

(i) Conducting routine auditing to ensure compliance with this policy.

## 422.11  RESTRICTED ACCESS AND RELEASE OF BWC RECORDINGS

1. Officers may request that a BWC Administrator flag a BWC recording for restricted access when:

(a) An officer makes a prohibited recording as defined above.

(b) A BWC recording is not related to a public encounter or in any way part of an officer's official duties.

(c) Interactions with child victims when the child's identity would need to be protected.

(d) Interactions involving the exchange of pedigree information, particularly for violent cases when it is likely that a protective order would be sought to protect the individual's identity.

(e) When an officer consults with a union or legal representative.

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police
Department

Suffolk County Police Department
NY LE Policy Manual

*BODY-WORN CAMERAS*

2.  The Digital Evidence and Discovery Unit shall, where practical, notify, confer, and take other appropriate action with the recording officer prior to disclosing BWC recordings pursuant to a subpoena or Freedom of Information Law request to the extent permitted in the BWC Memorandum of Agreement dated 11/29/2021.

## 422.12  CATEGORIZATION AND TRANSMISSION OF BWC RECORDINGS

1.  Officers shall identify the event type that best describes the content of each BWC recording, and categorize and upload each BWC recording in accordance with Department training at least once per tour, or as directed by a supervisor.

2.  In the case of an arrest, the arresting officer shall:

    (a)  Identify their BWC recording(s) associated with the arrest.

    (b)  Ensure their BWC recording(s) is (are) properly categorized.

    (c)  Share relevant BWC recording(s) with the District Attorney's Office in accordance with Department training

    *Note: Officers should categorize and tag BWC recordings bearing in mind that their actions will directly impact storage, maintenance, and retention of official investigative materials.*

    *Note: If an arresting officer does not have investigatory permissions, the arresting officer shall confer with their supervisor and/or the investigating officer/detective to ensure that all relevant BWC recordings are identified, properly categorized, and shared with the District Attorney's Office, including other officers' BWC recordings.*

## 422.13  ARREST PROCESSING
See Procedure for further guidance: ARRESTING OFFICER RESPONSIBILITIES, ARREST PROCESSED BY A PATROL OFFICER

See Procedure for further guidance: DESK SUPERVISOR/OIC RESPONSIBILITIES, ARREST PROCESSED BY A PATROL OFFICER

See Procedure for further guidance: ARRESTS PROCESSED BY INVESTIGATIVE COMMANDS

## 422.14  SECURITY, STORAGE AND RETENTION

### 422.14.1  SECURITY AND STORAGE
BWC recordings shall be safeguarded to ensure that access is limited to authorized Department personnel and the appropriate prosecutorial or other government agencies under appropriate circumstances.

### 422.14.2  RETENTION

1.  The Department shall retain records in compliance with the minimum standards required by the New York State Archives in the annually published Retention and Disposition Schedule for New York Local Government Records.

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police Department

Suffolk County Police Department

NY LE Policy Manual

## *BODY-WORN CAMERAS*

2.  BWC recordings that are considered evidence or potential evidence related to a criminal proceeding, and those deemed relevant and material to any other enforcement or administrative matter, shall be retained in accordance with the Department's evidence and record retention policies.

3.  Prior to the end of any applicable retention period, BWC recordings may be retained longer for training, historical, or public interest value upon approval of the Police Commissioner or his/her designee.

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police
Department

# SCHEDULE 3

Procedure

**422**

**Suffolk County Police Department**

NY Supplemental Manual

# Body-Worn Cameras

## 422.1  PURPOSE AND SCOPE

To establish procedures concerning the use, maintenance, and control of body-worn cameras and for the management, storage, retrieval, and dissemination of body-worn camera recordings.

## 422.2  START OF TOUR

### 422.2.1  OFFICER RESPONSIBILITIES

(a)  Use assigned BWC in accordance with Department training and policy.

(b)  If authorized and trained to utilize a BWC, officers shall report for duty with their assigned BWC and:

   1.  Power on and inspect the BWC to ensure functionality and sufficient battery life (approximately 90% charged).

   2.  Make a memo book entry noting the BWC's condition and status.

   3.  Wear the BWC on their outermost garment in an approved location and in a manner that optimizes recording capabilities using Department-issued mounting hardware.

(c)  If an officer's BWC is lost/missing, see Procedure 700.1.1 DEPARTMENT PROPERTY LOST/MISSING.

(d)  If an officer's BWC is damaged, depleted, or is otherwise not functioning properly, the officer shall:

   1.  Immediately notify a desk supervisor and request a replacement unit.

   2.  Make a memo book ent ry noting the condition and status of the missing, damaged, and/or malfunctioning BWC.

   i. If a replacement BWC is not available, make a memo book entry documenting the circumstances.

   *Note: The use of a non-Department-issued recording device is prohibited.*

   *Note: Sharing or exchanging BWCs with other officers is prohibited. Replacement BWCs shall be assigned to officers by a supervisor via the Digital Evidence Management System ("DEMS).*

### 422.2.2  DESK SUPERVISOR/OIC RESPONSIBILITIES

(a)   Account for all BWCs assigned to the command as spare units.  Make Tour Report entry noting the condition and status of those units.

(b)  Conduct an investigation when notified of an officer's lost/missing Bwc and notify the Risk Management Bureau of the facts and circumstances via email at

# Suffolk County Police Department
### NY Supplemental Manual

*Body-Worn Cameras*

---

BWC.RiskManagement@suffolkcountyny.gov. See procedure for further guidance: DEPARTMENT-OWNED AND PERSONAL PROPERTY

(c) Conduct an investigation when notified of an officer's missing, damaged, and/or malfunctioning BWC. Secure the affected officer's BWC and assign the officer a replacement BWC via the DEMS.

(d) Make a BWC Log entry, and notify Police Technology Bureau via email, BWC.Support@suffolkcountyny.gov, of the following:

1. Affected officer's name, rank, shield, and PID.

2. The missing, damaged, and/or malfunctioning BWC's serial number.

3. The replacement BWC's serial number.

### 422.2.3   POLICE TECHNOLOGY BUREAU RESPONSIBILITIES

(a) Secure the damaged and/or malfunctioning BWC.

(b) Assign the replacement BWC to the affected officer via the DEMS, if needed.

(c) Make a BWC log entry of the following:

1. Affected officer's name, rank, shield, and PID.

2. The missing, damaged, and/or malfunctioning BWC's serial number.

3. The replacement BWC's serial number.

(d) Facilitate an exchange or repair of the damaged and/or malfunctioning BWC with the BWC vendor, as appropriate.

### 422.2.4   FIELD SUPERVISOR RESPONSIBILITIES

(a) Inspect assigned officers and ensure their BWCs are properly worn and functioning.

(b) Notify Desk Supervisor/OIC if an officer's BWC is missing, damaged, and/or malfunctioning. Ensure the affected officer completes required memo book entries.

## 422.3   DURING TOUR

### 422.3.1   OFFICER RESPONSIBILITIES DURING TOUR

(a) Activate BWC prior to engaging in, or assisting another officer with, law enforcement related activity in accordance with Department policy and training.

(b) Activate BWC prior to arrival at an incident location. In the event of an unanticipated or exigent circumstance, officers shall activate their BWCs as soon as it is feasible and safe to do so after taking necessary action to preserve officer and public health and safety.

*Note: At no time shall officers disregard officer safety, the safety of the public, or compromise proper tactics solely to begin a recording.*

*Note: Officers should consider adding markers to identify key moments or important events during an incident, as necessary (i.e., interviews, notifications, suspect's*

---

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police Department

Case 2:15-cv-02431-WFK-LB   Document 432-1   Filed 03/06/23   Page 60 of 88 PageID #:
12079

*spontaneous utterance, capturing sensitive material or personnel such as undercover officers or confidential informants, finding evidence). Officers should add markers in the DEMS while reviewing BWC recordings prior to sharing with a supervisor or the District Attorney's Office.*

(c)  BWC recordings will automatically upload to the DEMS via Wi-Fi. Officers shall upload BWC recordings to the DEMS at least once per tour and after every arrest. Officers shall upload BWC recordings related to an incident, investigation, or arrest prior to the end of their tour and confirm successful upload with a supervisor.

(d)  Access the DEMS at least once per tour via a Department computer or mobile device (i.e., vehicle MDC, desktop, or Department-issued mobile device) and properly identify and categorize all BWC recordings by:

1.  Entering the Central Complaint number in the "ID" field of each BWC recording.

2.  Selecting the category that best reflects the nature of each BWC recording. Select multiple categories, if applicable, bearing in mind that categorization affects the retention period.

(e)  Indicate the existence of a BWC recording in all required reports (i.e., Field Report, Incident Report, Online Arrest Report, Domestic Incident Report).

(f)  Officers should dock and/or charge their BWCs whenever possible and as needed throughout their tour of duty to ensure sufficient battery life and to receive periodic firmware updates from the BWC vendor (i.e., during arrest processing).

## 422.3.2  SUPERVISOR RESPONSIBILITIES DURING TOUR

(a)  Log into the DEMS at least once per tour and identify BWC recordings that have not been properly categorized by assigned personnel.

1.  Direct assigned personnel to upload BWC recordings related to an incident, investigation, or arrest prior to the end of their tour of duty and confirm successful upload in the DEMS.

2.  Direct assigned personnel to properly categorize their BWC recordings, as appropriate.

(b)  Periodically review BWC recordings to assess compliance with policy, procedure, and training, identify best practices, provide positive feedback, and address any performance or tactical deficiencies observed through remedial action as necessary.

## 422.4  ARREST PROCESSED BY A PATROL OFFICER (SUMMARY ARREST)

## 422.4.1  ARRESTING OFFICER RESPONSIBILITIES, ARREST PROCESSED BY A PATROL OFFICER

(a)  Follow existing arrest processing procedures (Procedure 900) and:

1.  Access the DEMS and identify all of the arresting officer's BWC recordings related to the incident, investigation, or arrest.

Suffolk County Police Department
NY Supplemental Manual

*Body-Worn Cameras*

2. Notify Desk Supervisor/ OIC of any other possible BWC recordings related to the incident, investigation, or arrest from other responding officers.

3. Enter the Central Complaint number in the "ID" field of each BWC recording related to the incident, investigation, or arrest.

4. Select the category that best reflects the nature of each BWC recording related to the incident, investigation, or arrest. Select multiple categories, if applicable, bearing in mind that categorization affects the retention period (i.e., call for service, arrest).

5. Identify and share, to the extent permitted by system access controls, all BWC recordings related to the incident, investigation, or arrest with the Desk Supervisor/OIC.

422.4.2  DESK SUPERVISOR/OIC RESPONSIBILITIES, ARREST PROCESSED BY A PATROL OFFICER

(a) Follow existing arrest processing procedures (Procedure 900)

(b) Ensure all BWC recordings related to the incident, investigation, or arrest are identified, properly categorized, and have the appropriate Central Complaint number in the "ID" field.

(c) Share all BWC recordings related to the incident, investigation, or arrest with the District Attorney's Office via the DEMS as per Department training.

**422.5  ARRESTS PROCESSED BY INVESTIGATIVE COMMANDS**
Officers and supervisors assigned to investigative commands shall:

(a) Identify, review, and compile all BWC recordings related to the incident, investigation, or arrest, to the extent not already identified, reviewed, and compiled during the ordinary course of the investigation, and ensure they are properly categorized and have the appropriate Central Complaint number in the "ID" field.

(b) Document the identification and review of BWC recordings in the appropriate Departmental forms, consistent with other video recordings related to an incident, investigation, or arrest.

(c) Share all BWC recordings related to the incident, investigation, or arrest with the District Attorney's Office via the DEMS as per Department training.

**422.6  FAILURE TO ACTIVATE BWC WHEN REQUIRED**

422.6.1  OFFICER RESPONSIBILITIES, FAILURE TO ACTIVATE BWC WHEN REQUIRED
An officer who fails to activate his/her BWC as required whether intentionally or unintentionally, shall:

(a) Notify his/her immediate supervisor as soon as practical.

(b) Make a memo book entry documenting the incident and the supervisory notification.

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police Department

Suffolk County Police Department
NY Supplemental Manual

*Body-Worn Cameras*

---

(c)    Submit an Internal Correspondence (PDCS-2042) to their immediate supervisor explaining the circumstances surrounding the failure to activate.

422.6.2  SUPERVISOR RESPONSIBILITIES, FAILURE TO ACTIVATE BWC WHEN REQUIRED
A supervisor shall conduct an investigation when notified that an officer failed to record all or part of an incident as required by Department policy, and shall:

(a)    Ensure that any resulting failure to activate is properly documented in the officer's memo book.

(b)    Make a determination regarding the propriety of the circumstances surrounding the failure to activate and document the results by preparing and forwarding an Internal Correspondence (PDCS-2042) detailing the investigation, findings, and actions taken to the following recipients through the chain of command:

   1.    Commanding Officer

   2.    Division Chief

   3.    Assistant Deputy Commissioner, Risk Management Bureau

**422.7   MAKING A PROHIBITED RECORDING**

(a)    If a prohibited recording is made, the recording officer shall:

   1.    Notify his/her immediate supervisor as soon as practical.

   2.    Make a memo book entry documenting the incident and the supervisory notification.

   3.    Categorize the recording as "Accidental/Prohibited".

(b)    When notified of a prohibited recording, a supervisor shall:

   1.    Ensure the recording officer documents the incident in their memo book.

   2.    Ensure the recording officer categorizes the recording properly.

   3.    Notify the Officer in Charge (OIC), or his/her designee.

(c)    The OIC, or his/her designee, shall:

   1.    Conduct an investigation.

   2.    Review the recording officer's BWC recording to ensure it is properly categorized.

   3.    Prepare and forward an Internal Correspondence (PDCS-2042) detailing the investigation, findings, and actions taken to the following recipients through the chain of command:

      (a)    Commanding Officer

      (b)    Division Chief

      (c)    Assistant Deputy Commissioner, Risk Management Bureau

---

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police
Department

Suffolk County Police Department
NY Supplemental Manual

*Body-Worn Cameras*

___

(d) The Risk Management Bureau shall conduct audits of prohibited/accidental recordings periodically to assess the need for additional training and/or other remedial/disciplinary action.

(e) If a prohibited recording is also operationally sensitive, related to an incident, investigation, or arrest, and may pose a risk to victim, witness, or officer safety if disclosed to a defendant and/or the public at large, the OIC or his/her designee shall contact a BWC Administrator to expedite conferral with the District Attorney's Office or other appropriate prosecutorial agency.

(f) If an officer makes an unintentional recording that would otherwise be prohibited, such as an off-duty recording of a highly personal nature or inadvertent activation in a lavatory, locker room, or lactation room, the officer may categorize the video as "Accidental/Personal" and request the video be flagged for deletion by emailing BWC.RiskManagement@suffolkcountyny.gov.

(g) No video will be permanently deleted from the DEMS without review and approval by the Risk Management Bureau.

## 422.8  CRITICAL INCIDENTS

Critical incidents include situations involving (1) death/serious injury of an officer; (2) officer involved firearms discharges; (3) officer use of force incidents involving death/serious injury.

- OFFICER RESPONSIBILITIES

(a) Ensure scene is safe and render aid to any victim(s)/officer(s), as appropriate.

(b) Remove the injured officer's BWC, check its status, and deactivate it.

(c) Secure the injured officer's BWC and initiate a priority upload.

(d) Upon a supervisor's arrival, advise the supervisor of actions taken and be guided by the supervisor.

- SUPERVISOR RESPONSIBILITIES

(a) Respond to scene and assume command.

(b) Direct officer(s) involved in the incident to deactivate BWCs after interaction with the subject(s) and law enforcement related activity have concluded, or the event has stabilized.

(c) Collect and secure BWCs from officer(s) involved in the incident and ensure BWCs are deactivated.

(d) Document the officers' names and the serial numbers of their respective BWCs.

(e) Initiate a priority upload of involved officers' BWCs and/or ensure upload of BWC recordings, if needed.

(f) Ensure immediately upon upload that all videos related to the critical incident are appropriately categorized (i.e., "Command Restricted").

## 422.9  END OF TOUR

Suffolk County Police Department

NY Supplemental Manual

*Body-Worn Cameras*

___

422.9.1  OFFICER RESPONSIBILITIES, END OF TOUR

(a)    Appropriately categorize all recordings in accordance with Department training.

(b)    Inspect the condition of the BWC and document its status in memo book.

(c)    Power off BWC.

(d)    Charge and/or dock BWC.

**422.10   SUPERVISORY AND ADMINISTRATIVE FUNCTIONS**

422.10.1  SUPERVISORS/BWC ADMINISTRATORS/RISK MANAGEMENT BUREAU

(a)    Ensure BWC recordings will be accessed only by authorized users on approved equipment for official purposes only.

(b)    Conduct random audits to ensure procedures are followed in the uploading, categorization, review, release, and retention of BWC recordings.

    1.    Contact the recording officer if a BWC recording has not been properly categorized and direct the officer to properly categorize BWC recording.

(c)    Conduct periodic reviews of retained BWC recordings to:

    1.    Ensure system integrity, security and functionality.

    2.    Manage and comply with applicable retention periods.

    3.    Identify BWC recordings which may be useful as a training tool.

    4.    Provide positive feedback.

    5.    Address any performance or tactical deficiencies observed.

(d)    All audits and/or periodic reviews shall be documented as follows:

    1.    Name of the supervisor conducting the audit or review.

    2.    Name of the officer being audited or reviewed.

    3.    Date and time of the audit or review.

    4.    Serial number of the BWC.

    5.    Reason for the audit or review.

(e)    All BWC recording audits/reviews shall be random unless initiated pursuant to an administrative investigation.

___

Copyright Lexipol, LLC 2022/09/01, All Rights Reserved.
Published with permission by Suffolk County Police
Department

# APPENDIX I

DRAFT FOR PRELIMINARY APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING PRELIMINARY APPROVAL

## **[FORM OF] NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF NEW YORK

**If you are a Latino/a and use the roads of Suffolk County as a motorist or pedestrian, you may be part of a Class Action Settlement:**

***Plaintiffs #1-21, et al v. County of Suffolk, et al,***
**United States District Court for the Eastern District of New York**
**Case Number 15-cv-02431-WFK-LB**

**MORE INFORMATION: [Milbank link]**

IMPORTANT

PLEASE READ THIS NOTICE CAREFULLY
THIS NOTICE RELATES TO THE PENDENCY OF A CLASS ACTION LAWSUIT AND, IF
YOU ARE A CLASS MEMBER, CONTAINS IMPORTANT INFORMATION ABOUT
YOUR RIGHTS TO OBJECT TO THE CLASS ACTION SETTLEMENT

*A federal court has authorized this notice. This is not an advertisement. You are not being sued or restrained.*

This notice is to inform you of a proposed settlement of a class action lawsuit (the "Class Action Settlement") in the United States District Court for the Eastern District of New York, against the County of Suffolk (the "County"); Suffolk County Police Department ("SCPD"); Edward Webber; Milagros Soto (collectively, the "County Defendants").

**YOUR LEGAL RIGHTS\* AND OPTIONS IN THIS CLASS ACTION SETTLEMENT\*\***

| | |
|---|---|
| **DO NOTHING** | By doing nothing, you remain in the Class and benefit from the terms of the Class Action Settlement Agreement (the "Class Action Settlement Agreement"). |
| | There are no rights to "opt out" or exclude yourself from the Class Action Settlement Agreement. The proposed Class Action Settlement Agreement will bind Class Members. |
| **COMMENT OR OBJECT BY [30 days before Hearing date]** | Write to the Court about why you do, or do not, like the proposed Class Action Settlement. |
| **ATTEND A HEARING ON [insert date and time]** | Ask to speak to the Court about the fairness of the Class Action Settlement Agreement if you filed a request to do so by [**Objection Date**]. |

DRAFT FOR PRELIMINARY APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING PRELIMINARY APPROVAL

| | *(The date and time of the Final Approval Hearing is subject to change by Court Order and without further notice to the Class.  This hearing may proceed by video conference if so indicated on ECF.)* |
|---|---|

***\* These rights, options, and the deadlines to exercise them are explained in this notice.***

***\*\* The Court overseeing this case still has to decide whether to approve the Class Action Settlement.***

| **1.** | **What is this notice and why should I read it?** |
|---|---|

This notice is to inform you of a proposed Class Action Settlement of a class action lawsuit entitled *Plaintiffs #1-21, et al v. County of Suffolk, et al.*, Case No. 15-cv-02431-WFK-LB, brought on behalf of the Class, and pending in the United States District Court for the Eastern District of New York.  The Court has granted preliminary approval of the Class Action Settlement and has set a Final Approval Hearing to take place on [insert date, time] at 225 Cadman Plaza East, Brooklyn, NY 11201, to determine if the Class Action Settlement is fair, reasonable, and adequate.  **Note**: This date and time are subject to change by Court Order and may change without further notice to the Class.

This notice describes the proposed Class Action Settlement.  Your rights and options – **and the deadlines to exercise them** – are explained in this notice.  If you are a Class Member your legal rights are affected regardless of whether you act.

| **2.** | **What is a class action lawsuit and what is this lawsuit about?** |
|---|---|

In a class action, one or more people, called Class Representatives, sue for themselves and for people who have similar claims.  The people who brought the case – and all the Class Members like them – are called Plaintiffs.  The people or entities they have sued are called Defendants, or the "County Defendants" here.  The case name is *Plaintiffs #1-21, et al v. County of Suffolk, et al.*, and the case number is 15-cv-02431-WFK-LB.  The court in charge of this case is the United States District Court for the Eastern District of New York, the Honorable William F. Kuntz, II presiding.

This class action lawsuit involves claims by the Plaintiffs as representatives of the Class of all similarly situated Latinos in Suffolk County who are, or will be at risk of being subject to discriminatory and unconstitutional policing policies, patterns, and practices by County Defendants in violation of the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the common law of the state of New York.  Before the Court made a final determination in this lawsuit regarding whether the County Defendants' conduct is lawful or unlawful, Plaintiffs and the County Defendants reached this Class Action Settlement.  This Class Action Settlement does not seek any money from the County Defendants on behalf of the Class, except to reimburse Plaintiffs' attorneys for their fees and costs spent in bringing this lawsuit.

DRAFT FOR PRELIMINARY APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING PRELIMINARY APPROVAL

| **3.** | **How do I know if I am part of the Class?** |
|---|---|

The Court has certified the following class (the "Class"): All Latino or Latina persons who, at any time after January 2012, have been or in the future will be subject to a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk.  If you are one of these persons, you are participating in the lawsuit.

The Court has approved the distribution of this notice so that members of the Class can voice their support or opposition to final approval of the Class Action Settlement, and to explain how those in the Class may obtain the non-monetary relief offered by the Class Action Settlement.  If the Class Action Settlement does not receive final approval by the Court, or the Parties terminate it, the Class Action Settlement will be void, and the lawsuit will continue as if there had been no Class Action Settlement.

| **4.** | **Why is there a settlement?** |
|---|---|

The Court has not decided in favor of either side in this case.  The County Defendants deny all allegations of wrongdoing.  The County Defendants are settling in order to avoid the risks and substantial expense of further protracted litigation, including trial and appeal.  Plaintiffs and their attorneys maintain that their claims are meritorious, but believe that the Class Action Settlement is in the best interests of the Class because it provides an appropriate recovery now while avoiding the risks, expense and delay of pursuing the case through trial and any appeals.

| **5.** | **What does the settlement provide?** |
|---|---|

This notice summarizes the proposed Class Action Settlement.  For the complete terms and conditions of the Class Action Settlement, please see the Class Action Settlement Agreement available at [Milbank link], by contacting Class Counsel (*see* Question No. 7 for contact information), by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.nyed.uscourts.gov, or by visiting the office of the Clerk of Court for the United States District Court for the Eastern District of New York, between 8:30 am and 5:00 pm, Monday through Friday, excluding Court holidays.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS CLASS ACTION SETTLEMENT PROCESS.

Pursuant to the Class Action Settlement Agreement, the Plaintiffs and County Defendants have agreed to substantive terms modifying and supplementing SCPD policies, procedures and practices.  The County Defendants have agreed to the following in the Class Action Settlement Agreement:

**Precinct Level Advisory Boards:** Through this Class Action Settlement Agreement, SCPD will establish a Precinct Level Advisory Board ("PLAB") for each SCPD precinct. The PLABs will focus on addressing community concerns, fostering new relationships between the SCPD and community leaders, expanding the community engagement reach within each precinct, and providing a clear line of communication between the SCPD and

3

DRAFT FOR PRELIMINARY APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING PRELIMINARY APPROVAL

the community.  Annually, at a regularly scheduled quarterly meeting the Commanding Officer will be available to present up-to-date data on the precinct's traffic and pedestrian stop activity.  These meetings will be in addition to the public community meetings that already occur.

**Implicit Bias Training:** SCPD will work with a qualified third-party provider to establish an Implicit Bias 2.0 Training, which will be an updated version of the SCPD's current implicit bias training program.  The training will incorporate an analysis of the SCPD's traffic stop data which will be completed by an independent third party.  It is the intention of the County Defendants that all sworn officers will complete the Implicit Bias 2.0 Training.

**Traffic Stop Data and Analysis**: County Defendants will maintain their Public Traffic and Pedestrian Stop Data Dashboard with quarterly publication of its raw data.  The raw data sets will include, amongst other data, information related to: (i) where a stop occurred, (ii) the police action taken, and (iii) anonymized license plate data.

SCPD will continue to engage an independent third party to review the SCPD's traffic and pedestrian stop data and publish a report on an annual basis.  Additionally, the SCPD's precinct commanding officers, or their designees, will review traffic stop data quarterly to identify and address atypical patterns of traffic stops and/or enforcement activity.

The SCPD will issue an annual public report that includes information related to Internal Affairs Bureau ("IAB") complaints, including: (i) the number of complaints by type of allegation; (ii) case disposition per investigation; (iii) bias policing allegations; (iv) bias policing dispositions; (v) bias policing allegations by race or ethnicity; (vi) bias policing allegations by race or ethnicity per year; (vii) bias policing allegations by precinct/race or ethnicity; and (viii) the time it takes to complete investigations.

**Traffic and Pedestrian Stop Training:** The SCPD will ensure that its officers receive the appropriate training related to the SCPD policies regarding: (i) searches based solely on consent, (ii) permissible questions during traffic stops, (iii) search and seizure law and the four levels of suspicion; and (iv) adequate recording of necessary stop data, such as the primary reason for a stop.  Moreover, officers will be instructed to provide only a warning when encountering a minor vehicle equipment violation, unless there are additional facts or circumstances justifying a ticket for the equipment violation offense.  Furthermore, where no additional action is taken during a stop, officers will be instructed to provide a business card in both English and Spanish that includes their information, and both the IAB and the Human Rights Commission "HRC" contact information.  The contact information for both the IAB and HRC will also be prominently displayed on the SCPD website.

**Language Access:** The SCPD will implement additional procedures to improve language accessibility and ensure alignment with the goals and spirit of SCPD Policy 333.  Specifically, the SCPD will include links on its website to tools that translate webpages into Spanish.  The Spanish version of the website will include links to Spanish versions

DRAFT FOR PRELIMINARY APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING PRELIMINARY APPROVAL

of documents and forms. Moreover, the SCPD will provide language assistance services in accordance with the procedures contained in SCPD Policy 333 and will make residents aware that such services are available to them free of charge. The SCPD will post Language Access statistics on its website on a quarterly basis.

County Defendants will also hire certified Spanish Speaking Police Operations Aides to provide language assistance at the front desk of the Third Precinct, other than for the overnight shift. Furthermore, County Defendants agree to use best efforts to recruit and hire certified Spanish Speaking Police Operations Aides for open positions, other than the overnight shift, for the front desks of the First, Second, and Fifth Precincts.

**Civilian Oversight Review Process:** A civilian oversight review process will be managed by the HRC as follows: (i) providing an additional mechanism for in-person and online means by which the public may file complaints of officer misconduct; (ii) reviewing in tandem IAB investigations of police misconduct complaints being investigated by the IAB and over which the HRC has jurisdiction pursuant to its powers and duties under Suffolk County Code Section 119-3; (iii) accessing the Department's shared data portal to monitor the status of open complaints; and (iv) offering recommendations on additional steps to be taken by the IAB as part of a particular police misconduct investigation. The HRC will issue an annual report summarizing its review activities, observations, and recommendations.

**Body-Worn Camera Policy:** SCPD will comply with its Body-Worn Camera Policy 422 and Body-Worn Camera Procedure 422 and will deploy the use of body-worn cameras as standard police worn equipment for all authorized officers who regularly engage with the public in the course of their professional duties.

**U-Visa Matters:** The Commanding Officer of the SCPD's Hate Crimes Bureau (or his/her designee) will be designated as the contact person for all U-Visa matters, using appropriate language access resources, conducting outreach to crime victims, providing information regarding U-Visas, and responding to inquiries.

| **6.** | **What are my rights as a member of the Class?** |
|---|---|

If you **are** satisfied with the proposed Class Action Settlement, you do not have to do anything.

Even if you **are not** satisfied with the proposed Class Action Settlement, you do not have the right to opt out of the Class Action Settlement.

If you **are not** satisfied with the proposed Class Action Settlement, you **may object** to the Class Action Settlement or Class Counsels' request for fees by submitting your objection in writing to the Court. Specifically, you can ask the Court to deny approval by filing an objection. You cannot ask the Court to order a different settlement; the Court can only approve or reject the proposed Class Action Settlement. If the Court denies approval, this lawsuit will continue. If that is what you want to happen, you must object.

DRAFT FOR PRELIMINARY APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING PRELIMINARY APPROVAL

Any **objection** to the proposed Class Action Settlement must be in writing.  All written objections and supporting papers must (a) clearly identify the case name and number (*Plaintiffs #1-21, et al v. County of Suffolk, et al.*, Case No. 15-cv-02431-WFK-LB), (b) include the Class Member's Name, (c) include the Class Member's current address and telephone number, or current address and telephone number of the Class Member's legal representative, and (d) include an explanation of why the Class Member objects to the Class Action Settlement, including any supporting documentation and the reasons, if any, for requesting the opportunity to appear and be heard at the Final Approval Hearing.  All written objections and supporting papers must then be submitted to the Court either by mailing them to the Court Clerk, United States District Court for the Eastern District of New York, or by filing them in person at any location of the United States District Court for the Eastern District of New York.  All written objections must be filed or postmarked on or before [insert date].  **Note**: Failure to comply with all requirements of this section shall constitute grounds for striking an objection or denying a request to be heard, if applicable.

If you file a timely written objection that complies with the above-mentioned requirements, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney.  The Final Approval Hearing is scheduled for [insert date, time] at 225 Cadman Plaza East, Brooklyn, NY 11201 to determine if the Class Action Settlement is fair, reasonable, and adequate.  **Note**: this date and time are subject to change by Court Order and may change without further notice to the Class.  If you appear through your own attorney at the Final Approval Hearing, you are responsible for hiring and paying that attorney.

If, after the hearing, the Court rejects the Class Action Settlement Agreement, the Parties will continue to litigate this dispute in front of the Court.  If that happens, there is no guarantee that: (1) the Court will rule in favor of the Class Members; (2) a favorable Court decision, if any, would be as favorable to the Class Members as this Class Action Settlement; or (3) any favorable Court decision would be upheld if the Government filed an appeal.

| **7.** | **Who represents the Class?** |
|---|---|

**Class Representatives**: For purposes of the Class Action Settlement, the Court has appointed Plaintiffs #1-20 to serve as the class representatives.

**Class Counsel:** The Court has decided that the law firm of Milbank LLP and LatinoJustice PRLDEF are qualified to represent you and all Class Members in this case.  These lawyers are called Class Counsel.  They are experienced in handling similar cases.  If you have any questions about this case, you may call 212-219-3360 to speak with one of the lawyers handling the case or email info@latinojustice.org.  More information about Class Counsel, their practice, and their lawyers' experience is available at www.milbank.com and www.latinojustice.org.

From the beginning of the case in April 2015 to the present, Class Counsel has not received any payment for their services in prosecuting the case or obtaining the Class Action Settlement, nor have they been reimbursed for any out-of-pocket expenses they have incurred.  The Class Action Settlement includes an amount for attorneys' fees and expenses, the appropriateness of which the Court will consider in determining whether to approve the Class

DRAFT FOR PRELIMINARY APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING PRELIMINARY APPROVAL

Action Settlement.  You may hire your own lawyer to represent you in this case if you wish, but it will be at your own expense.

| 8. | What is the effect of final settlement approval? |
|---|---|

If the Court grants final approval of the Class Action Settlement, Plaintiffs agree that they will dismiss with prejudice their claims in the Action against the County Defendants.

The Court will retain exclusive jurisdiction over the Class Action Settlement Agreement for the purpose of enforcing any of its provisions and terms, and the Court's retention of jurisdiction shall be noted in the dismissal of this action.  The Court shall retain exclusive jurisdiction to enforce the Class Action Agreement until it issues a decision to terminate the Class Action Settlement Agreement.

| 9. | When and where will the Court hold a hearing on the fairness of the Class Action Settlement? |
|---|---|

The Final Approval Hearing is scheduled for [insert date, time] at 225 Cadman Plaza East, Brooklyn, NY 11201 to determine if the Class Action Settlement is fair, reasonable, and adequate, and to consider the request by Class Counsel for attorneys' fees.  **Note**: this date and time are subject to change by Court Order and may change without further notice to the Class.

At the hearing, the Court will hear any comments, objections, and arguments concerning the fairness of the proposed Class Action Settlement.  If you have filed an objection to the Class Action Settlement, the Court has the right to require your attendance at the Final Approval Hearing.  You will be contacted by the Court or by Class Counsel if the Court requires your appearance.  If you intend to appear at the Final Approval Hearing through your own attorney, your attorney will need to file a notice of intent to appear with the Court.  If you appear through your own attorney at the Final Approval Hearing, you are responsible for hiring and paying that attorney.

| 10. | Where do I get additional information? |
|---|---|

This notice provides only a summary of the matters relating to the proposed Class Action Settlement.  For the precise terms and conditions of the Class Action Settlement, please see the Class Action Settlement Agreement available at [insert link], by contacting Class Counsel (see Question No. 7 for contact information), by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.nyed.uscourts.gov, or by visiting the office of the Clerk of Court for the United States District Court for the Eastern District of New York, between 8:30 am and 5:00 pm, Monday through Friday, excluding Court holidays.

If you would like additional information, you can contact Class Counsel (see Question No. 7 above).

**PLEASE DO <u>NOT</u> CONTACT THE COURT OR THE JUDGE WITH QUESTIONS ABOUT THE CLASS ACTION SETTLEMENT**

# APPENDIX II

DRAFT FOR PRELIMINARY APPROVAL AND FINAL APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING FINAL APPROVAL

**[FORM OF] NOTICE OF FINAL CLASS ACTION SETTLEMENT FOR
LATINO/LATINA PERSONS WHO USE THE ROADS OF SUFFOLK COUNTY
AS A MOTORIST OR PEDESTRIAN**

*Plaintiffs #1-21, et al. v. County of Suffolk, et al.*, U.S. District Court for the Eastern District of New York, Case No. 15-cv-02431-WFK-LB

**TO**: All Latino or Latina persons who, at any time after January 2012, have been or in the future will be subject to a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk (the "Class").

**You are a Class Member if:**

1.     You identify as a Latina or Latino person; **and**

2.     You have been at any time after January 2012 or in the future will be subject to a vehicular or pedestrian stop or detention; **and**

3.     The vehicular or pedestrian stop or detention is by an agent of the Suffolk County Police Department (the "SCPD") in the County of Suffolk.

You do not need to live in Suffolk County to benefit under the Class Action Settlement Agreement.

**You are hereby notified that on [insert date] the Honorable William F. Kuntz of the U.S. District Court for the Eastern District of New York approved a settlement of the claims brought on your behalf in this lawsuit.**

**Background**:  This class action lawsuit involves claims by Plaintiffs #1-20 as representatives of the Class of all similarly situated Latinos in Suffolk County who are, or will be, at risk of being subject to discriminatory and unconstitutional policing policies, patterns, and practices by the County of Suffolk (the "County"); Suffolk County Police Department ("SCPD"); Edward Webber; Milagros Soto (collectively, the "County Defendants") in violation of the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the common law of the state of New York. Before the Court made a final determination in this lawsuit regarding whether the County Defendants' conduct is lawful or unlawful, Plaintiffs and the County Defendants reached a Class Action Settlement Agreement.  The Class Action Settlement Agreement provides for injunctive relief on behalf of the Class, which is memorialized in the Class Action Settlement Agreement described below.  Class Members are represented by Milbank LLP and LatinoJustice PRLDEF (collectively, "Class Counsel").

**Description of the Class Action Settlement Agreement**:  Pursuant to the Class Action Settlement Agreement, the Plaintiffs and County Defendants have agreed to substantive terms modifying and supplementing SCPD policies, procedures and practices.  The County Defendants have agreed to the following in the Class Action Settlement Agreement:

1.     **Precinct Level Advisory Boards:** Through this agreement, SCPD will establish a Precinct Level Advisory Board ("PLAB") for each SCPD precinct. The PLABs will focus on

DRAFT FOR PRELIMINARY APPROVAL AND FINAL APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING FINAL APPROVAL

addressing community concerns, fostering new relationships between the SCPD and community leaders, expanding the community engagement reach within each precinct, and providing a clear line of communication between SCPD and the community. Annually, the Commanding Officer will present up-to-date data on the precinct's traffic and pedestrian stop activity. These meetings will be in addition to the public community meetings that already occur.

2. **Implicit Bias Training:** SCPD will work with a qualified third-party provider to establish an Implicit Bias 2.0 Training, which will be an updated version of SCPD's current implicit bias training program. The training will incorporate an analysis of SCPD's traffic stop data which will be completed by an independent third party. All sworn officers will be required to complete the Implicit Bias 2.0 Training.

3. **Traffic Stop Data and Analysis**: County Defendants will create a Public Traffic and Pedestrian Stop Data Dashboard with quarterly publication of its raw data. The raw data sets will include, amongst other data, information related to: (i) where a stop occurred, (ii) the police action taken, and (iii) anonymized license plate data.

   SCPD will engage an independent third party to review SCPD's traffic and pedestrian stop data and publish a report on an annual basis. Additionally, SCPD's precinct commanding officers, or their designees, will review traffic stop data quarterly to identify and address atypical patterns of traffic stops and/or enforcement activity.

   SCPD will issue an annual public report that includes detailed information related to Internal Affairs Bureau ("IAB") complaints, including: (i) the number of complaints by type of allegation; (ii) case disposition per investigation; (iii) bias policing allegations; (iv) bias policing dispositions; (v) bias policing allegations by race or ethnicity; (vi) bias policing allegations by race or ethnicity per year; (vii) bias policing allegations by precinct/race or ethnicity; and (viii) the time it takes to complete investigations.

4. **Traffic and Pedestrian Stop Training:** SCPD will ensure that its officers receive the appropriate training related to the SCPD policies regarding: (i) searches based solely on consent, (ii) permissible questions during traffic stops, (iii) search and seizure law and the four levels of suspicion; and (iv) adequate recording of necessary stop data, such as the primary reason for a stop. Moreover, officers will be instructed to provide only a warning when encountering a minor vehicle equipment violation, unless there are additional facts or circumstances justifying a ticket for the equipment violation offense. Furthermore, where no action is taken during a stop, officers will be instructed to provide a business card in both English and Spanish that includes their information and the IAB and the Human Rights Commission ("HRC") contact information. The contact information for both the IAB and HRC will also be prominently displayed on the SCPD website.

5. **Language Access:** SCPD will implement additional procedures to improve language accessibility and ensure alignment with the goals and spirit of SCPD Policy 333. Specifically, SCPD will include links on its website to tools that translate webpages into Spanish. The Spanish version of the website will include links to Spanish versions of documents and forms. Moreover, SCPD will provide language assistance services in

DRAFT FOR PRELIMINARY APPROVAL AND FINAL APPROVAL PURPOSES ONLY
TO BE COMPLETED FOLLOWING FINAL APPROVAL

accordance with the procedures contained in SCPD Policy 333 and will make residents aware that such services are available to them free of charge.  SCPD will post Language Access statistics on its website on a quarterly basis.

County Defendants will also hire a certified Spanish Speaking Police Operations Aide (referred to in the Reform Plan as "Community Policing Aids") to provide language assistance at the front desk of the Third Precinct, other than for the overnight shift. Furthermore, County Defendants agree to use best efforts to recruit and hire certified Spanish Speaking Police Operations Aides for open positions, other than the overnight shift, for the front desks of the First, Second, and Fifth Precincts.

6. **Civilian Oversight Review Process:** County Defendants will ensure the implementation by the HRC of a civilian oversight review process, which is responsible for the following: (i) providing an additional mechanism for in-person and online means by which the public may file complaints of officer misconduct; (ii) reviewing in tandem IAB investigations of police misconduct complaints being investigated by the IAB and over which the HRC has jurisdiction pursuant to its powers and duties under Suffolk County Code Section 119-3; (iii) accessing the Department's shared data portal to monitor the status of open complaints; and (iv) offering recommendations on additional steps to be taken by the IAB as part of a particular police misconduct investigation.  The HRC will issue an annual report summarizing its review activities, observations and recommendations.

7. **Body-Worn Camera Policy:** SCPD will comply with its Body-Worn Camera Policy 422 and Body-Worn Camera Procedure 422, and will deploy the use of body-worn cameras as standard police worn equipment for all authorized officers who regularly engage with the public in the course of their professional duties.

8. **U-Visa Matters:** The Commanding Officer of SCPD's Hate Crimes Bureau (or his/her designee) will be designated as the contact person for all U-Visa matters, using appropriate language access resources, conducting outreach to crime victims, providing information regarding U-Visas, and responding to inquiries.

**For Further Information**:  The above description is only a summary of the Class Action Settlement Agreement.  You should read the entire Class Action Settlement Agreement to understand it fully.  Copies of the Class Action Settlement Agreement may be obtained: (1) from Class Counsels' website [insert link]; (2) by contacting Class Counsel at info@latinojustice.org or 212-219-3360; (3) by accessing the Court docket in this case, for a fee, at https://ecf.nyed.uscourts.gov; or (4) by visiting the Clerk of Court for the U.S. District Court for the Eastern District of New York, business days from 8:30 a.m. to 5:00 p.m.

# APPENDIX III

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

Plaintiffs #1-21, individually and on behalf
of all others similarly situated,

                                   Plaintiffs,

v.

THE COUNTY OF SUFFOLK; SUFFOLK
COUNTY POLICE DEPARTMENT; EDWARD
WEBBER, individually and in his official capacity;
MILAGROS SOTO, individually and in her official
capacity; SCOTT GREENE, individually and in his
official capacity; BRIDGETT DORMER,
individually and in her official capacity;
SUPERVISORY JOHN DOE DEFENDANTS,
individually and in their official capacities; and
JOHN DOE DEFENDANTS, individually and in
their official capacities,

                                   Defendants.

Case No.: 2:15-cv-02431-WFK-LB

---

**[PROPOSED] ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT**

The Court determines, preliminarily, that the Parties' March 6, 2023 Class Action

Settlement Agreement (the "Class Action Settlement Agreement") and its terms fall within the

range of reasonableness and merits final approval.

The Court also determines that the Class Notice and notice procedure as described in the

Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Approval of

Notice to the Class of Class Action Settlement ("Joint Motion for Preliminary Approval"): (i)

meets the requirements of Rule 23(e)(1) and due process; (ii) that individual notice to class

members is not feasible under these circumstances; (iii)  that the proposed method, schedule and

form of notice is  reasonably calculated, under the circumstances, to apprise the Class Members

of their right to object to the proposed Class Action Settlement; and (iv) the proposed method,

schedule and form of notice is reasonable and constitutes due, adequate, and sufficient notice to all those entitled to receive notice.

Having determined the above, the Court hereby GRANTS the Parties' Joint Motion for Preliminary Approval, and orders the following:

1. The proposed Notice of Proposed Class Action Settlement and Fairness Hearing and notice procedure, as set forth in the Joint Motion for Preliminary Approval, are approved, subject to finalization consistent with this Order;

2. There are no rights of Class Members in this Rule 23(b)(2) class to "opt-out" of the Class Action Settlement Agreement and the proposed agreement would bind Class Members;

3. The Parties shall cause the Class Notice to be disseminated in the manner set forth in the Joint Motion for Preliminary Approval on or before the Notice Date;

4. Any Class Member who wishes to object to the fairness, reasonableness, or adequacy of the Class Action Settlement must submit his or her objection ("Objection") to the Court in writing, via regular mail on or before the Objection Date, with copies to counsel for the Parties.  Such Objection shall include a statement of his or her objection, as well as the specific reason, if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence the Class Member wishes to introduce in support of his or her objection.  The Objection shall also state whether the Class Member and/or his or her counsel wishes to make an appearance at the Final Approval Hearing, or be barred from separately objecting;

5. The Notice Date is the date by which the Parties must give notice to the Class in accordance with the procedures set forth in the Joint Motion for Preliminary Approval

and is hereby set for five days following approval by the Suffolk County Legislature of the Class Action Settlement Agreement.

6. The Objection Date is the date by which Class members must submit any objections to the Class Action Settlement Agreement to the Court in accordance with the procedure set forth in the Joint Motion for Preliminary Approval and the Notice of Proposed Class Action Settlement and Fairness Hearing.

   a. The Objection Date is hereby set for the first business day that is not a Court holiday that is at least 30 days following the Notice Date.

7. The Response Date is the date by which the Parties must file with the Court any written response to objections received to the Class Action Settlement Agreement and a certification describing the date(s) and time(s) that notice was provided to the Class and the manner in which it was provided.

   a. The Response Date is hereby set for the first business day that is not a Court holiday that is at least 14 days after the Objection Date.

8. The Final Approval Hearing to consider the fairness, reasonableness, and adequacy of the Class Action Settlement Agreement under Rule 23(e)(2) will be held on the first available date that is convenient for the Court following the Response Date at U.S. District Court, 225 Cadman Plaza East, Brooklyn, New York 11201.

   a. The Parties will contact the Court on the date that the Suffolk County Legislature approves the Class Action Settlement Agreement or as soon as practicable thereafter (and prior to the Notice Date) to (a) obtain a date and time certain for the Final Approval Hearing to include in the Notice of Preliminary Approval; and

(b) to inform the Court of the specific month, day, and year of the Notice Date, Objection Date, and Response Date, as guided by this Order.

**IT IS SO ORDERED**

DATED: _____, 2023

_____
HON. WILLIAM F. KUNTZ III

# APPENDIX IV

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| Plaintiffs #1-21, individually and on behalf of all others similarly situated,<br><br>                     Plaintiffs,<br><br>v.<br><br>THE COUNTY OF SUFFOLK; SUFFOLK COUNTY POLICE DEPARTMENT; EDWARD WEBBER, individually and in his official capacity; MILAGROS SOTO, individually and in her official capacity; SCOTT GREENE, individually and in his official capacity; BRIDGETT DORMER, individually and in her official capacity; SUPERVISORY JOHN DOE DEFENDANTS, individually and in their official capacities; and JOHN DOE DEFENDANTS, individually and in their official capacities,<br><br>                     Defendants. | Case No.: 2:15-cv-02431-WFK-LB |

**[PROPOSED] FINAL ORDER APPROVING CLASS ACTION SETTLEMENT AND JUDGMENT DISMISSING CLASS CLAIMS AGAINST COUNTY DEFENDANTS WITH PREJUDICE**

Plaintiffs #1-20 ("Plaintiffs"), individually and on behalf of the Class, as defined below, and the County of Suffolk, the Suffolk County Police Department, Edward Webber, and Milagros Soto (collectively, "County Defendants"), determined to settle the above-captioned matter (the "Action") on the terms and conditions set forth in the Class Action Settlement Agreement dated March 6, 2023, and all appendices thereto (the "Class Action Settlement Agreement"), the original of which is filed with the Clerk of the Court (this settlement process is hereinafter referred to as the "Class Action Settlement").

Currently pending is an application for final approval of the Class Action Settlement Agreement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

The Court makes the following findings:

1. On [DATE OF PRELIMINARY ORDER], the Court entered an Order Granting Motion for Preliminary Approval of Class Action Settlement Agreement (the "Preliminary Approval Order") and, after being notified of the approval by the Suffolk County Legislature, directed that notice be given to the members of the Class of the proposed Class Action Settlement and Fairness Hearing.

2. In the Preliminary Approval Order, the Court approved the form of Class Notice directed to members of the Class.

3. On the dates and in the manner described in the certifications filed by the Parties on the [RESPONSE DATE], ECF Nos. [INSERT] the Parties provided Notice to the Class.

4. In accordance with the Notice, the Fairness Hearing was held on [DATE OF FAIRNESS HEARING].

The Court, having entered the Preliminary Approval Order, having heard the arguments in support of the Class Action Settlement, having reviewed all of the evidence, objections, and other submissions presented with respect to the Class Action Settlement and related matters, and the record of all proceedings in this case, and having considered all appropriate matters under Federal Rule of Civil Procedure 23(e) and case law interpreting it and other legal requirements, and having made the necessary findings,

It is hereby ORDERED, ADJUDGED, AND DECREED that:

1. This Court retains exclusive subject matter jurisdiction over this Action in accordance with Section I.B.1. of the Class Action Settlement Agreement. If the Parties are unable to resolve a dispute, the allegedly aggrieved Party may file a motion with the Court.

2.      The terms of the Class Action Settlement Agreement are incorporated into this Judgment, including the releases contained therein.

3.      The Class includes all individuals who meet the definition of the Class certified by the Court on April 5, 2021:

> All Latino or Latina persons who, at any time after January 2012, have been or in the future will be subject to a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk.

4.      As set forth in the Class Action Settlement Agreement, the settlement provides for injunctive and declaratory relief benefitting the Class, which was certified under Federal Rule of Civil Procedure 23(b)(2).  The Class Action Settlement Agreement does not provide for damages.  The Class Action Settlement Agreement releases Class claims against the County Defendants.  The Class Action Settlement Agreement does not release any claims against Defendant Scott Greene, the sole remaining defendant in this case following this Order.

5.      Notice to the members of the Class has been given in an appropriate, adequate, and sufficient manner and the Class Notice was reasonably calculated to apprise interested parties or the pendency of the Action, the nature of the claims, the definition of the Class, their opportunities to present objections to the Class Action Settlement. The Notice complied in all respects with the requirement of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the rules of this Court, and other applicable law.

6.      Members of the Class were given the opportunity to object to the Class Action Settlement. ____ Class Members filed an objection to [ANY DESCRIPTION OF THE OBJECTIONS].

3

7.     The Court finally approves the Class Action Settlement in all respects as fair, reasonable, adequate, and in the best interests of the Class pursuant to Rule 23(e). The Class Action Settlement was not a product of fraud or collusion, and the Court finds it satisfies Rule 23(e)(2) after considering the factors stated therein and those of the case law interpreting them and related constitutional requirements, including, *inter alia*:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

8.     The terms of the Class Action Settlement Agreement, including all exhibits to the Class Action Settlement Agreement and to this Judgment Order, shall be forever binding on the Class.

9.     Defendant Greene is not a party to the Class Action Settlement Agreement and the Class Action Settlement does not release any claims against Defendant Greene.

10.     None of the Class Action Settlement and Final Order approving it, this Judgment, any papers related to the Class Action Settlement, nor the fact of Class Action Settlement shall be used as a finding or conclusion of the Court, or an admission by County Defendants, of any fault, wrongdoing, or liability whatsoever.

11.     The Parties shall provide "Final Notice" to the Class on the terms set forth in the order granting Preliminary Approval of Class Action Settlement Agreement and substantially in the form attached to the Class Action Settlement Agreement.

12.     County Defendants shall have no liability or responsibility for any payments, fees, or costs under this Final Order and Judgment or the Class Action Settlement Agreement aside from the award of attorneys' fees to be paid to Class Counsel pursuant to the Class Action Settlement Agreement.

13.     Nothing in this Judgment shall preclude any action to enforce the terms of the Class Action Settlement Agreement as laid out in Section I.B.3. of the Class Action Settlement Agreement.

14.     Without affecting the finality of this Judgment in any way, this Court will retain exclusive continuing jurisdiction over all Parties and Class Members with regard to implementation of the Class Action Settlement Agreement and enforcement and administration of the Class Action Settlement Agreement, including the release and fees provisions thereof, in accordance with the terms in Sections IV.F. and IV.H. of the Class Action Settlement Agreement. The Court may order any appropriate legal or equitable remedy necessary to enforce the terms of this Judgment and/or the Class Action Settlement.

15.     The Action is dismissed with prejudice as against the County Defendants as to all claims other than those dismissed in the Court's separate Order of [DATE] granting the request of the Named Plaintiffs under Federal Rule of Civil Procedure 41(a) to dismiss all claims for damages against the County Defendants held by the Individual Defendants in their personal capacity only.  Together with that separate Order dismissing the Named Plaintiffs' individual claims for damages, all claims in the Action against the County Defendants have been dismissed with prejudice and there is no just cause to delay the entry of this Judgment as a final Judgment in the Action as against the County Defendants.

The Clerk is directed to enter this final judgment with respect to the County Defendants in the Action.

Because Scott Greene remains a defendant in the action, the Clerk is directed keep the file open.

**IT IS SO ORDERED**

DATED: _____, 2023

_____
HON. WILLIAM F. KUNTZ III